UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
UNITED STATES OF AMERICA

         -against-                          No. 13 Cr. 297 (KMK)

MALCOLM A. SMITH,
DANIEL J. HALLORAN,
VINCENT TABONE,
JOSEPH SAVINO,
NORAMIE JASMIN, and
JOSEPH DESMARET,

                  *Defendants.*
----------------------------------------------------------------X

## DEFENDANT MALCOLM A. SMITH'S MEMORANDUM OF LAW

## IN SUPPORT OF HIS PRETRIAL MOTIONS

Gerald L. Shargel
Ross M. Kramer
Winston & Strawn LLP
200 Park Avenue
New York, NY 10166

*Attorneys for Malcolm A. Smith*

## TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................... i

TABLE OF AUTHORITIES ....................................................................... ii

INTRODUCTION..................................................................................... 1

ARGUMENT ............................................................................................ 2

    I.   The Portion of Count One Charging an Honest Services Wire Fraud
       Conspiracy, and Count Two, Charging Substantive Honest Services Wire
       Fraud, Should be Dismissed for Failure to State an Indictable Offense .............. 2

    II.  The Portion of Count One Charging a Travel Act Conspiracy, and Count
       Three, Charging a Substantive Travel Act Violation, Should be Dismissed
       for Failure to Properly Allege an Underlying Violation of New York
       State Law ....................................................................................... 19

    III. The Portion of Count One Charging a Travel Act Conspiracy, and Count
       Three, Charging a Substantive Travel Act Violation, Should be Dismissed
       for Lack of Federal Jurisdiction .......................................................... 28

    IV. Count Four Should be Dismissed Because the Hobbs Act Extortion Charge
       Fails to Allege Inducement .................................................................. 33

    V.  Portions of Paragraphs 26 and 27 Should be Stricken as Prejudicial
       Surplusage ...................................................................................... 37

CONCLUSION ........................................................................................ 40

## TABLE OF AUTHORITIES

Bankoski v. Green, --- N.Y.S.2d ---, 2013 WL 4106392 (App. Div. 4th Dep't
  Aug. 15, 2013) ......................................................................................... 24, 25

Bifulco v. United States, 447 U.S. 381 (1980) ............................................... 27

Cleveland v. United States, 531 U.S. 12 (2000). ...................................... 19, 27

Conroy v. State Comm. of Independence Party of New York, 10 N.Y.3d 896 (2008) ............... 24

Evans v. United States, 504 U.S. 255 (1992).................................... 33, 35, 36

Haight v. Knapp, 931 N.Y.S.2d 135 (App. Div. 2d Dep't 2011) ................................. 24

Master v. Pohanka, 10 N.Y.3d 620 (2008) ...................................................... 24

McBoyle v. United States, 283 U.S. 25 (1931) ................................................ 27

McGrath v. Abelove, 928 N.Y.S.2d 405 (App. Div. 3d Dep't 2011)........................ 24

McNally v. United States, 483 U.S. 350 (1987) ..................................... 8, 9, 17

Mrazek v. Suffolk County Bd. of Elections, 630 F.2d 890 (2d Cir. 1980)................... 23

Potanovic v. French, 885 N.Y.S.2d 90 (App. Div. 2d Dep't 2009)....................... 25, 26

Rewis v. United States, 401 U.S. 808 (1971) ................................... 31, 32, 33

Skilling v. United States, 130 S.Ct. 2896 (2010)............................ 15, 18, 27, 37

Terranova v. Fudoli, 888 N.Y.S.2d 685 (App. Div. 4th Dep't 2009)........................ 24

Tulin v. Wade, 13 Misc. 3d 1207(A), 2006 WL 2640251 (N.Y. Sup. Ct. Saratoga Cty.
  Aug. 22, 2006) ....................................................................................... 24

United States v. Adler, 274 F. Supp. 2d 583 (S.D.N.Y. 2003)............................. passim

United States v. Archer, 486 F.2d 670 (2d Cir. 1973)...................................... passim

United States v. Bass, 404 U.S. 336 (1971)..................................................... 27

United States v. Blackmon, 839 F.2d 900 (2d Cir. 1988)..................................... 33

United States v. Brumley, 116 F.3d 728 (5th Cir. 1997)...................................... 15

United States v. Coates, 949 F.2d 104 (4th Cir. 1991) ................................................ 31

United States v. Corallo, 413 F.2d 1306 (2d Cir. 1969) .......................................... 31, 32

United States v. Carrillo, 229 F.3d 177 (2d Cir. 2000) ............................................... 20

United States v. Ganim, No. 01 Cv. 263, 2002 WL 31780856 (D. Conn. Dec. 12, 2002) ........... 17

United States v. Gotti, 42 F. Supp. 2d 252 (S.D.N.Y. 1999) ......................................... 40

United States v. Gradwell, 243 U.S. 476 (1917) ...................................................... 27

United States v. Kahn, 472 F.2d 272 (2d Cir. 1973) .................................................. 20

United States v. O'Grady, 742 F.2d 682 (2d Cir. 1984) ............................................ 34, 35

United States v. Malachowski, 604 F. Supp. 2d 512 (N.D.N.Y. 2009) .................................. 39

United States v. Margiotta, 688 F.2d 108 (2d Cir. 1982) ....................................... passim

United States v. Miller, 26 F. Supp. 2d 415 (N.D.N.Y. 1998) ......................................... 40

United States v. Murphy, 323 F.3d 102 (3d Cir. 2003) ......................................... passim

United States v. Nouri, 711 F.3d 129 (2d Cir. 2013) ................................................. 15

United States v. Rybicki, 354 F.3d 124 (2d Cir. 2003) .............................................. 9, 18

United States v. Salameh, 152 F.3d 88 (2d Cir. 1998) ................................................ 20

United States v. Santos, 553 U.S. 507 (2008) ........................................................ 27

United States v. Scarpa, 913 F.2d 993 (2d Cir. 1990). ............................................... 37

United States v. Szur, 289 F.3d 200 (2d Cir. 2002) .................................................. 20

United States v. Wallace, 85 F.3d 1063 (2d Cir. 1996) ............................................... 30

United States v. Warner, 292 F. Supp. 2d 1051 (N.D. Ill. 2003) ............................... passim

United States v. Woodward, 149 F.3d 46 (1st Cir. 1998) .............................................. 15

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

UNITED STATES OF AMERICA

       -against-                        No. 13 Cr. 297 (KMK)

MALCOLM A. SMITH,
DANIEL J. HALLORAN,
VINCENT TABONE,
JOSEPH SAVINO,
NORAMIE JASMIN, and
JOSEPH DESMARET,

                   *Defendants.*
-------------------------------------------------------------------X

## INTRODUCTION

      The charges in this case stretch federal authority too far. The honest services fraud counts are based on a theory that courts throughout the county have roundly rejected. The Travel Act counts are based on a plain misreading of the underlying New York State statutes. And, there is no federal jurisdiction for those Travel Act counts because any interstate nexus is far too weak. The government tortured state law bribery allegations into a federal prosecution in an effort to set federal standards for good state government. In doing so, it simply reached too far. The charges in this Indictment are built on footing so shaky that they cannot be supported, as a matter of law, under careful Rule 12 scrutiny. That scrutiny is provided below.

# ARGUMENT

## POINT I

### The Portion of Count One Charging an Honest Services Wire Fraud Conspiracy, and Count Two, Charging Substantive Honest Services Wire Fraud, Should be Dismissed for Failure to State an Indictable Offense

The portion of Count One charging an honest services wire fraud conspiracy, and Count Two, charging substantive honest services wire fraud, should be dismissed because they allege a legally invalid theory of honest services fraud. Those counts allege that Malcolm Smith, Daniel Halloran, Vincent Tabone and Joseph Savino committed honest services fraud through a scheme to bribe officers of the New York City Republican Party. But a scheme to bribe an officer of a political party – as opposed to a public official – *does not* constitute honest services fraud. In fact, since the honest services fraud statute (18 U.S.C § 1346) was enacted twenty-five years ago, every court to squarely address the issue – including Judge Brieant of this Court – has held that a scheme to bribe an officer of a political party cannot support a charge of honest services fraud. The reason for this limitation on the scope of Section 1346 can be simply stated: the public has no cognizable right to the honest services of private citizens who do not hold public office or employment. We respectfully submit that those well-reasoned decisions limiting the scope of Section 1346 should be applied here, and that the challenged counts should be dismissed under Federal Rule of Criminal Procedure 12(b)(3)(B). See Fed.R.Crim.P. 12(b)(3)(B) (providing that "at any time while the case is pending, the court may hear a claim that the indictment ... fails to invoke the court's jurisdiction or to state an offense.").

A.    <u>The Honest Services Fraud Allegations</u>

Malcolm Smith, Daniel Halloran, Vincent Tabone and Joseph Savino are charged in

Counts One and Two with honest services fraud.  (Indictment at ¶¶ 57-63.)  Count One charges

an honest services wire fraud conspiracy (<u>id.</u> at ¶ 57-61), and Count Two charges substantive

honest services wire fraud.  (<u>Id.</u> at ¶¶ 62-63.)  The basic allegation underlying Counts One and

Two is that Smith and Halloran engaged in a scheme to bribe Republican Party officers – Tabone

and Savino – in an effort to secure authorization (a "Wilson Paukula certificate") for Smith to

run for New York City Mayor in 2013 as a Republican.  (<u>Id.</u> at ¶ 5a.)  As a result, the alleged

scheme "deprive[d] New York City Republican Party county committees and members of the

Republican Party of the honest services of leaders of such county committees."  (<u>Id.</u> at ¶¶ 59,

63.)

The specific factual allegations underlying Counts One and Two are contained in

Paragraphs 26-56 of the Indictment (titled "The Conspiracy to Bribe New York City Political

Party Officials").  On or about April 26, 2012, Malcolm Smith allegedly told a cooperating

witness (the "CW") "that he was considering running for New York City Mayor in 2013 on the

Republican Party ballot."  (<u>Id.</u> at ¶ 26.)  On or about August 8, 2012, Smith allegedly told the

CW "that he was meeting with the five New York City Republican Party county committee

leaders the following week to discuss obtaining a Wilson-Pakula certificate from each."  (<u>Id.</u> at ¶

27.)  If Smith were able to obtain three of the five Wilson-Pakula certificates, he would be

authorized by the Republican Party to run for New York City Mayor as a Republican candidate.

(<u>Id.</u> at ¶ 1.)

According to the Indictment, at various times from November 2012 through February

2013, Smith, Halloran, the CW and an undercover FBI agent (the "UC") discussed attempting to

3

"influence" Republican Party officers through the payment of cash bribes and other financial arrangements, in order to secure the Wilson-Pakula certificates for Smith. (Id. at ¶¶ 29-56.)[1] Two of the Republican Party officers that Smith and Halloran allegedly attempted to "influence" were Vincent Tabone, the Vice Chairman of the Queens County Republican Party, and Joseph Savino, the Chairman of the Bronx County Republican Party. (Id. at ¶ 3.)

There is no allegation that the public was deprived of the honest services of either Smith or Halloran, who were both public officials (Smith as a New York State Senator, id. at ¶ 1, and Halloran as a New York City Councilmember, id. at ¶ 2). The Indictment only alleges that the public was deprived of the honest services of Tabone and Savino. (Id. at ¶¶ 57-63.)

### B.    The Law Does Not Support the Honest Services Fraud Allegations

The government's honest services fraud theory is that Smith, Halloran, Tabone and Savino engaged in a scheme to defraud the public of the honest services of officers of the Republican Party. This is not a novel theory of honest services fraud. Indeed, for a time it was the law in the Second Circuit that this was a valid theory of honest services fraud. In 1982, a divided panel held in United States v. Margiotta, 688 F.2d 108 (2d Cir. 1982) that an officer of a political party could be prosecuted for honest services fraud "notwithstanding that [the defendant] held no official public office." Id. at 122. Margiotta, however, was overruled by the Supreme Court and is no longer binding precedent, as detailed below. Its holding has been roundly criticized.

---

[1]    The Indictment alleges various meetings between Smith, the CW and the UC during this period. Separately, it alleges various meetings between Halloran, the CW and the UC. The Indictment only alleges a single meeting involving both Smith and Halloran. (Id. at ¶ 45.)

After Congress enacted the honest services fraud statute (Section 1346) in 1988, every court to have addressed the issue has held that bribery of a political party officer *does not* constitute honest services fraud.  In United States v. Murphy, 323 F.3d 102 (3d Cir. 2003), the Third Circuit held that there was no "logical rationale for treating private party officials in the same manner as public officials since such a loose interpretation of the mail fraud statute creates 'a catch-all political crime which has no use but misuse.'"  Id. at 117-118 (quoting Judge Winter's dissent in Margiotta, 688 F.2d at 144).  In United States v. Adler, 274 F. Supp. 2d 583 (S.D.N.Y. 2003), Judge Brieant of this Court held "that Margiotta was wrongly decided and is no longer good law in this Circuit or anyplace," and that an officer of a political party owes no duty to the public which could support a prosecution under § 1346.  Id. at 587.

In United States v. Warner, 292 F. Supp. 2d 1051 (N.D. Ill. 2003), a well-reasoned decision with a similar holding, the Northern District of Illinois concluded that it could not "adopt a construction of the mail fraud statute so expansive as to require a jury to decide whether a private individual acted enough like a government official to make him criminally liable under § 1346."  Id. at 1061.

Those courts were unanimous in finding that Margiotta was wrongly decided, and that Section 1346 does not support an honest services fraud charge against a private individual involved in politics.  The public simply has no cognizable right to the honest services of such individuals.  The relevant case law is provided in additional detail below.  We respectfully submit that those decisions – and the reasoning behind them – should apply here, and that the honest services fraud charges in this case should be dismissed.

### C.    The Relevant Case Law

#### 1. The Majority Opinion in United States v. Margiotta

Joseph Margiotta was the Chairman of the Republican Committees of Nassau County and the Town of Hempstead.  688 F.2d at 112.  He held no elective office.  Id. at 113.  He was charged with, among other things, mail fraud "in connection with the distribution of insurance commissions on municipal properties to [his] political allies."  Id. at 112.  The mail fraud charge "was based on a scheme to defraud the Town of Hempstead, Nassau County, New York State, and their citizens … of the right to Margiotta's honest and faithful participation in the governmental affairs of the Town, County and State."  Id. at 114.  Margiotta was convicted following two jury trials.  Id. at 112.

On appeal, Margiotta argued that his mail fraud conviction should be reversed "on the ground that the federal mail fraud statute … does not embrace a theory of fiduciary fraud by individuals who participate in the political process but who do not occupy public office."  Id. at 112, 120.  He argued that he "owed no fiduciary duty to the general citizenry of Nassau County and the Town of Hempstead under federal or state law."  Id. at 112, 120.

At the outset, the Court recognized the potential problem in holding that a private actor could be prosecuted for honest services fraud in the same manner as a public official:

> [I]t is essential to avoid the Scylla of a rule which permits a finding of fiduciary duty on the basis of mere influence or minimum participation in the processes of government.  Such a rule would threaten to criminalize a wide range of conduct, from lobbying to political party activities, as to which the public has no right to disinterested service.  Id. at 122.

Despite these concerns, the Court adopted a test which would allow a jury to determine on the particular facts of the case whether a fiduciary duty existed such that an honest services fraud prosecution could lie.  Id.  The Court determined that such a test would "recognize the

6

important distinction between party business and government affairs, permitting a party official to act in accordance with partisan preferences or even whim, up to the point at which he dominates government." Id. Under that test, the Court held that "the prosecution of Margiotta under the mail fraud statute was permissible, notwithstanding the fact that the appellant held no official public office." Id.

## 2. Judge Winter's Dissent in United States v. Margiotta

Judge Winter authored a sharp dissent as to Margiotta's mail fraud conviction. Id. at 139. He began by expressing concern that "[t]he majority's use of mail fraud as a catch-all prohibition of political disingenuousness … creates a real danger of prosecutorial abuse for partisan political purposes." Id. As a result of the majority decision, he wrote, "there is no end to the common political practices which may now be swept within the ambit of mail fraud." Id. at 140.

Judge Winter specifically addressed the troubling reach of the majority opinion as it pertained to non-elected political officials:

> A partisan political leader who throws decisive support behind a candidate known to the leader to be less qualified than his or her opponent because that candidate is more cooperative with the party organization, is guilty of mail fraud unless that motive is disclosed to the public. A partisan political leader who causes elected officials to fail to modernize government to retain jobs for the party faithful is guilty of mail fraud unless that fact is disclosed. Id.

According to Judge Winter, the majority's logic "would easily extend to the content of campaign literature. Indeed, it takes no great foresight to envision an indictment framed on the theory adopted by the majority and alleging fraud based on public speeches." Id. at 140-41.

Judge Winter took particular exception to the idea that the issue of whether a fiduciary relationship existed between a private individual and the public was left to a jury. Id. at 142. Under the test adopted by the Court, he wrote, "a jury may find that a politically active person has sufficient influence and power over the acts of elective officials to be subjected to the same

7

duty as those officials so far as those acts are concerned." Id. at 142. As a result, "no distinction is made between the fiduciary obligations of a civil servant, political appointee, elected official, candidate or partisan political leader. Juries are simply left free to apply a legal standard which amounts to little more than the rhetoric of sixth grade civics classes." Id.

At bottom, Judge Winter feared the potential for abuse inherent in the Court's decision: "The limitless expansion of the mail fraud statute subjects virtually every active participant in the political process to potential criminal investigation and prosecution." Id. at 143. "The problem," Judge Winter concluded, "is that in stretching the mail fraud statute to fit this case, we create a crime which applies equally to persons who have not done the evil things Margiotta is said to have done, a catch-all political crime which has no use but misuse." Id. Such a decision "lodges unbridled power in federal prosecutors to prosecute political activists. When the first corrupt prosecutor prosecutes a political enemy for mail fraud, the rhetoric of the majority about good government will ring hollow indeed." Id. at 144.

3. **McNally v. United States and Section 1346**

Five years after Margiotta, the Supreme Court ruled in McNally v. United States, 483 U.S. 350, 360 (1987) that the federal mail fraud statute was "limited in its scope to the protection of property rights." The Court took this approach in order to avoid construing the statute "in a manner that leaves its outer boundaries ambiguous and involves the Federal Government in setting standards of disclosure and good government for state and local officials." Id. McNally thereby overruled Margiotta, along with all other pre-existing honest services fraud decisions, at least until Congress could "speak more clearly than it has" on the scope of the relevant statutes. See id.

8

The following year (1988), Congress enacted 18 U.S.C. § 1346. Section 1346 defined the term "scheme or artifice to defraud" in relation to the mail fraud and wire fraud statutes to explicitly include "a scheme or artifice to deprive another of the intangible right of honest services." 18 U.S.C. § 1346. Congress thereby "reinstated the 'intangible rights' doctrine." United States v. Rybicki, 354 F.3d 124, 134 (2d Cir. 2003).

The Second Circuit did not, however, reinstate all of its pre-McNally decisions as precedent following the enactment of Section 1346. To the contrary, the Second Circuit ruled that case law decided before the enactment of Section 1346 is not, "after the intervening occurrences of McNally and section 1346, 'precedent' in the sense that it sets forth rules of law that we are bound to follow." Rybicki, 354 F.3d at 145. The Court held that while pre-McNally case law is "pertinent," "we are not bound by it in the *stare decisis* sense." Id.

As a result, the majority holding in Margiotta, though it may be "pertinent," is not binding under the facts of this case. See id.

### 4. United States v. Murphy

Following the enactment of Section 1346, it would be fifteen years before a court addressed the central Margiotta issue of whether an officer of a political party could be prosecuted for honest services fraud. See Murphy, 323 F.3d at 111 n.3 ("No other court has expressly followed Margiotta, thus it remains the Government's sole direct authority."). In United States v. Murphy, the Third Circuit explicitly rejected the majority decision in Margiotta, concluding, "in accord with Judge Winter, that Margiotta extends the mail fraud statute beyond any reasonable bounds." Id. at 104. Accordingly, the court held that there was no "logical rationale for treating private party officials in the same manner as public officials" under Section 1346. Id. at 117-18.

The defendant in <u>Murphy</u> was the Chairman of the Republican Party in Passaic County, New Jersey. 323 F.3d at 103-104. He was charged in a "contracts-for-payments scheme that [he] allegedly organized by using his considerable influence over Passaic County officials to procure [various] contracts[.]" <u>Id.</u> at 104. He would then "siphon off a certain amount of funds received from the County contracts[.]" <u>Id.</u> Murphy was charged with, among other things, honest services mail fraud for "depriving the County of its right to Murphy's own honest services in the affairs of the County." <u>Id.</u> The government's honest services fraud charge was based on the majority holding in <u>Margiotta</u>; "[t]he Government's <u>Margiotta</u> theory was that Murphy had attained such a dominant role in the political system of Passaic County that he could be considered the equivalent of a publicly elected official, and that Murphy had a fiduciary duty to the County and its citizens to provide honest services which he breached[.]" <u>Id.</u> He was convicted after trial. <u>Id.</u> at 108.

On appeal, Murphy argued, based on Judge Winter's dissent in <u>Margiotta</u>, that honest services fraud should not apply to private party officials. <u>Id.</u> at 113-14. He argued that "while government officials are bound by their office to act in the public interest, a party official is an entirely different creature," and that party officials are in fact "expected to pursue their self-interest." <u>Id.</u> at 114.

The Third Circuit agreed. It reversed Murphy's conviction, holding that "<u>Margiotta</u> is in direct contravention of the principles of honest services fraud" and set forth a "legally invalid theory" of prosecution under Section 1346. <u>Id.</u> at 118. Specifically, the court "agree[d] with Judge Winter that <u>Margiotta</u> fails to provide any logical rationale for treating private party officials in the same manner as public officials since such a loose interpretation of the mail fraud statute creates 'a catch-all political crime which has no use but misuse.'" <u>Id.</u> at 117-18 (citing

Margiotta, 688 F.2d at 144 and John C. Coffee, Jr., Modern Mail Fraud: The Restoration of the Public/Private Distinction, 35 Am.Crim. L.Rev. 427, (Spring 1998) ("The overreach in [Margiotta's] theory is obvious and invades even the sphere of the First Amendment.")).

The court wrote that "the idea of allowing a jury to determine whether a party official acted enough like a government official is itself enough to give us pause." Murphy, 323 F.3d at 114. It held that "[w]ithout any legal basis for determining whether Passaic County or its citizens had a right to Murphy's honest services, … it was improper for the District Court to allow the jury to conjure such a duty out of a fog of assumptions." Id. at 117.

Finally, the court cited the fear of potentially "overly broad application" of honest services fraud, as expressed in Judge Winter's dissent: "under the Margiotta theory, 'a partisan political leader who throws decisive support behind a candidate known to the leader to be less qualified than his or her opponent because that candidate is more cooperative with the party organization, is guilty of mail fraud unless that motive is disclosed to the public.'" Id. at 117 (quoting Margiotta, 688 F.2d at 140 (Winter, J., dissenting)). The court held that "[w]hile Murphy's actions certainly were not the same as in this hypothetical, … there is nothing in Margiotta that would prevent an over-zealous prosecutor from pursuing this scenario." Murphy, 323 F.3d at 117.

### 5. **United States v. Adler**

The same year that Murphy was decided by the Third Circuit, Judge Brieant of this Court issued a similar ruling. In United States v. Adler, he held that Margiotta was wrongly decided, and that an officer of a political party is not "a person who owe[s] a duty to the public" sufficient to support a prosecution under Section 1346. 274 F. Supp. 2d at 587.

The defendant in Adler was the Chairman of the Democratic Party of Rockland County, New York. 274 F. Supp. 3d at 584. He was charged with mail fraud for taking part in a scheme to obtain concessions from the local Planning Board. Id. In exchange for those concessions, he offered a member of the Planning Board (John Caine) a government job "with the intent of influencing Caine to use his position on the Planning Board to further the Project and to thereby 'deprive the citizens of the Town of the intangible right to Caine's honest services[.]'" Id. at 584-85. Adler pleaded guilty. Id. at 585.

"[W]hile in prison," Adler read the Third Circuit's decision in Murphy and brought a habeas petition, arguing that the mail fraud charge in his case should be vacated because, as a matter of law, he "did not owe a duty of honest services to the citizens of Rockland County." Id.

Judge Brieant began by analyzing Murphy, and noting that the Third Circuit "expressly declined to rely on the Second Circuit's decision in [Margiotta]." Id. at 585-86. He further noted that "The Margiotta decision … has been widely criticized by practically everybody including the writer." Id. at 587. He continued: "This Court agrees that Margiotta was wrongly decided and is no longer good law in this Circuit or anyplace, as found by the Third Circuit in Murphy. Mr. Adler was not a person who owed a duty to the public and neither was Margiotta." Id.

The Court, however, did not vacate Adler's conviction. Rather, the Court held that Adler "misapprehends the nature of the charge against him. It is not charged that he deprived the public of the intangible right to *his honest services* as a Party Chairman, but rather that he … [attempted] to deprive the citizens of the Town of Clarkstown of the intangible right to *Caine's honest services* as a public official, Member of the Planning Board." Id. at 587.

12

The theory of prosecution in Adler – that a public official owes a duty of honest services to the public under Section 1346 – is beyond question. Judge Brieant's ruling, however, made clear that this Court no longer views Margiotta as good law, and that an officer of a political party does not fall under the umbrella of Section 1346.

6. **United States v. Warner**

Later in 2003, Judge Pallmeyer of the Northern District of Illinois examined a similar situation and reached a similar conclusion. In United States v. Warner, the court held that it was "unwilling to adopt a construction of the mail fraud statute so expansive as to require a jury to decide whether a private individual acted enough like a government official to make him criminally liable under § 1346." 292 F. Supp. 2d 1051, 1061.

The defendant in Warner was "a close confidant of a high-ranking Illinois Secretary of State ('SOS') Office official." Id. at 1053. For years, he "participated in official SOS office matters," including attending meetings and directing and advising staff. Id. He was indicted on mail fraud charges in connection with numerous alleged schemes carried out through his relationship with the SOS. Id. at 1053-55.

The government charged that Warner "schemed to defraud the people of Illinois, the State of Illinois and the SOS Office of the intangible right to the honest services" of several individuals, including those of "Warner himself." Id. at 1057. In moving to dismiss, Warner argued "that he was not an agent of the SOS Office and did not owe the public a duty of honest services because he acted solely as a private citizen and businessman[.]" Id. He argued that none of his businesses was a public entity, and that he himself "was not a public officer, nor was he employed by the State of Illinois." Id. The government countered with a Margiotta theory, arguing that Warner "nevertheless owed a fiduciary duty to the people of Illinois and to the SOS

13

Office because of what the government call[ed] his 'direct and substantial participation in SOS Office affairs'[.]'" Id.

The court agreed with Warner, holding that although he was "an agent of the SOS office by virtue of his activities there," that relationship was insufficient to charge a private individual "with defrauding the public of his 'honest services.'" Id. at 1059. The court held that it was "unwilling to adopt a construction of the mail fraud statute so expansive as to require a jury to decide whether a private individual acted enough like a government official to make him criminally liable under § 1346." Id. at 1061 (citing Murphy, 323 F.3d at 104, 114).

The court particularly noted the "vagueness concerns" that would be "pronounced where, as here, the defendant is not a public officer or employee and does not own a public company or receive any public funds." Id .at 1062. The court held that "in this case it is not clear that Warner had fair warning that his conduct as a purported common law agent violated § 1346." Id. The court held that "with the exception of the Second Circuit's 1982 Margiotta decision, which has been roundly criticized and arguably is no longer good law, no case has found that a private individual who does not hold public office or employment and whose private company does not receive any public funds can have a fiduciary duty to provide honest services to the public. This court declines to reach such a conclusion here." Id. The court concluded that "Warner obviously believed that his alleged conduct was improper; indeed, he purportedly took careful measures to cover his trail. But that does not mean that Warner was on notice that he could be charged with depriving the citizens of Illinois and the SOS Office of his honest services." Id. The court recognized that this limitation on the scope of Section 1346 "permits a private citizen to act like a public official and manage government operations without any corresponding fiduciary duty to provide honest services. … Nevertheless, the court finds that there is insufficient basis for

14

treating public and private individuals the same way for purposes of 'honest services' mail fraud." Id. at 1346.

We have identified no case law on point subsequent to Warner.

**D.    The Honest Services Fraud Charges in this Case Should be Dismissed**

Under the decisions set forth above, we respectfully submit that the honest services fraud charges in this case should be dismissed. The touchstone of honest services fraud in the public sector is that a defendant deprived the public "of the intangible right to his honest services." See Adler, 294 F. Supp. 2d at 587. Here, the Section 1346 charges should fail because a politically-active private individual who does not hold public office – such as an officer of a political party (Tabone, Savino) – simply owes no duty of honest services to the public. See id. He is not a public official. He was not elected or appointed. He is not employed by the state. He does not work for the state in any formal capacity, and therefore does not owe the public the intangible right to his honest services. See United States v. Woodward, 149 F.3d 46, 57 (1st Cir. 1998) (noting that honest services fraud doctrine criminalizes "ways that *a public official* can steal his honest services from *his public employer*") (emphasis added); United States v. Brumley, 116 F.3d 728, 735 (5th Cir. 1997) (in honest services fraud context, "'rights' of citizens has little relevant meaning beyond a shorthand statement of a duty rooted in state law *and owed to the state employer*.") (emphasis added).[2]

The courts to have addressed this issue have all agreed that a politically-active or politically-involved private individual should not be treated as a "public official" for purposes of

---

[2]    Even the Supreme Court, searching for the core principles of honest services fraud in Skilling v. United States, referred specifically to "public officials" – not quasi-public officials, or those who "acted like" public officials. 130 S.Ct. 2896, 2932 (2010); United States v. Nouri, 711 F.3d 129, 138 (2d Cir. 2013) (Skilling "rejected the government's argument that § 1346 proscribed 'undisclosed self-dealing *by a public official* or private employee[.]'") (emphasis added).

Section 1346. Murphy, 323 F.3d at 117-18; Adler, 274 F. Supp. 2d at 587; Warner, 292 F. Supp. 2d at 1063. There is no "logical rationale for treating private party officials in the same manner as public officials" under Section 1346, because the duty of honest services owed to the public is absent. Murphy, 323 F.3d at 117-18; Adler, 274 F. Supp. 2d at 587. Under the facts of this case, Tabone and Savino – who were not public officials – did not (and could not) deprive the public of the intangible right to their honest services sufficient to support a Section 1346 charge.[3]

Nor should a jury be permitted to infer a duty of honest services between a politically-active private individual (Tabone, Savino) and the public. "[T]he idea of allowing a jury to determine whether a party official acted enough like a government official" to support a prosecution under Section 1346 is highly problematic. Murphy, 323 F.3d at 114. It would, in effect, allow jurors "to conjure" a duty of honest services "out of a fog of assumptions" about the roles of non-government actors. Id. at 117. With no clear distinction under the law "between the fiduciary obligations of a civil servant, political appointee, elected official, candidate or partisan political leader," a jury would be "left free to apply a legal standard which amounts to little more than the rhetoric of sixth grade civics classes." Margiotta, 688 F.2d at 142 (Winter, J. dissenting). Rather than permitting a jury to wind its way through a "fog of assumptions" about the proper role of a politically active person, a bright line rule separating public officials and private citizens under Section 1346 makes absolute sense.

Further, we submit that Section 1346 would be "void for vagueness" as applied under the facts of this case. "[T]he void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement."

---

[3] There is no allegation in this case that Smith or Halloran, who were public officials, deprived the public of the intangible right to their honest services.

Kolender v. Lawson, 461 U.S. 352, 357 (1983).  The doctrine "focuses both on actual notice to

citizens and arbitrary enforcement," with "the more important aspect of vagueness doctrine"

being "the requirement that a legislature establish minimal guidelines to govern law

enforcement." Id. at 357-58.  The fear is that "[w]here the legislature fails to provide such

minimal guidelines, a criminal statute may permit 'a standardless sweep [that] allows policemen,

prosecutors, and juries to pursue their personal predilections.'" Id. at 358.

     In this case, Section 1346 as applied would fail under both aspects of the void for

vagueness doctrine.  There is nothing in the plain language of Section 1346 that would put an

officer of a political party – someone who holds no public office – on notice that his conduct

could "subject him or her to a possible twenty-year federal prison term for [wire] fraud." See

United States v. Ganim, No. 01 Cv. 263, 2002 WL 31780856, at *1 (D. Conn. Dec. 12, 2002);

Warner, 292 F. Supp. 2d at 1062 ("vagueness concerns" would be "pronounced where, as here,

the defendant is not a public officer or employee and does not own a public company or receive

any public funds.").  There is also "no post-McNally Second Circuit case" applying Section 1346

to the acts of an officer of a political party – indeed, as set forth above, there is no post-McNally

federal case in *any* Circuit approving the prosecution of a politically-active private individual

under Section 1346. See Ganim, 2002 WL 31780856, at *2; Warner, 292 F. Supp. 2d at 1062

(lack of notice where "no case has found that a private individual who does not hold public

office or employment and whose private company does not receive any public funds can have a

fiduciary duty to provide honest services to the public.").

     Law enforcement would also be free to "pursue their personal predilections" in enforcing

the statute.  Under the government's theory, there is nothing to "prevent an over-zealous

prosecutor" from investigating and prosecuting state or local political organizations based on his

own political leanings. Murphy, 323 F.3d at 117.   As Judge Winter wrote in Margiotta, "[t]he limitless expansion of the mail fraud statute subjects virtually every active participant in the political process to potential criminal investigation and prosecution," and "lodges unbridled power in federal prosecutors to prosecute political activists." 688 F.2d at 143-44 ("When the first corrupt prosecutor prosecutes a political enemy for mail fraud, the rhetoric of the majority about good government will ring hollow indeed.").[4]

Third, allowing the charges in this case to stand would implicate serious federalism concerns. Section 1346, as currently applied, allows for the federal prosecution of state officials. Expanding Section 1346 to permit federal prosecution of individuals who are only active or involved in state politics – without holding any official state office – is a different issue entirely, and far more intrusive into the realm of state political affairs. In Rybicki, the Second Circuit held that in enacting Section 1346 Congress "spoke with sufficient clarity to obviate the danger that federal courts, rather than Congress, would determine how deeply into traditionally state concerns the federal government ventured." 354 F.3d at 137 n.10.   We respectfully submit that

---

[4]      This vagueness argument is different in kind from the one resolved in Skilling v. United States, 130 S.Ct. 2896, 2933 (2010). In Skilling, the Court held that Section 1346 was not unconstitutionally vague for lack of notice if it were "[i]nterpreted to encompass only bribery and kickback schemes," because "it has always been 'as plain as a pikestaff that' bribes and kickbacks constitute honest-services fraud[.]" Id.  With regard to "arbitrary prosecutions," the Court perceived "no significant risk that the honest-services statute … [would] be stretched out of shape." Id.

The vagueness inquiry in Skilling, therefore, looked at the issue of *what conduct* could be prohibited under Section 1346 without running afoul of the void-for-vagueness doctrine. Here, the problem is not defining the conduct, but rather *whose conduct* can be pulled within the ambit of the honest services fraud statute. Given the body of case law set forth above, it certainly is not "plain as a pikestaff" that a politically-active person can be prosecuted for honest services fraud as if he were a public official. And, permitting a jury to determine when a defendant crosses the amorphous line between private individual and *de facto* public official could unquestionably allow Section 1346 to be "stretched out of shape." The vagueness concern regarding Section 1346 as applied in this case, we submit, is therefore very much alive even after Skilling.

18

the theory of prosecution in this case (targeting officers of state political parties) ventures far too deeply into traditional state concerns.

Finally, any ambiguity in the reach of Section 1346 should be resolved in favor of lenity. See Skilling, 130 S.Ct. at 2933. Before choosing "the harsher alternative" – here, that a scheme to bribe a politically-active private individual, as opposed a public official, falls under Section 1346 – we respectfully submit that "it is appropriate … to require that Congress should have spoken in language that is clear and definite." See Cleveland v. United States, 531 U.S. 12, 25 (2000).

**POINT II**

**The Portion of Count One Charging a Travel Act Conspiracy, and Count Three, Charging a Substantive Travel Act Violation, Should be Dismissed for Failure to Properly Allege an Underlying Violation of New York State Law**

The portion of Count One charging a Travel Act conspiracy, and Count Three, charging a substantive Travel Act violation, should be dismissed because they fail to properly allege an underlying violation of New York State law.[5] Those counts allege that Malcolm Smith, Daniel Halloran, Vincent Tabone and Joseph Savino violated the Travel Act by, *inter alia*, causing an undercover FBI agent (the "UC") to violate two New York State statutes – Penal Law §§ 200.45 and 200.50. Penal Law §§ 200.45 and 200.50 were allegedly violated through a scheme to bribe officers of the New York City Republican Party (Tabone, Savino) to obtain Wilson-Pakula certificates for Smith. (Indictment at ¶ 5(a).) But Penal Law §§ 200.45 and 200.50 *do not* reach a bribe to obtain a Wilson-Pakula certificate. Those statutes criminalize bribery in exchange for

---

[5]    This issue was raised in Daniel Halloran's motion to dismiss. (See Daniel J. Halloran's Memorandum of Law in Support of His Motion to Dismiss, dated August 3, 2013, Docket No. 77. ("Halloran Mot.").)  We agree with the basic reasoning underlying Halloran's motion, but we submit that the additional arguments and case law provided here crystallize the issue and makes plain why dismissal is warranted in this case.

an "appointment" to public office, or a "designation" or "nomination" as a candidate to public office. A Wilson-Pakula certificate is none of those things. Rather, it is an "authorization" – a very different thing under New York law, as detailed below. Because there is no proper allegation of an underlying violation of New York State law, we respectfully submit that the challenged counts should be dismissed under Federal Rule of Criminal Procedure 12(b)(3)(B). See Fed.R.Crim.P. 12(b)(3)(B).

### A.    The Travel Act Requires an Underlying Violation of Law

The Travel Act, 18 U.S.C. § 1952, "proscribes travel in interstate or foreign commerce or use of the mail or any facility in interstate or foreign commerce, with intent to distribute the proceeds of, or otherwise further, promote, manage, establish, carry on, or facilitate any unlawful activity." United States v. Szur, 289 F.3d 200, 210 n.7 (2d Cir. 2002) (citing 18 U.S.C. § 1952(a)). "'Unlawful activity' includes 'extortion, bribery, or arson in violation of the laws of the State in which committed or of the United States.'" Szur, 289 F.3d at 210 n.7 (citing 18 U.S.C. § 1952(b)(2)).

When a Travel Act charge "predicates federal criminal liability upon commission of state law crimes," as it does in this case, "the elements of the predicate state law offense or offenses must be charged as elements of the federal crime of violating the Travel Act." United States v. Carrillo, 229 F.3d 177, 184 n.2 (2d Cir. 2000) (citing Leonard B. Sand et al., 3 Modern Federal Jury Instructions ¶ 60.01, at 60–29 (1999) (Instruction 60–10)). "[T]he initial inquiry in a Travel Act case is whether the underlying activity violates a state law." United States v. Salameh, 152 F.3d 88, 152 (2d Cir. 1998) (quoting United States v. Kahn, 472 F.2d 272, 277 (2d Cir. 1973)). Courts look to the definition of the state law at issue in making this inquiry. Salameh, 152 F.3d at 152 (considering New York Penal Law statutory definition).

Here, the Travel Act charges reference New York Penal Law §§ 200.45 and 200.50 as the underlying state law offenses.

**B.    New York Penal Law §§ 200.45 and 200.50 Criminalize Bribery in Exchange for Designations and Nominations for Public Office**

By their plain language, New York Penal Law §§ 200.45 and 200.50 criminalize bribery in exchange for an "appointment" to public office, or a "designation" or "nomination" as a candidate to public office.

Penal Law § 200.45 criminalizes "Bribe Giving for Public Office":

> A person is guilty of bribe giving for public office when he confers, or offers or agrees to confer, any money or other property upon a public servant or a party officer upon an agreement or understanding that some person will or may be *appointed* to a public office or *designated* or *nominated* as a candidate for public office.  P.L. § 200.45 (emphasis added).

Penal Law § 200.50 criminalizes "Bribe Receiving for Public Office":

> A public servant or a party officer is guilty of bribe receiving for public office when he solicits, accepts or agrees to accept any money or other property from another person upon an agreement or understanding that some person will or may be *appointed* to a public office or *designated* or *nominated* as a candidate for public office.  P.L. § 200.50 (emphasis added).

The "appointment" provision of the statute is not at issue in this case, because the public office in question – New York City Mayor (Indictment at ¶ 5(a)) – is an elected, not an appointed position.  The central question is therefore whether the Indictment properly alleges bribery in exchange for Malcolm Smith being "designated or nominated as a candidate for public office." For the reasons set forth below, we submit that it does not, because a Wilson-Pakula certificate is not a "designation" or "nomination" for public office under New York law.

**C.    Wilson-Pakula Certificates Are Not Designations or Nominations**

The Travel Act counts in this case are only viable if a Wilson-Pakula certificate (the *quid pro quo* of the alleged bribe) is a "designation" or "nomination" for public office, and thereby

21

within the scope of New York Penal Law §§ 200.45 and 200.50. Both the plain language of New York Election Law, and New York case law, dictate that it is not. Wilson-Pakula certificates are not "designations" or "nominations" – they are "authorizations."

Under New York law, "[n]omination and designation of candidates for election to public office or party position" are governed by New York Election Law Article 6. New York Election Law §§ 6-102, 106, 108, 110, 114 and 116 govern "Party Nominations" and New York Election Law § 6-104 governs "Party Designations." Each section contains the rule for how a candidate for a particular office is to be nominated or designated.[6]

New York Election Law § 6-120(2) explains why a Wilson-Pakula certificate is necessary, under certain circumstances. It states that "no party designation or nomination shall be valid" unless the person designated or nominated is an enrolled member of the designating or nominating political party. Election Law § 6-130(2) and (2). In other words, a designation or nomination under Article 6 is only valid if the candidate is a member of that party.

The following Section, New York Election Law § 6-120(3) (the "Wilson-Pakula" Law), provides an exception. It is possible to designate or nominate a candidate who is *not* a party member, if that designation or nomination is *authorized*. New York Election Law § 6-120(3) states:

> The members of the party committee representing the political subdivision of the office for which a designation or nomination is to be made, … may, by a majority vote of those present at such meeting provided a quorum is present, *authorize the designation or nomination* of a person as candidate for any office who is not enrolled as a member of such party as provided in this section. In the event that such designation or nomination is for an office to be filled by all the voters of the

---

[6]    For example, New York Election Law § 6-104 states that "[p]arty designation of a candidate for nomination for any office to be filled by the voters of the entire state shall be made by the state committee. The state committee shall make a decision by majority vote. The person receiving the majority vote shall be the party's designated candidate for nomination[.]" Election Law § 6-104(1) and (2).

> city of New York, such *authorization* must be by a majority vote of those present
> at a joint meeting of the executive committees of each of the county committees
> of the party within the city of New York, provided a quorum is present at such
> meeting. The *certificate of authorization* shall be filed not later than four days
> after the last day to file the designating petition, certificate of nomination or
> certificate of substitution to which such authorization relates. The *certificate of
> authorization* shall be signed and acknowledged by the presiding officer and the
> secretary of the meeting at which such authorization was given. Election Law §
> 6-120(3) (emphasis added).

New York Election Law § 6-120(3) thus provides that a party can authorize the designation or

nomination of a non-party candidate through issuance of a Wilson-Pakula certificate of

authorization.

The plain language of Section 6-120(3) makes clear that Wilson-Pakula certificates are

"authorizations," and not "designations" or "nominations." A Wilson-Pakula certificate can

"*authorize* the designation or nomination of a person as candidate for any office who is not

enrolled as a member of such party[.]" It does not designate or nominate a person in and of

itself. This comports with how Article 6 as a whole functions, as described above. A party can

designate or nominate a candidate for office (under the procedures set forth in New York

Election Law §§ 6-102, 104, 106, 108, 110, 114 and 116), but that designation or nomination is

not valid if the person is not a member of that party – unless the individual receives Wilson-

Pakula authorization. The best way to describe a Wilson-Pakula certificate may be as a

certificate of "authorization," "permission" or "approval" provided to a non-party member. See

generally Mrazek v. Suffolk County Bd. of Elections, 630 F.2d 890, 892 (2d Cir. 1980) ("New

York's 'Wilson-Pakula' law, now codified as New York Election Law s 6-120(3), requires that a

candidate soliciting the endorsement of a political party with which he is not affiliated *obtain the

approval* of the appropriate party committee before filing a petition with the county board of

elections designating him as that party organization's endorsed candidate.") (emphasis added).

As one New York court described it, a Wilson-Pakula certificate serves to remove an "impediment to candidacy." See Tulin v. Wade, 13 Misc. 3d 1207(A), 2006 WL 2640251 (N.Y. Sup. Ct. Saratoga Cty. Aug. 22, 2006). Under this analysis, there can be no claim that a Wilson-Pakula certificate is a designation or nomination in and of itself. Wilson-Pakula authorization is a separate, independent statutory requirement, only necessary in some cases. Because it is not itself a designation or nomination, an alleged bribe to obtain a Wilson-Pakula certificate does not fall under the scope of New York Penal Law §§ 200.45 and 200.50.

New York case law brings even more clarity to the issue. Many cases (including New York Court of Appeals cases) refer to Wilson-Pakula certificates explicitly as "Wilson-Pakula authorizations" or "certificates of authorization," or describe the "authorization" conferred by Wilson-Pakula certificates.[7] Other cases highlight the distinction between Wilson-Pakula "authorizations," and "designations" or "nominations" for public office. Very recently, for example, in Bankoski v. Green, --- N.Y.S.2d ---, 2013 WL 4106392, at *1-2 (App. Div. 4th

---

[7]    See, e.g., Conroy v. State Comm. of Independence Party of New York, 10 N.Y.3d 896, 898 (2008) ("Under Election Law § 6-120(3), a political party may grant the authority to issue *certificates of authorization*, or Wilson-Pakula certificates, to its state committee[.]") (emphasis added); Master v. Pohanka, 10 N.Y.3d 620, 623 (2008) ("[T]he Working Families Party of New York State … adopted a party rule that vested the State Committee with the authority to issue certificates of *authorization*, so-called 'Wilson-Pakula certificates,' for county, city and local elections.") (emphasis added); Haight v. Knapp, 931 N.Y.S.2d 135, 136 (App. Div. 2d Dep't 2011) ("As none of these candidates were enrolled members of the Conservative Party, … the Dutchess County Conservative Party filed a so-called Wilson-Pakula certificate *authorizing* them to appear on the ballot.") (emphasis added); McGrath v. Abelove, 928 N.Y.S.2d 405, 406 (App. Div. 3d Dep't 2011) ("[T]he New York State Committee of respondent Independence Party of New York adopted a resolution delegating to its State Executive Committee the power to, among other things, issue *certificates of authorization*, commonly known as *Wilson-Pakula authorizations*, to fill vacancies for public office in Rensselaer County.") (emphasis added); Terranova v. Fudoli, 888 N.Y.S.2d 685, 686 (App. Div. 4th Dep't 2009) ("[T]he certificate of substitution was not accompanied by an appropriate *authorization* pursuant to Election Law § 6-120(3). Because a person not enrolled in a party may not be designated as a candidate of that party without such *authorization*, petitioner's failure to file such *authorization* invalidated the certificate of substitution[.]") (emphasis added).

Dep't Aug. 15, 2013), the Appellate Division examined the role of Wilson-Pakula certificates, and repeatedly referred to them as "authorizations" that were related to, but separate and apart from, "designations." Id. The court wrote that the Petitioner "commenced this proceeding ... to invalidate certificates (Wilson-Pakula certificates) *authorizing* [individuals] *to be designated* as candidates on the ballot in the next primary election[.]" Id. (emphasis added). The court continued: "Because the Unenrolled Candidates were registered Republicans, they *could not be designated* as candidates on the Conservative Party's primary ballot without *authorization* from the party committee[.]'" Id. (emphasis added). The Appellate Division ultimately concluded that the Petitioner "failed to prove that the challenged *Wilson-Pakula authorizations* were not validly issued ... under the County Committee rules." Id. The court's explanation is clear – Wilson-Pakula certificates *authorize* individuals *to be designated* as candidates – they are not designations in and of themselves. An individual *cannot be designated* as a candidate *without authorization* conferred through a Wilson-Pakula certificate. In other words, a Wilson-Pakula certificate is a prerequisite for a designation, but it is not the designation itself.

Another case, Potanovic v. French, 885 N.Y.S.2d 90, 91 (App. Div. 2d Dep't 2009) provides even more clarity. In Potanovic, the Petitioner claimed that there was "conflict between the rules and regulations of the Conservative Party Committee of Dutchess County (hereinafter the County Committee) and the rules and regulations of the Conservative Party Committee of the Town of Beekman (hereinafter the Town Committee)." Id. The Appellate Division reviewed the rules and regulations of both Committees, and determined that there was no conflict, because the County Committee and the Town Committee were simply dividing responsibility with regard to elections: "These rules establish that the Town Committee has the right to *nominate or designate* a nonparty candidate for a town office, but that candidate must be *authorized* by the

County Committee during a Wilson-Pakula meeting[.]" Id. (emphasis added). It is impossible to reconcile the clear division of authority noted in Potanovic (the County Committee handled designations and nominations, and the Town Committee was responsible for Wilson-Pakula authorizations) with the government's theory in this case that authorizations, designations and nominations are all the same, or interchangeable.[8]

If the New York legislature had intended New York Penal Law §§ 200.45 and 200.50 to reach a bribe in exchange for a Wilson-Pakula certificate, those sections could have been written very differently. They could have read (italicized portions added):

> A person is guilty of bribe giving [or bribe receiving] for public office when he confers, or offers or agrees to confer, any money or other property upon a public servant or a party officer upon an agreement or understanding that some person will or may be appointed to a public office, or designated or nominated as a candidate for public office, *or authorized to be designated or nominated as a candidate for public office.*

New York Penal Law §§ 200.45 and 200.50, however, do not include that final clause.

This is especially noteworthy because Penal Law §§ 200.45 and 200.50 were enacted in 1965 (Penal Law 1965, Article 200), nearly 20 years after the Wilson-Pakula Law was enacted (originally Section 136-a of the Election Law, Chapter 432 of the Laws of 1947). The New York legislature therefore had ample time and opportunity to consider drafting the Penal Law with an expansive reach, to include bribery in exchange for Wilson-Pakula authorizations, but did not do

---

[8]     Even the plain language of the Indictment implicitly acknowledges that Wilson-Pakula certificates confer "authorization," and do not "designate" or "nominate" a candidate for public office. The Indictment states that "Because he was a registered Democrat, pursuant to New York Election Law § 6-120(3), SMITH was not *permitted* to run for New York City Mayor as a Republican absent the written consent of three of the City's five Republican Party county chairmen." (Indictment at ¶ 1.) It further states that Tabone and Savino, allegedly in exchange for bribes, agreed to use their offices "to *approve* and obtain *approval* for SMITH to run as a Republican candidate for New York City Mayor." (Id. at ¶ 5(a).) The Indictment does not claim that Smith would be "*designated* or *nominated* as a candidate for public office" as a *quid pro quo* for the alleged bribes. All it claims is that bribes would be paid in exchange for *permission* or *approval* – in other words, Wilson-Pakula *authorization*.

so.[9] This provides good reason to conclude that the legislature's failure to explicitly criminalize

bribery in connection with Wilson-Pakula authorizations was "not a slip of the legislative pen,

nor the result of inartful draftsmanship, but was a conscious and not irrational legislative choice."

See Bifulco v. United States, 447 U.S. 381, 387 (1980). We respectfully submit that a more

expansive reach – apparently rejected by the New York legislature – should not be read into

Penal Law §§ 200.45 and 200.50 in connection with this federal prosecution.

**D.      Any Ambiguity in the Reach of New York Penal Law §§ 200.45 and 200.50 Should
be Resolved Under the Rule of Lenity**

To the extent that there is ambiguity in the terms "designated or nominated as a candidate

for public office," and thereby the reach of Penal Law §§ 200.45 and 200.50, the challenged

counts should be dismissed under "the rule of lenity." See Bifulco, 447 U.S. at 387. It is a well-

settled principle that "ambiguity concerning the ambit of criminal statutes should be resolved in

favor of lenity." Skilling, 130 S.Ct. at 2932 (citing Cleveland, 531 U.S. at 25). Said otherwise,

where there is ambiguity concerning the scope of a criminal statute, "the tie must go to the

defendant." United States v. Santos, 553 U.S. 507, 514 (2008). "The rule of lenity requires

ambiguous criminal laws to be interpreted in favor of the defendants subjected to them." Id.

(citing United States v. Gradwell, 243 U.S. 476, 485 (1917); McBoyle v. United States, 283 U.S.

25, 27 (1931); United States v. Bass, 404 U.S. 336, 347–349 (1971)). This "venerable rule …

vindicates the fundamental principle that no citizen should be held accountable for a violation of

a statute whose commands are uncertain, or subjected to punishment that is not clearly

prescribed." Santos, 553 U.S. at 514.

---

[9]      It should also be noted that in the 48 years since Penal Law §§ 200.45 and 200.50 were
enacted, not once (as far as we can ascertain) have those statutes been employed to prosecute
bribery related to Wilson-Pakula certificates.

In this case, for the reasons set forth above, we maintain that there is no ambiguity in New York Penal Law §§ 200.45 and 200.50, because New York Election Law makes clear that Wilson-Pakula certificates are not "designations" or "nominations." New York case law confirms this point. To the extent that the reach of those statutes is ambiguous, however, we respectfully submit that "the tie must go to the defendant," and the challenged counts should be dismissed.

## POINT III

### The Portion of Count One Charging a Travel Act Conspiracy, and Count Three, Charging a Substantive Travel Act Violation, Should be Dismissed for Lack of Federal Jurisdiction

The portion of Count One charging a Travel Act conspiracy, and Count Three, charging a substantive Travel Act violation, should be dismissed for lack of federal jurisdiction. Those counts allege that federal jurisdiction is appropriate under the Travel Act because Smith and Halloran "placed telephone calls and sent text messages" to the UC "while the UC was outside New York State," and because the defendants "arranged to meet with the UC, causing the UC to travel from outside New York State to the Southern District of New York." (Indictment at ¶¶ 61(j), (l), (m).) This is insufficient to sustain federal jurisdiction, because the interstate contact was incidental, and because it exclusively involved the actions of an undercover federal agent. We therefore respectfully submit that the challenged counts should be dismissed under Federal Rule of Criminal Procedure 12(b)(3)(B). See Fed.R.Crim.P. 12(b)(3)(B).

### A.    Manufactured Jurisdiction and "Casual and Incidental" Contact: United States v. Archer

The Second Circuit addressed the issue of federal jurisdiction under the Travel Act in United States v. Archer, 486 F.2d 670 (2d Cir. 1973) – a case with facts highly similar to those here. In Archer, a group of federal agents set up a sting operation to nab corrupt lawyers in

Queens County. Id. at 672. The government arranged for an undercover agent to be "arrested," and for a cooperating witness to introduce the agent to people in the legal system who might accept a bribe to influence the outcome of the case. Id. at 672-73. With the agent as "bait," the government "hoped that some evidence of corruption would surface and that some use of interstate facilities would occur or could be arranged so that the incident of corruption would be transformed into a violation of the Travel Act." Id. at 672. To ensure Travel Act jurisdiction, the agents and informants placed interstate calls to the defendants to discuss the scheme, and prompted the defendants to make interstate calls by giving them out-of-state numbers at which the informants could supposedly be reached. Id. at 673-74. The case ultimately led to Travel Act charges against the defendants, and a conviction.

On appeal, the Second Circuit reversed the defendants' convictions, holding that the government "did not provide sufficient proof of use or agreement to use interstate or foreign telephone facilities to satisfy the requirements of the so-called 'Travel Act[.]'" Id. at 672. Although it was uncontested that the defendants engaged in interstate and foreign telephone calls, the Court defined the question as whether the defendants "used a facility in interstate or foreign commerce … in a *sufficiently meaningful* way to subject themselves to liability under the statute." Id. at 680 (emphasis added). The Court ultimately held that the calls at issue were either incidental to the bribery (of "a casual and incidental occurrence" or "a matter of happenstance"), or manufactured by the government for the sole purpose of transforming a local bribery offense into a federal crime. Id. at 682-83.

On rehearing, the Court clarified its original holding, explaining that there was "no indication that the defendants agreed either to make or to cause to be made any interstate or foreign telephone calls." Id. at 684-85. The Court also addressed another issue: "application of

29

the Travel Act where the sole 'federal' elements were telephone calls from or to an undercover agent." Archer, 486 F.2d at 684. "Despite grave reservations whether interstate or foreign travel or transportation or use of interstate or foreign telephone facilities by an undercover agent, as distinguished from actual participants in the crime, can ever supply the federal jurisdictional basis required by the Travel Act," the Court had left open in its original decision "the possibility that this might suffice when sufficiently pervasive or functional." Id. On rehearing, the Court held that "when the federal element in a prosecution under the Travel Act is furnished solely by undercover agents, a stricter standard is applicable than when the interstate or foreign activities are those of the defendants themselves[.]" Id. at 686-87.[10]

### B.    There is No Federal Jurisdiction Under the Travel Act in this Case

In this case, the use of interstate telephone facilities alleged in the Indictment is insufficient "to bring the defendants within the Travel Act." See Archer, 486 F.2d at 683. The allegations fail to establish that the defendants "used a facility in interstate or foreign commerce … in a *sufficiently meaningful* way to subject themselves to liability" under the Travel Act. See id. at 680 (emphasis added).

---

[10]    In United States v. Wallace, 85 F.3d 1063, 1065 (2d Cir. 1996), the Second Circuit noted that following Archer, the applicability of the "manufactured jurisdiction" doctrine has been limited. In particular, "[c]ourts have refused to follow Archer when there is any link between the federal element and a voluntary, affirmative act of the defendant. Thus, when confronted with situations in which (i) the FBI introduces a federal element into a non-federal crime and (ii) the defendant then takes voluntary actions that implicate the federal element, this Court has consistently held that federal jurisdiction has not been improperly 'manufactured' and that the statutory elements have been met, despite the surface similarity to Archer." Id. at 1066.
    In this case, no "federal element" exists – there are no allegations of "affirmative acts" in the Indictment that could bring this case within the scope of the examples set forth in Wallace (*e.g.*, defendant voluntarily set fire to government-owned car; defendant committed himself to bringing drugs into the United States; defendant burned down building over which there was federal jurisdiction). All of the allegations involve purely New York State actions and effects.

First, the Indictment leaves open the question of whether the government affirmatively sent the UC to North Carolina in order to "manufacture jurisdiction;" in other words, whether the UC was directed to travel outside New York "for the sole purpose" of engaging in interstate telephone calls with the defendants. See id. at 681-82 (Congress "did not intend to include a telephone call manufactured by the Government for the precise purpose of transforming a local bribery offense into a federal crime."); United States v. Coates, 949 F.2d 104, 105 (4th Cir. 1991). That open question, however, does not preclude resolution of the jurisdiction issue.

Even if jurisdiction was not manufactured, the fact that some calls and text messages to the UC may have been interstate as opposed to intrastate was only "a casual and incidental occurrence" and "a matter of happenstance." Archer, 486 F.2d at 682-83 (quoting United States v. Corallo, 413 F.2d 1306, 1325 (2d Cir. 1969) and Rewis v. United States, 401 U.S. 808, 812 (1971)). The facts in the Indictment make clear that calls and texts received by the UC when he happened to be in North Carolina "served no purpose that would not have been equally served" by calls and texts received when he happened to be in New York. See id. at 683. All of the defendants' calls in the Indictment were placed from within New York, all of the defendants' meetings were held in New York, and the case revolved around purely New York issues (New York State politics and real estate). The UC's location, based on the facts in the Indictment, would have been "a matter of complete indifference" to the defendants in this case. See id. at 683. Calls and texts received when the UC happened to be in North Carolina are therefore insufficient to transform this "federally provoked incident of local corruption into a crime against the United States." See id.

That the UC may have been in North Carolina "on legitimate business and was not sent there solely to manufacture jurisdiction in this case" makes no difference in this analysis. See

Archer, 486 F.2d at 685. "Any such holding would permit the Government to convert any local bribery it had provoked into a federal offense by furnishing an out-of-state address for an undercover agent or sending him outside the state on a legitimate errand and having a call made before the offense was consummated. The Travel Act confers ample power on federal law enforcement officers to assist local officials without going so far." See id.

Likewise, this is not a case that comports with the legislative history of the statute. Certainly it does not concern "persons who reside in one State while operating or managing illegal activities located in another," because the alleged crimes are all purely New York State issues. See Archer, 486 F.2d at 680 (citing Rewis, 401 U.S. at 812). The Congressional purpose of the Travel Act was "to permit the federal government to act against members of organized crime whose activity crossed state lines when local law enforcement officers were unable or unwilling to do so." See Archer, 486 F.2d at 685. It was not "to extend federal power to deal with corruption in local [politics]" because of interstate phone calls to an undercover agent "on any such 'casual and incidental' basis as here." See id. (citing Corallo, 413 F.2d at 1325).

Finally, it is significant that the entire interstate nexus involved an undercover federal agent. "[W]hen the federal element in a prosecution under the Travel Act is furnished solely by undercover agents, a stricter standard is applicable than when the interstate or foreign activities are those of the defendants themselves." Archer, at 686-87. In this case, the allegations are limited in scope to New York State actions, New York State issues, and New York State effects. As in Archer, the standard for federal jurisdiction "was not met here" simply because a federal

agent answered his phone or read a text message when he happened to be in another state. We respectfully submit that the Travel Act counts should be dismissed accordingly. See id.[11]

## POINT IV

### Count Four Should be Dismissed Because the Hobbs Act Extortion Charge Fails to Allege Inducement

Count Four, charging Hobbs Act extortion, should be dismissed because there is no allegation that Malcolm Smith "induced" anyone to confer a benefit on his behalf. We recognize that in Evans v. United States, 504 U.S. 255, 268 (1992), a divided Supreme Court held that an affirmative act of inducement by a public official is not a necessary element of extortion under color of official right. For the reasons set forth below, however, we believe that Evans was wrongly decided, and we wish to preserve the issue for potential review by the Supreme Court.

### A.    The Extortion Allegations

Count Four alleges that Malcolm Smith committed Hobbs Act extortion under 18 USC § 1951(b)(2), because the UC and the CW "paid bribes on Smith's behalf" to obtain Wilson-Pakula certificates for Smith, in exchange for Smith "using, and agreeing to use, his official position" to help the UC and the CW obtain New York State funds for a Spring Valley real estate project. (Indictment at ¶¶ 66-67.)

According to the Indictment, the CW – and not Smith – suggested that he and others undertake this course of action. (Id. at ¶ 29.) Paragraph 29 states, in pertinent part:

---

[11]    Application of the Travel Act here would also raise significant federalism concerns. "The Supreme Court has observed, for example, that expansive application of the Travel Act to activity 'traditionally subject to state regulation' and to defendants who themselves did not travel interstate … 'would alter sensitive federal-state relationships' and 'could overextend limited federal police resources.'" See United States v. Blackmon, 839 F.2d 900, 906 (2d Cir. 1988) (citing Rewis, 401 U.S. at 812; Archer, 486 F.2d at 680; R.J. Miner, Federal Courts, Federal Crimes, and Federalism, 10 Harv.J.L. & Pub.Pol'y 117, 124–27 (1987)).

On or about November 16, 2012, MALCOLM A. SMITH, the defendant met with the UC and the CW at a hotel in White Plains, New York. During the meeting, SMITH and the CW discussed SMITH's plan to run for New York City Mayor. SMITH told the CW that one of the Republican Party county committee leaders ("County Chairman #1") was supporting someone else. *When the CW suggested that the CW might be able to influence County Chairman #1,* SMITH responded: 'If you can change him, call me. Seriously.' (Id.) (emphasis added).

There is no allegation in the Indictment that Smith used any form of duress, or that he affirmatively solicited or demanded any benefits from the UC, the CW, or anyone else.

## B.     Second Circuit Law Before Evans: United States v. O'Grady

Before the Supreme Court decided Evans in 1992, the Second Circuit employed for nearly a decade the rule for which we advocate. To prove extortion under color of official right during that period, the government was required to show that a public official "induced" the benefits received (not that he simply received benefits). That rule was adopted in United States v. O'Grady, 742 F.2d 682, 688 (2d Cir. 1984).

The defendant in O'Grady was a superintendent with the New York City Transit Authority ("NYCTA"). Id. at 683. He was charged with violating the Hobbs Act for accepting benefits (free meals, expense-paid trips, complimentary rounds of golf) from companies under contract to provide subway cars to the NYCTA. Id. There was no evidence that O'Grady ever demanded or asked for any of the benefits he received. Id. at 685. The benefits "were freely and willingly offered by the vendors." Id. O'Grady was convicted at trial. Id. at 686.

On appeal, O'Grady argued that his conduct did not constitute extortion under color of official right, because the scope of the Hobbs Act should be limited to extortion accompanied by some form of duress. Id. at 686-87. The Second Circuit agreed, and reversed the conviction. The Court held that "[t]he conduct proscribed by the Hobbs Act is the wrongful use of public office, not merely the acceptance of benefits." Id. at 687. "Although receipt of benefits by a

34

public official is a necessary element of the crime, there must also be proof that the public official did something, under color of his public office, to cause the giving of benefits." Id.

The Court held that the district court's jury charge improperly permitted the jury "to find O'Grady guilty of extortion under color of official right absent any proof that he wrongfully used his office to *induce* the benefits he received." Id. at 188. The problem with the district court's instruction was that it effectively "impose[d] upon all public officials an affirmative obligation not to accept benefits of any type or form. The statute is thus transformed from a vehicle to eradicate extortion and robbery in interstate commerce into a professional ethics standard governing public officials." Id. at 687. The Court concluded that "to prove the crime of extortion under color of public office the government must show that the public official *induced* the benefits received." Id. at 688. "Thus, extortion under color of official right begins with the public official, not with the gratuitous actions of another." Id. at 691.

### C.    Evans v. United States

Over time, a circuit split developed with regard to whether extortion under color of official right required "inducement" on the part of the public official. The Supreme Court resolved that split in Evans v. United States, 504 U.S. 255 (1992).

The defendant in Evans was an elected member of the Board of Commissioners of DeKalb County, Georgia. Id. at 258. An FBI agent posing as a real estate developer met with Evans on a number of occasions, seeking Evans' assistance in rezoning a tract of land. Id. "Virtually all, if not all, of those conversations were initiated by the agent[.]" Id. On one occasion, the agent handed Evans cash totaling $7,000 and a $1,000 check payable to Evans' campaign. Id. Evans was charged with, among other things, Hobbs Act extortion. Id. He was convicted after a jury trial. Id.

A divided Supreme Court affirmed the conviction.  The Court held that to prove Hobbs

Act extortion under color of official right, "the Government need only show that a public official

has obtained a payment to which he was not entitled, knowing that the payment was made in

return for official acts."  Id. at 268.

There was substantial disagreement between members of the Court with regard to

whether "inducement" was a necessary element of extortion under color of official right.  Justice

Thomas, joined by Chief Justice Rehnquist and Justice Scalia, authored a dissenting opinion and

wrote that the majority erred "in asserting that common-law extortion is the rough equivalent of

what we would now describe as 'taking a bribe.'"  Id. at 283 (internal quotation marks omitted).

He noted that historically bribery and extortion have always been "different crimes," and that

"[b]y stretching the bounds of extortion to make it encompass bribery, the Court ... blurs the

traditional distinction between the crimes."  Id. at 283-84.  He also noted that the most "natural

construction" of the statute "is that the verb 'induced' applies to *both* types of extortion

described in the statute."  Id. at 288 (emphasis in original).  Therefore, there would be no

distinction between an offense by a private individual and an offense by a public official – both

would require proof that any benefits were "induced."  Id.[12]

### D.    The Extortion Charge in this Case Should be Dismissed

We submit that Count Four, charging Hobbs Act extortion, should be dismissed because

there is no allegation that Malcolm Smith "induced" anyone to confer a benefit on his behalf.

---

[12]    Justice Thomas also opined that the majority's interpretation of the Hobbs Act was
"repugnant not only to the basic tenets of criminal justice reflected in the rule of lenity, but also
to basic tenets of federalism."  Id. at 290-91 ("Over the past 20 years, the Hobbs Act has served
as the  engine for a stunning expansion of federal criminal jurisdiction into a field traditionally
policed by state and local laws – acts of public corruption by state and local officials ... [F]ederal
prosecutors came to view the Hobbs Act as a license for ferreting out *all* wrongdoing at the state
and local level – 'a special code of integrity for public officials.'").

There is no allegation that Smith solicited or demanded any benefit from the UC or the CW, or

that he used any sort of duress. Indeed, the Indictment claims that any alleged benefit was

"suggested" by the CW. (See Indictment at ¶ 29). We recognize that in Evans the Supreme

Court held that inducement by a public official is not a necessary element of extortion, but given

the Court's recent decision in Skilling to limit the scope of honest services fraud, we believe that

the reach of the Hobbs Act is a question that the Supreme Court could – and should – choose to

revisit.

**POINT V**

**Portions of Paragraphs 26 and 27 Should be Stricken as Prejudicial Surplusage**

Portions of Paragraphs 26 and 27 of the Indictment should be stricken as prejudicial

surplusage. Federal Rule of Criminal Procedure 7(d) permits a court to strike "surplusage" from

an indictment "where the challenged allegations are not relevant to the crime charged and are

inflammatory and prejudicial." United States v. Scarpa, 913 F.2d 993, 1013 (2d Cir. 1990). The

challenged portions of Paragraphs 26 and 27 contain a serious allegation of campaign finance

fraud, and conspiracy to commit campaign finance fraud. This allegation, repeated nowhere else

in the Indictment, is both irrelevant to the crimes charged and highly prejudicial.

Paragraphs 26 and 27 are part of the narrative of the alleged "Conspiracy to Bribe New

York City Political Party Officials," which spans Paragraphs 26 through 56. The basic allegation

of the charged conspiracy is that Malcolm Smith and Daniel Halloran engaged in a scheme to

bribe Republican Party officers – Vincent Tabone and Joseph Savino – in an effort to secure

authorization (a "Wilson Paukula certificate") for Smith to run for New York City Mayor in

2013 as a Republican. (Indictment at ¶ 5a.)

Paragraph 26 addresses the first alleged meeting between Smith and a cooperating witness (the "CW"). The challenged portion of the paragraph is italicized:

> On or about April 26, 2012, MALCOLM A. SMITH, the defendant, met the CW at a restaurant in Rockland County, New York. During that meeting, SMITH solicited a $10,000 contribution to his campaign for State Senate from the CW and discussed the CW giving SMITH an additional $100,000 for Smith to give to other State Senators in an effort to win their support of SMITH for a State Senate leadership position. During the same meeting, SMITH states that he was considering running for New York City Mayor in 2013 on the Republican Party ballot. *At the end of the meeting, the CW told SMITH that the CW would give money to an associate of the CW who, in turn, would give the money to other people who would donate it to SMITH's campaign in order to keep the CW's name off of SMITH's campaign finance disclosures. SMITH responded: 'Okay.'*

Paragraph 27 addresses the second alleged meeting between Smith and the CW. The challenged portion of the paragraph is italicized:

> On or about August 8, 2012, MALCOLM A. SMITH, the defendant, met the CW at the same Rockland County restaurant. *During the meeting, the CW gave SMITH $15,000 worth of checks made out to SMITH's campaign drawn on the account of various persons. The CW told SMITH, in substance, that the money came from the CW but that the CW was providing the money through other people. The CW told SMITH, in substance, that the CW did not want the CW's name to appear on any campaign finance disclosures. SMITH said, in substance, that the CW's name would not appear on any disclosure statements. In fact, SMITH later disclosed the checks on his campaign finance filings as contributions from the people whose names appeared on the checks and not the CW.* During the meeting, SMITH told the CW, in substance, that he was meeting with the five New York City Republican Party county committee leaders the following week to discuss obtaining a Wilson-Pakula certificate from each. (<u>Id.</u> at ¶ 27) (emphasis added).

The non-italicized portions of Paragraphs 26 and 27 continue the narrative relevant to the alleged conspiracy: on April 26, Smith allegedly told the CW that he was considering running for New York City Mayor as a Republican; August 8, Smith allegedly told the CW that he was meeting with officers of the Republican Party to discuss obtaining Wilson-Pakula certificates. (<u>Id.</u> at ¶¶ 26-27.) Sandwiched around that relevant narrative, however, is an allegation that

Smith committed campaign finance fraud, and conspired to commit campaign finance fraud.[13] We submit that those portion of Paragraphs 26 and 27 should be stricken as irrelevant, prejudicial surplusage.

First, the challenged portions of Paragraphs 26 and 27 are not relevant to the charges in this case. Counts One through Four (the charges relating to Smith) have absolutely no connection to allegations of campaign finance fraud. No other paragraphs in the Indictment mention campaign finance fraud, and none of the charged counts involve campaign finance fraud, or cite the relevant statute. The allegation of campaign finance fraud in Paragraphs 26 and 27 is separate, distinct and unrelated to the actual charges in this case, and therefore it is irrelevant under Rule 7(d).

Second, the challenged portions of Paragraphs 26 and 27 are highly prejudicial. An allegation of campaign finance fraud is extremely serious, and could resonate with jurors because of the many recent prosecutions under the campaign finance laws.[14] And, it could "compel some jurors to infer" that the alleged scheme in the Indictment extended beyond the limited scope of the charges (all relating to efforts to obtain Wilson-Pakula certificates). See United States v. Malachowski, 604 F. Supp. 2d 512, 518-19 (N.D.N.Y. 2009).

The allegation of campaign finance fraud in Paragraphs 26 and 27 is "inflammatory and prejudicial," and because it is also irrelevant to the charges in this case, we respectfully submit

---

[13]    "Contributions in name of another prohibited: No person shall make a contribution in the name of another person or knowingly permit his name to be used to effect such a contribution, and no person shall knowingly accept a contribution made by one person in the name of another person." 2 U.S.C. § 441f.

[14]    See, e.g., FBI.gov, Press Release, Former Campaign Treasurer and Fundraiser Found Guilty in Manhattan Federal Court of Campaign Finance Fraud, dated May 2, 2013 ("Manhattan U.S. Attorney Preet Bharara said: '… Cases like this give the people of New York yet another reason to be troubled by the electoral process, and they have a right to demand fair, open, and honest elections untainted by cynical subversion of campaign finance laws.'").

that it should be stricken from the Indictment as surplusage under Rule 7(d). See Malachowski, 604 F. Supp. 2d at 518-19 (grating motion to strike surplusage); United States v. Gotti, 42 F. Supp. 2d 252, 293 (S.D.N.Y. 1999) (same); United States v. Miller, 26 F. Supp. 2d 415, 420-21 (N.D.N.Y. 1998) (same).

### CONCLUSION

As detailed above, the charges in this case stretch federal authority too far. We respectfully submit that Malcolm Smith's motions should be granted, and that the challenged counts in the Indictment should be dismissed.

Dated: September 3, 2013

Respectfully submitted,

Gerald L. Shargel
Ross M. Kramer
Winston & Strawn LLP
200 Park Avenue
New York, NY 10166

*Attorneys for Malcolm A. Smith*

40