UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------- x
UNITED STATES OF AMERICA       :
       :
    - against -       :     13 Cr. 297 (KMK)
       :
MALCOLM A. SMITH,       :
DANIEL J. HALLORAN,       :
VINCENT TABONE,       :
JOSEPH J. SAVINO,       :
NORAMIE JASMIN, and       :
JOSEPH DESMARET,       :
       :
     Defendants.       :
--------------------------------------------------------- x

## GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' PRETRIAL MOTIONS

PREET BHARARA
United States Attorney for the
Southern District of New York
Attorney for the United States
of America

DOUGLAS B. BLOOM
JUSTIN ANDERSON
Assistant United States Attorneys
   - Of Counsel -

TABLE OF CONTENTS

BACKGROUND ........................................................................................................... 2

   I.   The Indictment ................................................................................................. 2

   II.   The Offense Conduct ...................................................................................... 3

      A.    The Scheme to Bribe New York City Republican Party Leaders ........................... 3

      B.    The City Council Discretionary Funding Scheme ................................................ 5

      C.    The Spring Valley Community Center Project ...................................................... 6

ARGUMENT ............................................................................................................... 7

   I.   The Honest Services Charges Should Not Be Dismissed ............................... 7

      A.    Applicable Law ..................................................................................................... 8

      B.    Counts One and Two Properly Allege Honest Services Wire Fraud ..................... 9

      C.    The Honest Services Fraud Statute is Not Unconstitutionally Vague ................. 11

      D.    The Defendants' Remaining Attacks on the Honest Services Charges Are Meritless ............................................................................................................. 16

   II.   The Indictment Properly Alleges a Violation of the Travel Act ................... 19

      A.    Applicable Law ................................................................................................... 20

         1.   The Travel Act .............................................................................................. 20

         2.   Sections 200.45 and 200.50 of the New York Penal Law ............................. 21

         3.   Section 6-120(3) of the New York Election Law ......................................... 22

      B.    Discussion ........................................................................................................... 22

         1.   Sections 200.45 and 200.50 Apply to Bribery in Connection with a Wilson-Pakula Authorization .......................................................................... 22

         2.   The Frequency of Prosecutions under Sections 200.45 and 200.50 Has No Bearing on Whether this Prosecution is Authorized by Law .................... 27

         3.   Halloran Aided and Abetted the Bribery of Others ..................................... 29

         4.   The Indictment Alleges Sufficient Interstate Activity ................................. 29

   III.   The Indictment Adequately Alleges a Violation of the Hobbs Act .............. 34

   IV.   This Prosecution Comports with the First Amendment and Federalism ...... 34

   V.   The Indictment Does Not Contain Prejudicial Surplusage .......................... 38

   VI.   The Indictment Should Not Be Dismissed for Lack of Particularity ............ 39

   VII.   A Severance is Unwarranted ........................................................................ 40

CONCLUSION .......................................................................................................... 46

i

TABLE OF AUTHORITIES

**<u>Federal Cases</u>**

*Badders v. United States*, 240 U.S. 391 (1916) ........................................................ 17

*Carpenter v. United States*, 484 U.S. 19 (1987) ................................................ 35, 36

*Costello v. United States*, 350 U.S. 359 (1956) ................................................... 8, 19

*Evans v. United States*, 504 U.S. 255 (1992) ........................................................... 34

*Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490 (1949) .................................... 35

*Hamling v. United States*, 418 U.S. 87 (1974) ......................................................... 40

*Moskal v. United States*, 498 U.S. 103 (1990) ......................................................... 25

*Mrazek v. Suffolk County Board of Elections*, 630 F.2d 890 (2d Cir. 1980) ......... 22, 25

*Muscarello v. United States*, 524 U.S. 125 (1998) ................................................... 26

*Perez v. Westchester County Dep't of Corr.*, 587 F.3d 143 (2d Cir. 2009) ............... 25

*Sabri v. United States*, 541 U.S. 600 (2004) ........................................................... 18

*Skilling v. United States*, 130 S.Ct. 2896 (2010) ............................................ *passim*

*United States v. Aboumoussallem*, 726 F.2d 906 (2d Cir. 1984) .............................. 37

*United States v. Adler*, 274 F. Supp. 2d 584 (S.D.N.Y. 2003) ............................. 9, 15

*United States v. Al Kassar*, 660 F.3d 108 (2d Cir. 2011) .......................................... 32

*United States v. Alfisi*, 308 F.3d 144 (2d Cir. 2002) ................................................. 12

*United States v. Alfonso*, 143 F.3d 772 (2d Cir. 1998) ............................. 8, 32, 33, 36

*United States v. Amato*, 15 F.3d 230 (2d Cir. 1994) ................................................. 41

*United States v. Antelope*, 430 U.S. 641 (1977) ...................................................... 18

*United States v. Archer*, 486 F.2d 670 (2d Cir. 1973) ............................. 30, 31, 32, 33

*United States v. Bahel*, 662 F.3d 610 (2d Cir. 2011) ....................................... 9, 10, 12

*United States v. Bin Laden*, 91 F. Supp. 2d 600 (S.D.N.Y. 2000) ............................ 38

*United States v. Blakney*, 941 F.2d 114 (2d Cir. 1991) ............................................ 41

*United States v. Borelli*, 435 F.2d 500 (2d Cir. 1970) .............................................. 42

*United States v. Bruno*, 661 F.3d 733 (2d Cir. 2011) ........................................... 9, 13

*United States v. Butler*, 351 F.Supp.2d 121 (S.D.N.Y. 2004) .................................. 38

*United States v. Carson*, 702 F.2d 351 (2d Cir. 1983) ............................................. 43

*United States v. Casamento*, 887 F.2d 1141 (2d Cir. 1989) .......................... 41, 42, 44

*United States v. Cervone*, 907 F.2d 332 (2d Cir. 1990) ............................................ 45

*United States v. Chang AnLo*, 851 F.2d 547 (2d Cir. 1988) ..................................... 43

*United States v. Coyne*, 4 F.3d 100 (2d Cir. 1993) ............................................. 13

*United States v. Craveiro*, 907 F.2d 260 (1st Cir. 1990) ................................... 16

*United States v. Cullen*, 499 F.3d 157 (2d Cir. 2007) ........................................ 26

*United States v. Dillard*, 214 F.3d 88 (2d Cir. 2000) ........................................ 23

*United States v. Douglas*, 713 F.3d 694 (2d Cir. 2013) ..................................... 27

*United States v. Feliciano, Jr.*, 2002 WL 575662, No. 01 Cr. 448 (S.D.N.Y. April 16, 2002).... 42

*United States v. Ferguson*, 478 F. Supp. 2d 220 (D. Conn. 2007) ...................... 39

*United States v. Frega*, 179 F.3d 793 (9th Cir. 1999) ........................................ 27

*United States v. Friedman*, 854 F.2d 535 (2d Cir. 1988) ................................... 42

*United States v. Ganim*, 510 F.3d  134 (2d Cir. 2007) ................................. 12, 13

*United States v. Guzman*, 591 F.3d 83 (2d Cir. 2010) ...................................... 37

*United States v. Handakas*, 286 F.3d 92 (2d Cir. 2002) ................................... 16

*United States v. Harriss*, 347 U.S. 612 (1954) ................................................. 27

*United States v. Jenkins*, 943 F.2d 167 (2d Cir. 1991) ...................................... 20

*United States v. Keppler*, 2 F.3d 21 (2d Cir. 1993) .......................................... 35

*United States v. LaPorta*, 46 F.3d 152 (2d Cir. 1994) ...................................... 31

*United States v. Lau Tung Lam*, 714 F.2d 209 (2d Cir. 1983) .......................... 31

*United States v. Locasio,* 6 F.3d 924 (2d Cir. 1993) ......................................... 43

*United States v. Lyles*, 593 F.2d 182 (2d Cir. 1979) ......................................... 42

*United States v. Margiotta*, 688 F.2d 108 (2d Cir. 1982) ...................... 14, 15, 24, 36

*United States v. Markoll*, No. 300 Cr. 133 (EBB), 2001 WL 173763 (D. Conn. Jan 24, 2001) .. 38

*United States v. Mostafa*, ___ F. Supp. 2d ___, 2013 WL 4714158 (S.D.N.Y. 2013) ................ 38

*United States v. Murphy*, 323 F.3d 102 (3d Cir. 2003) ............................... 9, 14

*United States v. Nadirashvili*, 655 F.3d 114 (2d Cir. 2011) ............................. 12

*United States v. Nouri*, 711 F.3d 129 (2d Cir. 2013) .......................................... 9

*United States v. O'Grady*, 742 F.2d 628 (2d Cir. 1984) .................................... 34

*United States v. Orena*, 32 F.3d 704 (2d Cir. 1994) ........................................... 8

*United States v. Papdakis*, 510 F.2d 287 (2d Cir. 1975) ................................... 18

*United States v. Perez*, 575 F.3d 164 (2d Cir. 2009) ......................................... 33

*United States v. Piervinanzi*, 23 F.3d 670 (2d Cir. 1994) ................................. 16

*United States v. Rabbitt*, 583 F.2d 1014 (8th Cir. 1978) ................................... 44

*United States v. Rahman*, 189 F.3d 88 (2d Cir. 1999) ...................................... 35

*United States v. Rittweger*, 524 F.3d 171 (2d Cir. 2008)............................................................ 45

*United States v. Rivera*, 546 F.3d 245 (2d Cir. 2008)................................................................ 45

*United States v. Rosa*, 11 F.3d 315 (2d Cir. 1993) .................................................................... 42

*United States v. Rosen*, 716 F.3d 691 (2d Cir. 2013)................................................................. 13

*United States v. Salameh*, 152 F.3d 88 (2d Cir. 1998)......................................................... 20, 43

*United States v. Sampson*, 385 F.3d 183 (2d Cir. 2004)........................................................... 44

*United States v. Sancho*, 957 F. Supp. 39 (S.D.N.Y. 1997)...................................................... 19

*United States v. Scarpa,* 913 F.2d 993 (2d Cir. 1990) .............................................................. 38

*United States v. Shellef*, 507 F.3d 82 (2d Cir. 2007) ................................................................ 45

*United States v. Stassi*, 544 F.2d 579 (2d Cir. 1976) ................................................................ 39

*United States v. Stavroulakis*, 952 F.2d 686 (2d Cir. 1992) ................................................. 39, 40

*United States v. Szur*, 289 F.3d 200 (2d Cir. 2002) .................................................................. 20

*United States v. Torres*, 901 F.2d 205 (2d Cir. 1990)............................................................... 42

*United States v. Tubol*, 191 F.3d 88 (2d Cir. 1999) .................................................................. 41

*United States v. Turner*, 465 F.3d 667 (6th Cir. 2006) ..................................................... 16, 17

*United States v. Turoff*, 853 F.2d 1037 (2d Cir. 1988) ........................................................ 41, 45

*United States v. Ventura*, 724 F.2d 305 (2d Cir. 1983) ............................................................ 41

*United States v. Wallace*, 85 F.3d 1063 (2d Cir. 1996) .................................................. 31, 33, 34

*United States v. Walsh*, 194 F.3d 37 (2d Cir. 1999) ................................................................... 8

*United States v. Walsh*, 700 F.2d 846 (2d Cir. 1983) ............................................................... 20

*United States v. Warner*, 292 F. Supp. 2d 1051 (N.D. Ill. 2003)................................... 15, 31, 32

*United States v. Warner*, No. 02–CR–506, 2006 WL 2583722 (N.D. Ill. Sept.7, 2006)............. 15

*United States v. Werner*, 620 F.2d 922 (2d Cir. 1980) ............................................................. 44

*United States v. Williams*, 504 U.S. 36 (1992) .......................................................................... 8

*United States v. Zackson*, 6 F.3d 911 (2d Cir. 1993) ............................................................... 43

*Williams v. United States*, 341 U.S. 97 (1951) ........................................................................ 12

**State Cases**

*Bankoski v. Green*, 970 N.Y.S.2d 843 (4th Dep't 2013) ........................................................... 25

*People v. Bright*, 71 N.Y.2d 376 (1988)................................................................................... 26

*People v. Burke*, 82 Misc. 2d 1005 (N.Y. Sup. Ct. 1975).......................................................... 26

*People v. Cunningham*, 88 Misc. 2d 1065 (N.Y. Sup. Ct. 1976)...................................... 27, 28, 29

*Tischler v. Board of Education*, 323 N.Y.S.2d 508 (2d Dep't 1971) ........................................... 24

**Federal Statutes**

16 U.S.C. § 3372 ................................................................................................. 37

18 U.S.C. § 1343 ................................................................................................... 8

18 U.S.C. § 1952 ................................................................................. 20, 29, 30

18 U.S.C. § 2 ...................................................................................................... 29

18 U.S.C. § 3156 ............................................................................................... 23

U.S. Const. Art. VI ........................................................................................... 17

**State Statutes**

N.Y. Elec. L. § 3-204 ....................................................................................... 10

N.Y. Elec. L. § 448 ........................................................................................... 26

N.Y. Elec. L. § 6-120 ........................................................... 10, 22, 25, 36

N.Y. Penal L. § 200.40 .................................................................................... 21

N.Y. Penal L. § 200.45 ............................................................................ *passim*

N.Y. Penal L. § 200.50 ............................................................................ *passim*

**Federal Rules**

Fed. R. Crim. P 14 ..................................................................................... 40, 41

Fed. R. Crim. P. 7 ...................................................................................... 38, 39

Fed. R. Crim. P. 8 ..................................................................................... *passim*

**Other Authorities**

Black's Law Dictionary (7th ed. 1999) ......................................................... 23

Criminal Jury Instructions 2d, New York ....................................... 21, 22, 23

*Federal Prosecution of Election Offenses* (May 2007) ................................ 16

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------ x
UNITED STATES OF AMERICA        :
                                       :

        - against -        :      13 Cr. 297 (KMK)
                                       :

MALCOLM A. SMITH,           :
DANIEL J. HALLORAN,        :
VINCENT TABONE,            :
JOSEPH J. SAVINO,          :
NORAMIE JASMIN, and        :
JOSEPH DESMARET,          :
                                       :

               Defendants.     :
------------------------------------------------------------ x

**GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' PRETRIAL MOTIONS**

The Government respectfully submits this memorandum in opposition to the motions filed by defendants Malcolm A. Smith (Dkt. 93), Daniel J. Halloran (Dkt. 81), Vincent Tabone (Dkt. 104), and Joseph J. Savino (Dkt. 101). Through their motions, the defendants seek: (a) dismissal of Counts One and Two of indictment 13 Cr. 297 (KMK) (the "Indictment") for failure to state an offense of honest services wire fraud, 18 U.S.C. §§ 1343 and 1346; (b) dismissal of Counts One and Two of the Indictment on the ground that the honest services statute, 18 U.S.C. § 1346, is unconstitutionally vague both facially and as applied to the defendants; (c) dismissal of Counts One and Three of the Indictment for failure to state an offense under the Travel Act, 18 U.S.C. § 1952(a)(3); (d) dismissal of Count Four of the Indictment for failure to state an offense under the Hobbs Act, 18 U.S.C. § 1951; (e) dismissal of the Indictment as a contravention of the defendants' First Amendment rights to free assembly and free speech; (f) dismissal of the Indictment for lack of particularity; (g) to strike surplusage from the Indictment;

and (h) a severance of the trial of each of the Counts in the Indictment. Their motions are unsupported by fact or law and should be denied.

## BACKGROUND

### I.     The Indictment

On April 18, 2013, a grand jury returned the Indictment, which charged the defendants in ten counts. Count One charges Smith, Halloran, Tabone, and Savino with conspiring, in violation of Title 18, United States Code, Section 371, to commit honest services wire fraud and to violate the Travel Act in connection with a scheme to bribe leaders of the New York City Republican Party county committees in exchange for a Wilson Pakula certificate that would have enabled Smith to seek the Republican nomination for New York City mayor.  Count Two charges those same defendants with substantive honest services wire fraud and attempt to commit honest services wire fraud in connection with the same bribery scheme, in violation of Title 18, United States Code, Sections 1343, 1346, 1349, and 2.  Count Three charges those same defendants with a substantive violation of the Travel Act in connection with the same bribery scheme, in violation of Title 18, United States Code, Sections 1952 and 2 and New York Penal Law Sections 200.45 and 200.50.

Count Four charges Smith with Hobbs Act extortion, in violation of Title 18, United States Code, Section 1951, arising from his promise to obtain state funding for a Spring Valley, New York community center project in exchange for bribes paid in connection with the scheme charged in Counts One through Three.

Counts Five and Six charge Halloran with wire fraud and a violation of the Travel Act, arising from his acceptance of bribes in exchange for City Council discretionary funds.

Counts Seven through Ten charge Jasmin and Desmaret with mail fraud, in violation of Title 18, United States Code, Section 1343, and Hobbs Act extortion, in violation of Title 18, United States Code, Section 1951, in connection with a scheme in which Jasmin and Desmaret accepted bribes in exchange for their assistance in completing the community center project to which Smith agreed to send New York State transportation money.

## II.     The Offense Conduct

At trial, the Government expects the evidence to establish the following facts.

### A.      The Scheme to Bribe New York City Republican Party Leaders

Between the fall of 2012 and the spring of 2013, Malcolm A. Smith, a Democratic member of the New York State Senate, former acting Lieutenant Governor, and former Majority Leader of the New York State Senate, was considering whether to run for mayor of New York City as a Republican.  From in or about November 2012 through in or about April 2013, Smith agreed with New York City Councilman Daniel J. Halloran, an undercover FBI agent posing as a wealthy real estate developer (the "UC"), and a cooperating witness ("CW") to bribe New York City Republican Party county leaders.  The bribe payments were in exchange for the Republican leaders' authorization for Smith to appear on the 2013 New York City mayoral ballot as a Republican candidate, even though Smith was a registered Democrat. Because Smith was not a registered Republican, under New York state law, he needed the approval of three of the five New York City Republican county executive committees in a form known as a "Wilson Pakula certificate" in order to appear on the ballot's Republican Party line.

In furtherance of the scheme, Halloran negotiated cash bribes to be paid by the UC and the CW to Vincent Tabone, the Vice Chairman of the Queens County Republican Party, Joseph J. Savino, the Chairman of the Bronx County Republican Party, and the chairman of a third

Republican county committee. Halloran also arranged for the UC and the CW to meet Tabone, Savino, and two other Republican county committee chairmen to discuss the possibility of obtaining a Wilson Pakula certificate for Smith and what the chairmen would want in exchange for their approval of Smith to run for mayor as a Republican.

On February 8, 2013, Halloran met at a Manhattan hotel with the UC and CW. During that meeting, Halloran gave the following instructions to the CW and the UC: "So, look, you gotta, you gotta get [Savino] business but put twenty-five in an envelope. . . . [Tabone] is twenty-five up front, twenty-five when the Wilson Pakula is delivered. So, he wants, and he doesn't care about [the Queens County Republican Party] getting anything at this point." On February 10, 2013, the UC and CW met Smith at a hotel in Manhattan. During that meeting, the UC and CW told Smith about their conversation with Halloran and the three discussed how to ensure that Tabone and Savino would follow through on their promise to obtain a Wilson Pakula certificate for Smith after they had been paid. During that conversation, Smith discussed structuring the payments so that only a portion of the bribe would be paid initially, with the remainder to be paid after Smith received the Wilson Pakula certificate. Smith cautioned: "I wouldn't give them more than like ten, just to, just to start out. . . ." Toward the end of the meeting, Halloran joined Smith, the UC and the CW. During that portion of the meeting, Smith said to Halloran, "You've been busy," and Halloran responded that it had been "a heavy lift."

Halloran arranged for the UC and CW to meet with Tabone and Savino at a restaurant in Manhattan on February 14, 2013. In exchange, Halloran solicited and received from the UC and the CW approximately $20,500 in cash for himself. At the restaurant, Tabone and the UC discussed how much it would cost for Tabone to support obtaining a Wilson Pakula certificate for Smith. During that conversation, Tabone gave a "commitment" to "work to get . . . three or

4

four" Republican county chairmen to sign a Wilson Pakula certificate for Smith. In exchange, the UC suggested a payment to Tabone of "twenty now, twenty later" and Tabone responded, "I was thinking twenty-five now, twenty-five later." Tabone also told the UC that he would send the UC a retainer agreement for the money. Following this conversation, Tabone and the UC retired to the UC's car where the UC handed Tabone an envelope containing $25,000 in cash.

The UC and CW also met with Savino at the Manhattan restaurant. During that meeting, Savino agreed to obtain a Wilson Pakula certificate for Smith in exchange for a total payment of $30,000. Like Tabone, Savino got into the UC's car, where he accepted $15,000 in cash and agreed to accept another $15,000 after he formally approved Smith's appearance on the 2013 Republican ballot for New York City Mayor.

In exchange for the bribe payments to Tabone and Savino by the UC and CW, Smith, in his capacity as a New York State Senator, agreed to help obtain $500,000 in New York State funds for road work that would benefit a real estate project in Spring Valley that Smith understood was being developed by the UC's company.

B.     The City Council Discretionary Funding Scheme

Between August 2012 and April 2013, Halloran accepted more than $18,000 in cash bribes and approximately $6,500 in straw donor campaign contribution checks from the UC and the CW in exchange for agreeing to steer up to $80,000 in New York City Council discretionary funding to a consulting company he believed was controlled by the UC and the CW (the "Company"). In particular, in exchange for the cash and checks provided by the UC and CW, Halloran suggested that he give discretionary money from the City Council to the UC and the CW by granting them a contract to perform consulting work on a senior center in Queens (the "Senior Center Project"). The UC told Halloran that he did not want to do any actual work and

5

was seeking "basically a no show" job. Halloran responded that the Senior Center Project might provide what the UC wanted.

In furtherance of this scheme, Halloran wrote two letters on New York City Council letterhead, one to civic organizations and the other to the Company. Despite suggesting in these letters that work would be done by the Company to support the allotment of up to $80,000 in discretionary funding for the Senior Center Project, Halloran agreed with the UC and the CW that the Company would provide no services.

As part of this arrangement, Halloran demanded that the UC and CW return a portion of the discretionary funds back to him in the form of a cash payment.  On November 16, 2012, the UC met Halloran at a restaurant in Queens, New York, and provided Halloran with $10,000 cash in an envelope.  At that same meeting, Halloran agreed to assist Smith in his quest to obtain a Wilson Pakula certificate from the New York City Republican Party.

C.     The Spring Valley Community Center Project

In exchange for the UC and CW's assistance in obtaining a Wilson Pakula certificate for Smith's mayoral run, Smith agreed to direct $500,000 of state transportation money to a community center project that he believed the UC and CW were constructing in Spring Valley, New York (the "Community Center Project").  From September 2011 through April 2013, Noramie Jasmin, the Mayor of Spring Valley, New York, and Joseph Desmaret, the Deputy Mayor of Spring Valley, accepted financial benefits from the UC and the CW in exchange for their assistance in procuring land and money for the Community Center Project. Desmaret accepted approximately $10,500 worth of cash bribes from the UC and the CW in exchange for his vote in favor of a sale of land owned by Spring Valley to a company he believed was controlled by the UC. In exchange for her vote, Jasmin demanded a secret ownership stake in the

company that purchased the property from Spring Valley, which she believed was controlled by the UC and the CW.

In support of the scheme, Jasmin coached the UC on how to make his presentation to the Spring Valley Village Board. She also coached two other individuals, whom she understood were associates of the UC available to pose as competing developers (but who were actually undercover FBI agents), on how to make their presentation to the Village Board. Jasmin and Desmaret also agreed to steer to the UC's company the New York State funding for road work that Smith had pledged to provide.

**ARGUMENT**

**I.     The Honest Services Charges Should Not Be Dismissed**

Smith, Halloran, Tabone, and Savino seek dismissal of Counts One and Two of the Indictment, which allege conspiracy to commit wire fraud, in violation of Title 18, United States Code, Section 371, and substantive wire fraud, in violation of Title 18, United States Code, Sections 1343 and 1346. Both counts are based on the "honest services" theory of wire fraud set forth at Title 18, United States Code, Section 1346. The defendants argue that the honest services fraud counts should be dismissed because: (i) the allegations set forth in the indictment are insufficient to constitute an offense (Smith Br. 2-16, 18-19; Tabone Br. 25-38); and (ii) Section 1346 is unconstitutionally vague both facially and as applied to this case (Smith Br. 16-18; Tabone Br. 15-25). In addition, Tabone, in the context of arguing that the honest services fraud statute is unconstitutionally vague, contends that an application of the statute to this case would contravene the First Amendment to the United States Constitution. (Tabone Br. 17-18). The defendants' arguments, which are foreclosed by the Supreme Court's decision in *Skilling v. United States*, 130 S.Ct. 2896 (2010), are meritless and their motions should be denied.

7

A.    Applicable Law

Rule 7(c) of the Federal Rules of Criminal Procedure requires that an indictment contain

a "plain, concise and definite written statement of the essential facts constituting the offense

charged." The validity of an indictment is tested by its allegations, not by whether the

Government can ultimately prove its case. *See Costello v. United States*, 350 U.S. 359, 363

(1956); *United States v. Contreras*, 776 F.2d 51, 54 (2d Cir. 1985). To that end, the Second

Circuit has concluded that "'an indictment need do little more than to track the language of the

statute charged and state the time and place (in approximate terms) of the alleged crime.'" *United

States v. Alfonso*, 143 F.3d 772, 776 (2d Cir. 1998) (citation omitted); *accord United States v.

Walsh*, 194 F.3d 37, 44 (2d Cir. 1999). An indictment will be deemed sufficient "unless it is so

defective that it does not, by any reasonable construction, charge an offense for which the

defendant [can be] convicted." *United States v. Orena*, 32 F.3d 704, 714 (2d Cir. 1994) (citations

omitted). Accordingly, "[a]n indictment returned by a legally constituted and unbiased grand

jury, . . . if valid on its face, is enough to call for trial of the charges on the merits." *Costello*, 350

U.S. at 365; *see also United States v. Williams*, 504 U.S. 36, 54 (1992).

The wire fraud statute prohibits the use of interstate wires by one who has "devised or

intend[ed] to devise any scheme or artifice to defraud, or for obtaining money or property by

means of false or fraudulent pretenses, representations, or promises," 18 U.S.C. § 1343, or "a

scheme or artifice to deprive another of the intangible right of honest services." 18 U.S.C. §

1346. As the Supreme Court recently instructed, the statute proscribes "fraudulent schemes to

deprive another of honest services through bribes or kickbacks supplied by a third party who had

not been deceived." *Skilling v. United States*, 130 S.Ct. 2896, 2928 (2010). "[T]o violate the right

to honest services, the charged conduct must involve a quid pro quo, *i.e.*, an 'intent to give or

8

receive something of value in exchange for an . . . act.'" *United States v. Nouri*, 711 F.3d 129, 139 (2d Cir. 2013) (quoting *United States v. Bruno*, 661 F.3d 733, 743–44 (2d Cir. 2011)) (ellipsis in original); *see also United States v. Bahel*, 662 F.3d 610, 635–36 (2d Cir. 2011) ("the 'corrupt' intent necessary to a bribery conviction is in the nature of a quid pro quo requirement; that is, there must be a specific intent to give something of value in exchange for an official act.") (internal quotations and modifications omitted).

B.    Counts One and Two Properly Allege Honest Services Wire Fraud

Smith, Halloran, and Savino initially argue that the Government has failed to allege a violation of the honest services statute because "[t]he public simply has no cognizable right to the honest services of" "private individual[s] involved in politics." (Smith Br. 5). As Tabone rightly notes, however, the Indictment does not allege that the defendants violated a fiduciary duty owed to the public, rather, it alleges that they deprived "the New York City Republican Party county committees and members of the Republican Party of the honest services of leaders of such county committees." (Indict. ¶¶ 59, 63; Tabone Br. 1-2). Smith, Halloran, and Savino do not dispute—nor can they—that Savino and Tabone, as members of the Bronx and Queens County Republican Party Executive Committees, each owed a fiduciary duty to their respective party committees and the members of their respective parties.

Tabone's conclusory claim that "a party officer does not owe a duty of honest services to the political party," on the other hand, is contradicted by the very authority he cites in support of his motion. *See, e.g., United States v. Murphy*, 323 F.3d 102, 111 (3d Cir. 2003) (noting that defendant in *Margiotta* himself conceded that "party officials . . . owe a fiduciary duty to their employer, the political party"); *United States v. Adler*, 274 F. Supp. 2d 584, 587 (S.D.N.Y. 2003) (Democratic party county committee members owe fiduciary duty "to the Democratic Party

9

members"). Tabone's repeated incantation that he was an unpaid volunteer does not alter the analysis and, notably, he cites no authority that an unpaid party officer is permitted to accept bribes in the course of his duties on behalf of the party.

To the extent that Smith, Halloran, and Savino argue that honest services fraud reaches only public, not private, actors, they are mistaken. *See, e.g.*, *Skilling*, 130 S.Ct. at 2934 n.45 ("§ 1346's application to state and local corruption and to private-sector fraud reaches misconduct that might otherwise go unpunished"); *Bahel*, 662 F.3d at 632 (affirming conviction of foreign national U.N. employee for mail fraud and noting that "*Rybicki*, like *Skilling*, stands for the proposition that fraud actionable under Section 1346 is limited to the nature of the offenses prosecuted in the pre-*McNally* cases . . . not the identity of the actors involved in those cases"); *United States v. Rybicki*, 354 F.3d 124 (2d Cir. 2003) (rejecting as applied constitutional vagueness challenge to honest services fraud charges where attorneys bribed insurance adjusters).

Even if the Indictment here—as Smith mistakenly claims—had alleged that the defendants owed a duty of honest services to the public, the defendants' motion would still fail. Party county executive committee members in New York State are granted an exclusive right under New York State law to exercise certain powers that have an impact on the public as a whole, not just the members of their own party. *See, e.g.,* N.Y. Elec. L. § 3-204 (appointment of members to the New York City Board of Elections); N.Y. Elec. L. § 6-120 (designation and appointment for political positions and authority to authorize non-party members to seek appointment and nomination on party's ballot line). In exercising these duties, party officers act more like elected public officials than private citizens. Unsurprisingly, then, New York State law holds those officers to the same anti-bribery standards as public officials in the exercise of their

10

state law-granted duties. *See, e.g.,* N.Y. Penal L. §§ 200.45 and 200.50 (prohibiting giving a bribe to "public servant[s]" and "party officer[s]" and conversely prohibiting those servants and officers from receiving bribes).

Accordingly, as the Indictment properly alleges that Tabone and Savino owed a duty of honest services to the Republican Party and its committees, the defendants' motion to dismiss Counts One and Two should be denied.

C.     The Honest Services Fraud Statute is Not Unconstitutionally Vague

All of the defendants argue that the honest services fraud statute is unconstitutionally vague both facially and as applied to this case because "nothing in the text of the honest services fraud statute, or the history of enforcement of this statute could give fair warning to a political party member that he might be violating a penal statute by advocating a particular political act in exchange for money." (Tabone Br. 15-25; Smith Br. 16-18). Their argument runs counter to both Supreme Court and Second Circuit precedent.

As an initial matter, in *Skilling*, the Supreme Court resolved the exact same facial attack on the honest services statute that the defendants now mount. *See Skilling*, 130 S.Ct. at 2929-2931 (declining the defendant's request to strike section 1346 "*in toto*" and holding that, in limiting the statute to bribery and kickback schemes, the Court had "preserve[d] the statute without transgressing constitutional limitations"). Accordingly, the defendants' facial attack on the statute should be denied.

The defendants' as-applied attack is equally meritless. The void-for-vagueness doctrine requires that a "penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *United States v. Nadirashvili*, 655 F.3d 114, 121 (2d

Cir. 2011) (quotation omitted). The law has long made obvious to "ordinary people" that quid pro quo bribery constitutes a crime. Indeed, in *Skilling*, the Supreme Court held that quid pro quo bribery was plainly unlawful even well before it narrowed and clarified the honest services fraud statute. *See Skilling,* 130 S. Ct. at 2933 (explaining that "whatever the school of thought concerning the scope and meaning of § 1346, it has always been as plain as a pikestaff that bribes and kickbacks constitute honest services fraud . . . and the statute's mens rea requirement further blunts any notice concern") (quoting *Williams v. United States*, 341 U.S. 97, 101 (1951)) (internal quotation marks omitted).

The contours of quid pro quo bribery are equally well-settled. To establish the quid pro quo "necessary to a bribery conviction," the evidence must establish a "specific intent to give . . . something of value *in exchange for* an official act." *United States v. Alfisi*, 308 F.3d 144, 149 (2d Cir. 2002) (internal citation omitted; emphasis in original). However, "the government need *not* show that the defendant intended for his payments to be tied to specific official acts." *Bahel*, 662 F.3d at 635 (quoting *United States v. Ganim*, 510 F.3d 134, 148 (2d Cir. 2007)) (emphasis in original). Rather, quid pro quo bribery is proved where "the evidence shows that the 'favors and gifts . . . [are] *in exchange for* a pattern of official actions favorable to the donor." *Ganim*, 510 F.3d at 149 (citation omitted; emphasis in original).

Additionally, for two decades, the Second Circuit has rejected the notion that the Government must prove an express, rather than an implied, quid pro quo agreement outside the campaign finance context. On the contrary, the Second Circuit has repeatedly held that "it is sufficient if the . . . official understands that he or she is expected as a result of the payment to exercise particular kinds of influence — *i.e.*, on behalf of the payor — as specific opportunities

arise." *United States v. Coyne*, 4 F.3d 100, 114 (2d Cir. 1993); *accord Bruno*, 661 F.3d at 744;

*Ganim*, 510 F.3d at 145.

In short, the Second Circuit has "made it crystal clear that the federal bribery and honest

services fraud statutes . . . criminalize 'scheme[s] involving payments at regular intervals in

exchange for specific official[ ] acts as the opportunities to commit those acts arise,' even if 'the

opportunity to undertake the requested act has not arisen,' and even if the payment is not

exchanged for a particular act but given with the expectation that the official will 'exercise

particular kinds of influence.'" *United States v. Rosen*, 716 F.3d 691, 700 (2d Cir. 2013) (quoting

*Coyne*, 4 F.3d at 114) (alteration in original, internal citations omitted). "Once the quid pro quo

has been established, the specific transactions comprising the illegal scheme need not match up

this for that." *Id*. (quoting *Ganim*, 510 F.3d at 147).

Here, the defendants are alleged to have engaged in precisely the type of quid pro quo

scheme that Section 1346 prohibits. The Indictment alleges that Smith caused the UC and CW to

pay cash bribes on his behalf to Tabone and Savino in exchange for their procuring a Wilson

Pakula certificate for Smith to run as a Republican in the 2013 New York City mayoral race.

(Indict. ¶ 5(a)). For their part, both Tabone and Savino are alleged to have accepted cash in an

envelope while sitting in a car outside a Manhattan restaurant in exchange for their promise to

obtain a Wilson Pakula certificate for Smith.  Halloran is alleged to have orchestrated the entire

affair—negotiating the bribes and arranging the meetings in exchange for more than $20,000 in

cash for himself. Such allegations bring this case within the core of honest services fraud. As the

Supreme Court explained, "[a] criminal defendant who participated in a bribery or kickback

scheme . . . cannot tenably complain about prosecution under § 1346 on vagueness grounds."

*Skilling*, 130 S.Ct. at 2934; *see also Rosen*, 716 F.3d at 700 ("The illegality of an 'as

opportunities arise' quid pro quo agreement has been established in this Circuit for more than two decades.").

The defendants' assertion that this case represents an "unprecedented" application of the honest services statute does not withstand scrutiny. (Tabone Br. at 2).  This case represents an application of § 1346 to a garden variety bribery scheme.  *See Skilling*, 130 S.Ct. at 2933 (citing broad range of cases applying Section 1346 to prosecute bribery).  To the extent that the defendants claim that the Government is stretching honest services fraud beyond its former bounds by charging a party official as a defendant, they are mistaken.  As even the defendants recognize, in *Margiotta*, the Second Circuit affirmed the conviction of a member of a Republican County Committee under an honest services theory of mail fraud.  *See United States v. Margiotta*, 688 F.2d 108, 121-130 (2d Cir. 1982).[1]  The defendants have pointed to no rule of law providing special protection to party leaders from prosecution when they defraud their parties, and for good reason—there is none.

The cases cited by the defendants that criticized *Margiotta* are inapposite. (Smith Br. 3-15; Tabone Br. 30-31). Each was penned before the *Skilling* decision clarified the boundaries of honest services fraud and criticizes *Margiotta* for finding a duty owed to *the public* by a private party member.  *See Murphy*, 323 F.3d at 117 (reversing conviction of party official who used influence over elected party members to engage in contracts-for-payments scheme where honest services fraud charges alleged a duty owed to the public); *United States v. Adler*, 274 F. Supp. 2d

---

[1] The defendants' claim that *Margiotta* has been repudiated misses the mark. Although *Margiotta* was later abrogated by the Supreme Court's decision in *McNally*, in which the Court struck down the honest services theory of mail and wire fraud entirely, *McNally v. United States*, 483 U.S. 350, 353 (1987), the subsequent passage of Section 1346 breathed new life into the *Margiotta* decision, and the Second Circuit still cites it as "precedent" on the question of what fiduciary duties give rise to honest services liability. *Bahel*, 662 F.3d at 633.

584, 587 (S.D.N.Y. 2003) (noting, in *dicta*, that Democratic County Committee chairman owed a duty "to the Democratic Party members, in connection with, [among other things,] the recruiting and nominating of candidates," but did not owe a duty to the public); *United States v. Warner*, 292 F. Supp. 2d 1051, 1063 (N.D. Ill. 2003) (private individual who used relationship with state employee to influence the state's decisions for his own personal gain could not be charged with "defrauding *the public* of *his own* honest services") (emphasis added); *compare United States v. Warner*, No. 02–CR–506, 2006 WL 2583722, at *1 (N.D. Ill. Sept. 7, 2006) (denying motion for acquittal where the same *Warner* defendant was convicted of defrauding the public out of the former Illinois governor's honest services), *aff'd*, 498 F.3d 666 (7th Cir. 2006).  Here, the Government does not allege a breach of a duty of honest services to the general public, as the Government did in *Margiotta*.  Rather, the Government is prosecuting the defendants for engaging in a scheme to deprive the party itself of the honest services of its officers.  In engaging in that scheme, Tabone and Savino abused, for their own personal financial gain, the trust placed in them by their fellow county committee members and the members of their parties. The *Skilling* Court set clear boundaries for honest services fraud, and this case falls squarely within those bounds.

In short, the law is clear—and has been for decades—that undisclosed acceptance of personal financial benefits by the officer of an organization—here, thousands of dollars in cash in an envelope—in exchange for taking action on behalf of the organization, where the scheme involves interstate wires, constitutes honest services fraud.  *See Skilling*, 130 S.Ct. at 2933.

D.       The Defendants' Remaining Attacks on the Honest Services Charges Are Meritless

Tabone relies on a Department of Justice ("DOJ") manual in an attempt to find some support for his position. (Tabone Br. 16). He claims that its analysis that "most voter fraud schemes do not appear to involve . . . an objective" of "depriv[ing] a victim of the intangible right of honest services," Department of Justice, *Federal Prosecution of Election Offenses* 77-78 (May 2007), constitutes a barrier to this prosecution. (Tabone Br. 16). The premise of Tabone's argument is unsound because this is not a "voter fraud" prosecution.  This prosecution does not involve "elected officials and campaign workers who falsify votes and thereby defraud the electorate of the right to an honest election." *United States v. Handakas*, 286 F.3d 92, 101-02 (2d Cir. 2002); *see also United States v. Turner*, 465 F.3d 667, 671 (6th Cir. 2006) (defendant charged with funneling straw donations to candidate and using the donated money to pay voters to vote for candidate). Instead, this is an honest services prosecution involving bribery for official action by a party official.

Even if Tabone were correct that this prosecution does not accord with the advice regarding election offenses contained in the DOJ manual, which he is not, that advice "provides no substantive rights to criminal defendants." *United States v. Piervinanzi*, 23 F.3d 670, 682 (2d Cir. 1994); *see also United States v. Craveiro*, 907 F.2d 260, 264 (1st Cir. 1990) ("the internal guidelines of a federal agency, that are not mandated by statute or the constitution, do not confer substantive rights on any party"). In addition, any such pronouncement in the 2007 version of that manual would necessarily need to be revised in light of the Supreme Court's 2010 decision in *Skilling* which clarified the scope of the honest services fraud statute.

Tabone's effort to characterize his behavior as permissible "political horsetrading" (Tabone Br. 17) is equally misguided. He did not trade one political favor for another. He traded the exercise of a state-created privilege belonging to a political party committee for personal financial benefit—an envelope containing $25,000 in cash and the promise of another $25,000 when he had followed through on his promise. *See, e.g., Turner*, 465 F.3d at 671 ("honest services fraud is 'anchored upon the defendant's misuse of his public office for personal profit.'") (quoting *United States v. Gray*, 790 F.2d 1290, 1295 (6th Cir. 1986)).

Tabone's assertion that this case impedes upon Tabone's First Amendment rights equally lacks any basis in law or fact. As described further in Section IV below, the First Amendment does not protect bribery. Tabone is free to "voic[e] his poltical views, ideas, and [exercise his] associational rights to support a potential candidate for election." (Tabone Br. 18). What he cannot lawfully do is demand or accept an undisclosed personal cash payment in exchange for his agreement to use his position on a party county committee to cause that committee to grant a waiver from the state law barring a person from appearing on the party's ballot line.

Tabone's contention that the Government is precluded from prosecuting state political committees that are organized under state law is equally baseless. While it is certainly true that the Republican Party County Committees are creatures of New York law, (Tabone Br. 19-21), it is simply not the case that only the state can prosecute a fraud practiced on those committees and the party's members. Tabone cites no authority for the contrary conclusion, and for good reason—any such authority would contravene the Supremacy Clause of the United States Constitution and nearly a century of mail and wire fraud jurisprudence. *See* U.S. Const. Art. VI, Cl. 2; *Badders v. United States*, 240 U.S. 391, 398 (1916) ("Congress may forbid any such act done in furtherance of a scheme that it regards as contrary to public policy, whether it can forbid

17

the scheme or not" since "[t]he overt act of putting a letter into the post office of the United States is a matter that Congress may regulate."); *cf. United States v. Antelope*, 430 U.S. 641, 670 n.13 (1977) (citing Supremacy Clause for proposition that federal criminal laws apply where there is federal jurisdiction even if applicable state laws would be more lenient).

While Tabone may believe "there is no imaginable conflict between a party official and his or her party which would necessitate the involvement of the federal government," (Tabone Br. 20), such a conflict plainly arises where a party officer accepts personal cash payments in exchange for action taken on behalf of his party. This is especially true where, as here, that action affects the ballot for mayor of the nation's most populous city. By the same measure, although it may be true that New York State could prosecute the defendants for violations of the anti-bribery provisions of its Penal Law, that fact does not preclude the Government from enforcing its own prohibition on corrupt behavior.  *See, e.g., United States v. Papdakis*, 510 F.2d 287, 296 (2d Cir. 1975) (affirming narcotics conviction arising in "unusual situation where state and federal violations may be the result of the same act").  There is a powerful federal interest here.  The defendants are charged with offering and accepting bribes relating to the election of an executive officer who would oversee the expenditure of millions of dollars in federal money. *See Sabri v. United States*, 541 U.S. 600, 605 (2004) (describing federal interest in enforcing its bribery laws and noting that "Congress does not have to sit by and accept the risk of operations thwarted by local and state improbity").  Nor is there anything to be gainsaid by the defendants' bald assertion that New York State would not enforce its own laws in this context.  *See Skilling*, 130 S.Ct. at 2934 n. 45 ("§ 1346's application to state and local corruption and to private-sector fraud reaches misconduct that might otherwise go unpunished").

Finally, Tabone's assertion that his conduct—accepting an undisclosed cash payment in exchange for a "commitment" to get Smith a Wilson Pakula certificate—can somehow co-exist with his fiduciary obligations to his employer are matters for the jury. (Tabone Br. 34-38). The Indictment does not, and simply cannot, contain the universe of the Government's proof, and a motion to dismiss is not the appropriate forum to litigate the merits of this case. *See Costello v. United States*, 350 U.S. 359, 364 (1956) ("a rule permitting defendants to challenge indictments on the ground that they are not supported by competent evidence . . . would run counter to the whole history of the grand jury institution"). To the extent that Tabone argues that he lacked the requisite mens rea because he could not follow through on his promise, he is mistaken. It has long been established that "[i]mpossibility is not a defense under the Wire Fraud Act." *United States v. Sancho*, 957 F. Supp. 39, 42 n.1 (S.D.N.Y. 1997).

As the Indictment adequately alleges a violation of, and a conspiracy to violate, the statute prohibiting honest services wire fraud and that statute passes constitutional muster, the Court should deny the defendants' motions to dismiss Counts One and Two.

## II.      The Indictment Properly Alleges a Violation of the Travel Act

Halloran, Smith, and Tabone contend that Counts One and Three should be dismissed because (i) bribery in exchange for authorization to seek a party's nomination is not illegal under their reading of New York law, and (ii) the Indictment alleges insufficient interstate activity to support a Travel Act prosecution. The defendants are wrong. First, Sections 200.45 and 200.50 of the New York Penal Law extend to bribery in exchange for the authorization to seek a nomination because those statutes prohibit bribery in exchange for "an agreement or understanding" that someone "may be" designated or nominated as a candidate. Second, the

defendants' voluntary use of interstate communications to carry out the offense, as alleged in the Indictment, constitutes sufficient interstate activity to support the Travel Act counts.

A.    Applicable Law

1.    The Travel Act

The Travel Act "is a substantive offense that . . . punishes individuals for using facilities of interstate or foreign commerce to further certain unlawful activities." *United States v. Jenkins*, 943 F.2d 167, 173 (2d Cir. 1991); *see* 18 U.S.C. § 1952(a). "Unlawful activity" includes "extortion, bribery, or arson in violation of the laws of the State in which committed or of the United States," among other offenses. 18 U.S.C. § 1952(b)(2). The Travel Act is violated when a defendant "use[s] a facility of interstate or foreign commerce to make easier or facilitate the intended unlawful activity, and thereafter [commits] one additional act in furtherance of the unlawful activity." *Jenkins*, 943 F.2d at 173 (internal quotation marks omitted).

A Travel Act violation is therefore adequately pled when the Government alleges that a defendant "(1) used a facility of interstate or foreign commerce; (2) with intent to commit any unlawful activity (including [bribery] in violation of New York state law); and (3) thereafter performed an additional act to further the unlawful activity." *United States v. Salameh*, 152 F.3d 88, 152 (2d Cir. 1998) (citing *Jenkins*, 943 F.2d at 172). Where a state offense constitutes the relevant unlawful activity, state law defines the parameters of that offense. *See United States v. Szur*, 289 F.3d 200, 210-11 (2d Cir. 2002).  The Second Circuit has taken a broad view of what constitutes "bribery" for purposes of the Travel Act.  *See United States v. Walsh*, 700 F.2d 846, 858 (2d Cir. 1983) (finding New Jersey "gratuity" statute "well within the broad generic description of bribery").

20

2.      Sections 200.45 and 200.50 of the New York Penal Law

Under New York law, it is illegal to offer, pay, solicit, or receive a bribe in connection with an appointment, designation, or nomination for public office. Section 200.45 governs the offering or paying of bribes, as it prohibits "confer[ring], or offer[ing] or agree[ing] to confer, any money or other property upon a public servant or a party officer upon an agreement or understanding that some person will or may be appointed to a public office or designated or nominated as a candidate for public office." N.Y. Penal L. § 200.45. Similarly, Section 200.50 bars soliciting or receiving bribes by party officers "upon an agreement or understanding that some person will or may be appointed to a public office or designated or nominated as a candidate for public office." N.Y. Penal L. § 200.50. The defendants do not contest that Tabone and Savino are "party officers" for purposes of these statutes. *See* N.Y. Penal L. § 200.40 ("'party officer' means a person who holds any position or office in a political party, whether by election, appointment or otherwise.").

These crimes each have two elements. *See* Criminal Jury Instructions 2d, New York ("CJI[NY]"), available at http://www.nycourts.gov/judges/cji/2-PenalLaw/200/art200hp.htm (last accessed October 7, 2013). To prove a violation of Section 200.45, the Government must demonstrate that: (i) the defendant "conferred, or offered, or agreed to confer, any money or other property upon [a public servant or party official] upon an agreement or understanding that a person would or might be appointed to a public office or designated or nominated as a candidate for public office," and (ii) the person who received the bribe or the offer of a bribe "was a public servant or party officer." CJI2d[NY] Penal Law § 200.45 (internal brackets omitted). Similarly, a violation of Section 200.50 has the following elements: (i) "the defendant . . . was a public servant or party officer," and (ii) "the defendant . . . solicited, accepted, or agreed

21

to accept money or other property from another person upon an agreement or understanding that a person would or might be appointed to a public office or designated or nominated as a candidate for public office." CJI2d[NY] Penal Law § 200.50 (internal brackets omitted).

### 3. Section 6-120(3) of the New York Election Law

Under "New York's 'Wilson-Pakula' law . . . a candidate soliciting the endorsement of a political party with which he is not affiliated [must] obtain the approval of the appropriate party committee before filing a petition with the county board of elections designating him as that party organization's endorsed candidate." *Mrazek v. Suffolk County Board of Elections*, 630 F.2d 890, 892 (2d Cir. 1980). The Wilson-Pakula law, codified at Section 6-120(3) of the New York Election Law, provides that in New York City, "such authorization must be by a majority vote of those present at a joint meeting of the executive committees of each of the county committees of the party within the city of New York." N.Y. Elec. L. § 6-120(3). Accordingly, a non-party member who seeks that party's nomination for public office must first obtain authorization from at least three out of five county committees before he can even compete for the nomination.

### B. Discussion

#### 1. Sections 200.45 and 200.50 Apply to Bribery in Connection with a Wilson-Pakula Authorization

Halloran, Smith, and Tabone contend that Sections 200.45 and 200.50 do not extend to bribery in connection with obtaining a Wilson Pakula certificate. In their view, "[a] Wilson Pakula certificate is *neither* a designation *nor* a nomination" and therefore beyond the scope of Sections 200.45 and 200.50. (Halloran Br. 3; Smith Br. 19-21 (same); Tabone Br. 3 (same)). As they see it, a Wilson-Pakula certificate is simply a "permission-slip" that authorizes the holder to seek a designation or nomination. (Halloran Br. 11; Smith Br. 23 ("The best way to describe a Wilson-Pakula certificate may be as a certificate of 'authorization,' 'permission' or 'approval'

provided to a non-party member."); Tabone Br. 9 ("[T]he Wilson Pakula authorization . . . simply opens the party primary process to persons who would otherwise be legally barred.")). Because a Wilson-Pakula certificate does not guarantee a designation or nomination, the defendants believe that it can be the object of bribery without violating Sections 200.45 and 200.50.

The text of those provisions flatly contradicts the defendants' position. Sections 200.45 and 200.50 bar bribery in connection with an "agreement or understanding" that someone "will or *may be*" appointed, nominated, or designated. The natural reading of that text is that bribery is barred with respect to both (i) the guarantee of an appointment, nomination, or designation; and (ii) permission to seek or the possibility of obtaining an appointment, nomination, or designation. *See* Black's Law Dictionary 993 (7th ed. 1999) (defining "may" as "[i]s permitted to," "[h]as a possibility (to)," and "might"); *see, e.g.*, *United States v. Dillard*, 214 F.3d 88, 92 (2d Cir. 2000) ("This clause speaks to offenses that give rise to a possibility, rather than a certainty, that force may be used. This is clear from its use of the terms 'substantial *risk* that physical force . . . *may* be used.'" (quoting 18 U.S.C. 3156) (emphasis in original)). The inclusion of the words "may be" in the statutory text—which are completely ignored by the defendants—expand the scope of the prohibited conduct to reach not just the certainty of obtaining an appointment, nomination, or designation, but also the possibility of obtaining such a benefit.

The pattern jury instructions, published by the New York State Court System, confirm this view. Under those instructions, bribery violates Sections 200.45 and 200.50 when the object of the bribery is that "a person *would or might be* appointed to a public office or designated or nominated as a candidate for public office." CJI2d[NY] Penal Law §§ 200.45, 200.50 (emphasis added). These instructions make plain that these laws are violated when the bribe is in exchange

23

for (i) the promise of an appointment, designation or nomination ("would be"); or (ii) other steps taken for the purpose of causing or creating the possibility of an appointment, designation or nomination ("might be").

This construction of the statutes makes good sense, as it reflects that there are occasions where a public servant or party official can directly confer a benefit in exchange for a bribe, such as an appointment, designation or nomination that is solely within the discretion of that official, s*ee, e.g.*, *Margiotta*, 688 F.2d at 125 (noting that "the Chairman of the Nassau County Democratic and Republican Committees are given the authority to nominate a Commissioner of the Nassau County Board of Elections"), as well as occasions where a public servant or official can confer only eligibility for a benefit because the ultimate appointment, designation or nomination lies beyond a single official's power, s*ee, e.g.*, *Tischler v. Board of Education*, 323 N.Y.S.2d 508, 512 (2d Dep't 1971) ("The Superintendent's recommendation is a screening device which brings before the Board of Education all those who are qualified by objective standards" for the appointment which is made by the Board alone). Sections 200.45 and 200.50 reach bribery in exchange for both types of benefits.

A Wilson-Pakula certificate falls within the latter category of benefit for which bribery is prohibited under Sections 200.45 and 200.50. As the defendants acknowledge, a Wilson-Pakula certificate is permission, authorization or approval to seek a designation or nomination. (Halloran Br. 11; Smith Br. 23; Tabone Br. 9). Upon the issuance of such a certificate, a non-party member "may be" nominated or designated as a candidate.  In other words, he or she is then "permitted to" seek a nomination or designation, or "might be" nominated or designated. Conversely, absent such an authorization, a non-party member cannot be nominated or designated a candidate.  This is exactly how New York Courts describe a Wilson-Pakula certificate. *See, e.g.*, *Bankoski v.*

24

*Green*, 970 N.Y.S.2d 843, 844 (4th Dep't 2013) ("Because the Unenrolled Candidates were registered Republicans, they could not be designated as candidates on the Conservative Party's primary ballot without *authorization* from the [relevant] party committee." (citing N.Y. Elec. L. § 6-120(3) (emphasis added)). The Second Circuit's view is no different. *See Mrazek*, 630 F.2d at 892 ("New York's 'Wilson-Pakula' law . . . requires that a candidate soliciting the endorsement of a political party with which he is not affiliated obtain the approval of the appropriate party committee before filing a petition with the county board of elections designating him as that party organization's endorsed candidate").  Accordingly, a Wilson-Pakula certificate falls well within the prohibition of bribery in connection with an "agreement or understanding" that someone "may be . . . designated or nominated as a candidate for public office" set forth in Sections 200.45 and 200.50.

The state legislature did not need to refer explicitly to a Wilson-Pakula certificate in the statutory text to bring that authorization within the statute's ambit, as Halloran and Smith urge. (Halloran Br. 7; Smith Br. 26-27). To maintain otherwise, the words "may be" must be excised from the statute.  And the defendants do exactly that when they assert that the bribery outlawed by Sections 200.45 and 200.50 must be in return for a guarantee of a designation or nomination. (Halloran Br. 3; Smith Br. 19-21; Tabone Br. 3). While the defendants may wish these words did not appear in the statute, ignoring their presence is an impermissible method of statutory interpretation. Quite to the contrary, the Supreme Court has counseled that "a court should give effect, if possible, to every clause and word of a statute." *Moskal v. United States*, 498 U.S. 103, 109 (1990) (internal quotation marks omitted); *see also Perez v. Westchester County Dep't of Corr.*, 587 F.3d 143, 155 (2d Cir. 2009) ("[W]e construe statutes to avoid surplusage whenever possible."). The construction the defendants urge would be correct only if the statute read "*will*

*be* appointed, nominated or designated," rather than "*will or may be* appointed," nominated or designated, as it now reads. The Court should reject the defendants' invitation to ignore the statutory text, which by its terms reaches bribery for a Wilson-Pakula certificate.

Halloran relies on *People v. Burke*, 82 Misc. 2d 1005 (N.Y. Sup. Ct. 1975), to support his construction of Sections 200.45 and 200.50. (Halloran Br. 19). But *Burke* addressed statutory language far different from the text at issue here, which language omits the critical "may be" phrase. *See* 82 Misc. 2d at 1006 (discussing N.Y. Elec. L. § 448(3) which prohibits payments or benefits to any person "upon an understanding or promise" of "nomination or appointment").

Smith and Tabone's contention that the rule of lenity tips the scales in favor of their construction of the statute is equally meritless. (Smith Br. 27-28; Tabone Br. 11). For the reasons stated above, Sections 200.45 and 200.50 are not ambiguous, and therefore the rule of lenity has no application here. *See United States v. Cullen*, 499 F.3d 157, 164 (2d Cir. 2007) ("To invoke lenity there must be grievous ambiguity in a statute."); *see also Muscarello v. United States*, 524 U.S. 125, 138 (1998) ("The rule of lenity applies only if, after seizing everything from which aid can be derived, we can make no more than a guess as to what Congress intended." (internal quotation marks and ellipses omitted)).

Finally, Halloran's claim that the statutes failed to give "fair warning" of the prohibited conduct cannot be credited. (Halloran Br. 13-14). As noted, the prohibited conduct under the statute is not ambiguous. But even if there were some ambiguity in the statute, Halloran is hard-pressed to assert credibly that he was unaware that this form of bribery was unlawful. *See People v. Bright*, 71 N.Y.2d 376, 382-83 (1988) ("[D]ue process requires that a penal statute be sufficiently definite by its terms so as 'to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute.'" (quoting *United States v. Harriss*, 347

U.S. 612, 617 (1954)).  The illegality of paying bribes in order to seek a ballot line is plain. *Cf., e.g.*, *United States v. Frega*, 179 F.3d 793, 803 (9th Cir. 1999) ("[A] person of reasonable intelligence would conclude that the accepting of bribes while sitting as a judge constituted a criminal offense.").  Indeed, the actions of the defendants made plain their knowledge of the criminal nature of their conduct, such as Tabone and Savino's acceptance of cash in an envelope inside a car (Compl. ¶¶ 66, 68), and Tabone's frisking the undercover agent in an apparent effort to ensure that their conversation was not recorded (Compl. ¶ 67).

> 2.   The Frequency of Prosecutions under Sections 200.45 and 200.50 Has No Bearing on Whether this Prosecution is Authorized by Law

Halloran argues that the infrequency of prosecutions under Sections 200.45 and 200.50 is a basis to dismiss Counts One and Three. (Halloran Br. 7 ("In the nearly fifty years since these bribery statutes became law, only two criminal cases have been published wherein charges were brought under these two statutes.")).  Halloran identifies no legal principle that would support such a result, and for good reason.  It is not the law.  *Cf. United States v. Douglas*, 713 F.3d 694, 701 (2d Cir. 2013) (rejecting "relative infrequency of prosecution" argument in context of challenge to sentence).  Besides, the only the evidence of infrequency of prosecution that Halloran can point to is a lack of reported decisions.  The absence of reported decisions, however, signifies nothing, particularly in a criminal justice system dominated by pretrial pleas (and where the crime involves cash in an envelope in exchange for a place on a ballot).

The authority Halloran does reference is inapposite.  He places great weight on *People v. Cunningham*, 88 Misc. 2d 1065, 1075 (N.Y. Sup. Ct. 1976), but the facts of that case, which did not involve a personal cash payment to a party leader, bear no resemblance to those at issue here.  In *Cunningham*, the defendant, a political party leader, was alleged to have acted illegally by

supporting a sitting city councilman's judicial nomination in exchange for (i) a monetary

contribution to the party; and (ii) that candidate's agreement to resign early so that the party

could avoid a primary contest over the seat. *Id.* at 1069-70, 1077.

The judge in *Cunningham* held that the monetary contribution to the party did not run

afoul of Section 200.45 because "the capacity and willingness of candidates to finance their

political campaigns is often a significant factor in determining the selection of candidates" and a

party official seeking to offset the cost of campaigning for a candidate does not amount to

soliciting a bribe. *Id.* at 1079. Here, in contrast, the Indictment does not allege that the party

officials were seeking funds to offset the costs of Smith's campaign for mayor; it alleges that

they sought and received concealed cash payments for their personal use in exchange for a

Wilson Pakula certificate (*i.e.*, a bribe).

In his brief, Halloran quotes from a passage in *Cunningham* that addressed the "settled

judgment of prosecutors" not to bring charges under a statute that it characterized as

"ambiguous." (Halloran Br. 8). This quotation has little relevance here because the judge was

referring to Section 448 of the Election Law, not Sections 200.45 and 200.50 of the Penal Law.

*Id.* at 1074-75. In point of fact, the judge found Sections 200.45 and 200.50 clear on the point

that he found ambiguous in Section 448. *Id.* at 1074. Moreover, the "settled judgment of

prosecutors" that the judge in *Cunningham* referred to was the determination that "a promise to

resign in order to confer a benefit upon a political organization[] does not in fact state a violation

of the law." *Id.* 1075-76. Here, of course, the Government makes no such claim, as it has

charged the party officials with soliciting and receiving bribes for their personal use.

While *Cunningham* does not stand for the propositions that Halloran advances, it is

nevertheless helpful in resolving the defendants' motions. In *Cunningham*, the defendant argued

that he could not have violated Section 448 because he did not have "the unqualified power to cause such a nomination" to take place.  *Id.* at 1073.  *Cunningham* rejected that argument because crediting it "would leave so wide a gap in the intended statutory protection against corrupt practices in nominations for public office." *Id.* at 1073-74.  Insofar as the defendants contend, like the defendant in *Cunningham*, that they could not have violated Sections 200.45 and 200.50 because they also lacked the "unqualified power" to deliver a designation or nomination, *Cunningham* makes clear that the defendants' argument should be rejected as contrary to the statutory objective of sections 200.45 and 200.50.

### 3.   Halloran Aided and Abetted the Bribery of Others

Halloran further contends that he cannot have violated Sections 200.45 and 200.50 because he neither paid nor received a bribe.  (Halloran Br. 20-24, 24 ("Nowhere . . . does the Indictment indicate that Mr. Halloran *gave* money to anyone" (emphasis in original))).  This argument ignores the fact that Halloran is charged under Title 18, United States Code, Section 2, as well as Section 1952.  Pursuant to Section 2(a), "[w]hoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal."  Here, the Government has alleged that Halloran aided, abetted, counseled, and procured Smith's bribery of Tabone and Savino by, among other things, "arranging meetings with [Tabone and Savino] and negotiating the bribe payments" on behalf of Smith. (Indict. ¶ 5(a)).  Whether Halloran actually paid or received a bribe is irrelevant.

### 4.   The Indictment Alleges Sufficient Interstate Activity

The Indictment alleges a number of interstate communications in furtherance of the Travel Act charges.  *See, e.g.,* Indict. ¶ 51 (telephone call between Smith and UC while UC was in North Carolina); Indict. ¶ 61(l) (alleging interstate text messages between the UC and Smith

and Halloran); Indict. ¶ 62(m) (alleging that the defendants' caused the UC to travel in interstate commerce in furtherance of the mayoral bribery scheme). Smith submits that the Indictment contains insufficient allegations of interstate activity to support a Travel Act prosecution. (Smith Br. 28-33). Smith's argument is premised on a long-discarded understanding of the reach of the Travel Act that should be rejected here.

In order to prove a violation of the Travel Act, the Government must establish interstate or foreign travel or the use of "the mail or any facility in interstate or foreign commerce." 18 U.S.C. § 1952(a). In *United States v. Archer*, the Second Circuit held that this interstate element could not be established by telephone calls that were entirely pretextual in nature or incidental to the underlying criminal activity. 486 F.2d 670, 683 (2d Cir. 1973). The *Archer* Court was faced with three telephone calls that the Government asserted satisfied the Travel Act: (i) an interstate telephone call initiated by an undercover agent for the sole purpose of establishing the interstate element; (ii) another interstate call initiated by a defendant based on an undercover agent's false statement that he could be reached out of state; and (iii) an international call from the agent to a defendant that was purely "casual and incidental" and nothing more than "happenstance." *Id.* 681-83. The *Archer* Court held that the first two calls were insufficient because they were "planted," that is placed for the "sole purpose" of satisfying the interstate element. *Id.* at 682. The third call was insufficient because it was "a matter of happenstance" that was wholly irrelevant to the scheme and because the defendant received the call rather than initiated it. *Id.* at 682-83.

Since deciding *Archer*, the Second Circuit has taken great care to emphasize the limited scope of that holding. On rehearing, the Circuit clarified *Archer*'s holding, explaining that it had not ruled out an undercover agent's interstate travel or use of interstate communications as a

basis for a Travel Act prosecution, but simply determined that "a stricter standard is applicable." *Archer*, 486 F.2d at 686.  While the *Archer* Court adhered to its holding based on the facts of that case, it left "the task of further line-drawing to the future."  *Id.*  Later, in *United States v. Lau Tung Lam*, the Second Circuit stated that *Archer* "questioned, but stopped short of deciding, whether telephone calls by a federal agent could ever supply the jurisdictional element required by the Travel Act."  714 F.2d 209, 210 (2d Cir. 1983).  That Court explained that *Archer* "'left open the possibility' that such calls 'might suffice when sufficiently pervasive or functional' and limited the holding to 'the narrow basis that these conditions were not here fulfilled.'"  *Id.* (quoting *Archer*, 486 F.2d at 684); *see also United States v. LaPorta*, 46 F.3d 152, 160 (2d Cir. 1994) ("[T]he calls in *Archer* served no purpose other th[a]n to manufacture federal jurisdiction. Adding insult to injury in *Archer*, as part of the federal investigation, undercover agents lied to New York police officers and committed perjury before New York judges and grand jurors." (internal citation omitted)).

　　　More recently, in *United States v. Wallace*, the Second Circuit observed that "[c]ourts that have construed *Archer* have taken pains to limit its applicability and to explain that 'manufactured jurisdiction' as an independent doctrine is a dubious concept." 85 F.3d 1063, 1065 (2d Cir. 1996) (internal citations omitted).  The *Wallace* Court distilled the Circuit's teaching on this issue to the simple proposition that *Archer* is inapplicable "when there is any link between the federal element and a voluntary, affirmative act of the defendant."  *Id.* at 1066. Accordingly, under Second Circuit precedent, when "(i) the FBI introduces a federal element into a non-federal crime and (ii) the defendant then takes voluntary actions that implicate the federal element, th[e] Court has consistently held that federal jurisdiction has not been improperly 'manufactured' and that the statutory elements have been met, despite the surface

31

similarity to *Archer*."  *Id.*; *United States v. Al Kassar*, 660 F.3d 108, 120 (2d Cir. 2011) ("[E]ven if the government initiates an essential element of a crime, jurisdiction is not manufactured if the defendant then takes voluntary actions that implicate the government-initiated element." (internal quotation marks and brackets omitted)).

Smith relies almost exclusively on *Archer* to support his view that the interstate communications alleged in the Indictment fail to establish the interstate element of the Travel Act.  (Smith Br. 30-32).  Setting aside for the moment that the Second Circuit has carefully limited the significance of *Archer* in more recent decisions, the record would not support a dismissal of the Travel Act counts even under *Archer*'s uncabined reasoning.  The record contains no evidence whatsoever that any of the interstate communications alleged in the Indictment were pretextual.  Smith concedes as much, recognizing it as an "open question" without evidentiary support.  (Smith Br. 31).  Indictments are not properly dismissed based on conjecture about what the evidence might show and "open question[s]" about the Government's ability to prevail on the merits.  *See Alfonso* 143 F.3d at 776 (courts should not look "beyond the face of the indictment and dr[a]w inferences as to the proof that would be introduced by the government at trial" when considering a motion to dismiss an indictment).

In any event, the out of state contacts were not pretextual.  The Government expects that the trial evidence will show, among other things, that being an out-of-state developer was an important part of the agent's cover because (i) it provided a basis for his desire to curry favor with local politicians so that he could enter the New York market, and (ii) it explained why he was unknown to people, like Smith (himself a former real estate developer), who are familiar with the New York real estate market.  If the Government had utilized a locally-based agent as the case UC, Smith might have immediately detected that the UC was not who he claimed to be.

32

Smith's contention that the use of interstate communications here was "casual and incidental" and "a matter of happenstance," (Smith Br. 31 (quoting *Archer*, 486 F.2d at 682-83)), is baseless.  As an initial matter, his argument is not properly raised on a motion to dismiss.  *See Alfonso*, 143 F.3d at 776-77 ("Unless the government has made what can fairly be described as a full proffer of the evidence it intends to present at trial to satisfy the jurisdictional element of the offense, the sufficiency of the evidence is not appropriately addressed on a pretrial motion to dismiss an indictment."); *see also United States v. Perez*, 575 F.3d 164, 166 (2d Cir. 2009) (same).  Even if it were properly raised at this stage in the litigation, *Archer* would not preclude this prosecution because the allegations demonstrate that the interstate calls were not incidental to the scheme.  For example, the Indictment alleges that Smith and the UC, who was posing as an out-of-state real estate developer, spoke on February 17, 2013, while the UC was in North Carolina.  (Indict. ¶ 51).  During that call, Smith and the UC spoke about one of the real estate projects that the UC was promoting.  The conversation then turned to bribing Tabone and Savino and the amounts of the bribes.  *Id.*  There is nothing "casual" or "incidental" about that telephone call, as it touched upon the real estate projects that explained the motivation for the UC, as an out-of-state developer, to curry favor with local politicians, and it extended to a discussion of the bribery scheme that is the very subject of the Travel Act counts.  Even under *Archer*, this call would satisfy the interstate element because it was "sufficiently . . . functional" in the context of the offense.  486 F.2d at 684.

*Archer* does not govern this inquiry, of course, because the Second Circuit has repeatedly and explicitly limited the scope of that holding, as described above.  As stated in *Wallace*, the relevant question is whether "there is any link between the federal element and a voluntary, affirmative act of the defendant."  85 F.3d at 1066.  Smith contends that there is no "federal

element" alleged in the Indictment.  (Smith Br. 30 n.10).  But it is Smith's use of the telephone, as alleged in paragraph 51 of the Indictment, among other instances, that supplies the federal element—that is, the use of a "facility in interstate or foreign commerce" as required by the Travel Act.  Smith's voluntary use of the telephone to discuss the amounts of the bribes that should be paid to Tabone and Savino satisfies the standard established by *Wallace*.

## III.    The Indictment Adequately Alleges a Violation of the Hobbs Act

Smith argues that Count Four of the Indictment, charging him with Hobbs Act extortion in connection with the Spring Valley Community Center scheme, should be dismissed because the Indictment failed to allege that Smith induced anyone to confer a benefit on his behalf. (Smith Br. 33-37).  As even Smith acknowledges, the Supreme Court has held that the Government does not need to allege any such inducement.  *See Evans v. United States*, 504 U.S. 255, 268 (1992).  In fact, the *Evans* Court directly rejected the then-prevailing Second Circuit precedent that Smith asks this Court to apply.  *See Evans*, 504 U.S. at 265 (declining to follow *United States v. O'Grady*, 742 F.2d 628 (2d Cir. 1984)).  Accordingly, as Smith's motion runs contrary to long-established Supreme Court precedent, it should be denied.

## IV.    This Prosecution Comports with the First Amendment and Federalism

Tabone argues that the First Amendment and our federal system of government bar this prosecution in its entirety.  (Tabone Br. 11-15).  This argument is unmoored from precedent, as Tabone has pointed to no authority directly supporting his position.  Instead, he advances a series of "concerns" that he contends weigh in favor of dismissing the Indictment.  These arguments should be rejected as meritless.

First, Tabone contends that a prosecution of party officials accused of defrauding their members by accepting bribes violates the First Amendment's free association clause.  (Tabone

Br. 12-13).  In Tabone's view, such a prosecution requires the Government to probe whether a party officer, such as Tabone, was an "effective leader" of the party.  (Tabone Br. 12).  There is no persuasive reason to accept that view of these proceedings.  The Indictment does not charge Tabone with being ineffective; it charges him with abusing his position as a party leader to enrich himself personally by accepting a payment to influence his conduct on behalf the party.  Tabone's trial will be about his acceptance of a bribe, not whether he was otherwise good at his job as a party leader.  Indeed, there is no reason to believe that accepting bribes is limited solely to effective (or ineffective) leaders.  Effectiveness is irrelevant to the charged offenses.

Moreover, the First Amendment is not offended by the prosecution of officers who defraud their organizations, even when the exercise of rights by those organizations is protected by the First Amendment.  Consistent with the First Amendment, church officials have been convicted of defrauding parishioners, *see, e.g.*, *United States v. Keppler*, 2 F.3d 21 (2d Cir. 1993); newspaper columnists have been convicted of mail and wire fraud, *see, e.g.*, *Carpenter v. United States*, 484 U.S. 19 (1987); and non-profit employees have been convicted of defrauding the non-profit entity they work for, *see, e.g., United States v. Burns*, 104 F.3d 529, 532 (2d Cir. 1997).  The First Amendment does not confer immunity for fraud simply because the fraud takes place in the general vicinity of a protected activity.  *See generally Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 498 (1949) ("It rarely has been suggested that the constitutional freedom for speech and press extends its immunity to speech or writing used as an integral part of conduct in violation of a valid criminal statute.  We reject the contention now."); *United States v. Rahman*, 189 F.3d 88, 117 (2d Cir. 1999) ("The fact that [the defendant's] speech or conduct was 'religious' does not immunize him from prosecution under generally-applicable criminal statutes.")).

35

Second, Tabone believes that his duty to his party and its members is too "vague[]" to form the basis for a prosecution.  (Tabone Br. 13-14).  While Tabone may claim that this duty is vague, the Second Circuit does not find it so.  That Court has held that "New York law supports the position that a party officer, who owes a duty to his party and its followers, may owe certain minimum duties to the public as well, as a result of the other obligations he assumes." *Margiotta*, 688 F.2d at 125.  That holding remains good law.  Tabone was an agent of the Queens County Republican Party and, as such, was a fiduciary of the organization.  It is the most basic tenet of agency law that all fiduciaries owe a duty to their principal, and that duty includes the duty to refrain from accepting secret personal cash payments in exchange for action on behalf of the principal.  Section 6-120(3) of the New York Election Law empowers party officers to act as gatekeepers for their ballot lines.  It is risible for Tabone to assert that his duty not to accept bribes in exchange for the exercise of power conferred on him by statute is simply too vague to support a prosecution.

Third, Tabone believes that it should be left to either his party or New York State to determine whether he should be punished for his conduct.  (Tabone Br. 14-15).  Tabone is not the first defendant to attempt to redefine his criminal conduct as nothing more than a civil dispute that should be resolved internally by the relevant parties.  *See, e.g.*, *Carpenter*, 484 U.S. at 27 ("We cannot accept petitioners' further argument that [the petitioners'] conduct in revealing prepublication information was no more than a violation of workplace rules and did not amount to fraudulent activity that is proscribed by the mail fraud statute.").  He can try to make that argument to the jury if he wishes, but it provides no basis to dismiss the Indictment.  *See Alfonso*, 143 F.3d at 776-77 ("[T]he sufficiency of the evidence is not appropriately addressed on a pretrial motion to dismiss an indictment.").  It is also irrelevant that New York State could also

prosecute him for his offense.  Many federal crimes can also be prosecuted in some form in state court.

Nor does the fact that New York State has an interest in regulating its political parties undermine the power of the United States to prosecute those who violate federal law.  *Cf. United States v. Aboumoussallem*, 726 F.2d 906, 909 (2d Cir. 1984) ("[A]n acceptable cost of federalism, tolerable under principles of both double jeopardy and due process, is the risk of successive prosecutions by state and federal authorities for identical conduct.").  In fact, some federal crimes arise from a violation of state regulations.  *See, e.g.*, 16 U.S.C. § 3372(a)(2) (making it unlawful for anyone "to import, export, transport, sell, receive, acquire, or purchase in interstate or foreign commerce . . . any fish or wildlife taken, possessed, transported, or sold in violation of any law or regulation of any State").

That certain conduct runs afoul of both state regulations and federal criminal law reflects nothing more than shared priorities and commitments. Complementary action by state and federal governments does not violate any recognized principle of federalism. *See, e.g.*, *United States v. Guzman*, 591 F.3d 83, 91 (2d Cir. 2010) (describing SORNA's requirement that "sex offenders . . . update their registrations due to intrastate changes of address or employment status" as "a perfectly logical way to help ensure that states will more effectively be able to track sex offenders when they do cross state lines"). Indeed, Tabone points to no legitimate interest of New York State that is undermined by this prosecution.  Having failed to show that this prosecution runs afoul of any New York State prerogative, Tabone's reliance on federalism concerns as a basis to dismiss the Indictment is ultimately unavailing.

**V.      The Indictment Does Not Contain Prejudicial Surplusage**

Smith argues that paragraphs 26 and 27 of the Indictment constitute prejudicial

surplusage and, pursuant to Rule 7(d) of the Federal Rules of Criminal Procedure, should be

stricken. (Smith Br. 37-40). Smith's motion should be denied as premature.

"Although the Federal Rules of Criminal Procedure grant the Court authority to strike

surplusage from an indictment, it has long been the policy of courts within the Southern District

to refrain from tampering with indictments." *United States v. Bin Laden*, 91 F. Supp. 2d 600

(S.D.N.Y. 2000) (internal quotation marks, alterations, and citations omitted). "Motions to strike

surplusage from an indictment will be granted only where the challenged allegations are not

relevant to the crime charged and are inflammatory and prejudicial." *United States v. Scarpa,*

913 F.2d 993, 1013 (2d Cir. 1990) (internal quotation marks omitted). "[I]f evidence of the

allegation is admissible and relevant to the charge, then regardless of how prejudicial the

language is, it may not be stricken." *Id.* (internal quotation marks omitted)). This is true even

where the allegations can be proven only through the introduction of other acts evidence

pursuant to Rule 404(b) of the Federal Rules of Evidence. *United States v. Markoll*, No. 300 Cr.

133 (EBB), 2001 WL 173763, at *2-3 (D. Conn. Jan 24, 2001). "Courts in this district routinely

await presentation of the Government's evidence at trial before ruling on a motion to strike."

*United States v. Mostafa*, ___ F. Supp. 2d ___, 2013 WL 4714158, at *12 (S.D.N.Y. 2013); *see*

*also United States v. Butler*, 351 F. Supp. 2d 121, 124 (S.D.N.Y. 2004) ("There is little or no

purpose in attempting to predict in advance of trial what evidence will prove admissible or how

specific allegations relate to the overall charges.").

The Court should not strike the challenged paragraphs. Smith argues that the allegations

contained in the challenged paragraphs unfairly tar him with a crime with which he is not

charged and have no bearing on the case in hand. (Smith Br. 39). Those allegations, which center around the CW's payment of and Smith's acceptance of straw campaign contributions, are admissible as direct evidence in this case. They provide essential background to the relationship between the CW and Smith, dispelling any notion that, outside the context of the bribery scheme at the heart of the indictment, theirs was anything but a corrupt relationship.  They help explain why Smith was willing to speak as frankly as he did to the CW and make clear that he was not speaking hypothetically or jokingly about corrupt arrangements with the CW.  By including these allegations, the Indictment provides Smith with notice that the Government may seek to introduce this evidence against him at trial, one of the purposes of an Indictment contemplated by Rule 7.  *See*, *e.g.*, *United States v. Stassi*, 544 F.2d 579, 583 (2d Cir. 1976) (admitting evidence of other bad acts of co-conspirators to demonstrate the nature of their relationship).

In any event, it is impossible to judge the admissibility of evidence of the challenged allegations at this point in the proceedings.  Therefore, the Court should deny Smith's motion as premature. *See*, *e.g.*, *United States v. Ferguson*, 478 F. Supp. 2d 220, 232 (D. Conn. 2007).

## VI.    The Indictment Should Not Be Dismissed for Lack of Particularity

Tabone moves to dismiss the 31-page Indictment, under Rule 7(c), on the ground that it fails to provide sufficient particularity concerning the honest services charges contained in Counts One and Two.  (Tabone Br. 38-40).  As the Indictment provides more than ample notice of the charges against Tabone, his motion should be dismissed.

An Indictment satisfies Rule 7(c) "when it charges a crime with sufficient precision to inform the defendant of the charges he must meet and with enough detail that he may plead double jeopardy in a future prosecution based on the same set of events." *United States v. Stavroulakis*, 952 F.2d 686, 693 (2d Cir. 1992).  "It is generally sufficient that an indictment set

forth the offense in the words of the statute itself, as long as those words of themselves fully, directly, and expressly . . . set forth all the elements necessary to constitute the offence intended to be punished." *Hamling v. United States*, 418 U.S. 87, 117 (1974) (internal quotations omitted).

Here, the Indictment satisfies the requirements of Rule 7(c). Counts One and Two track the language of the statutes charged and state the approximate dates of the alleged crimes. *See Stavroulakis*, 952 F.2d at 692. In addition, this lengthy "speaking" Indictment provides extensive detail about the offenses including the dates of relevant meetings, transcripts of the contents of relevant conversations, and details of the observations of the agents who monitored those conversations. In short, the Indictment provides far more detail than is ordinarily present in an indictment and far exceeds that required by the rules. Tabone's motion should be denied.

## VII.   A Severance is Unwarranted

Tabone and Halloran seek to have the trial of Counts One through Three of the Indictment severed from that of the remaining counts pursuant to Rules 8 and 14 of the Federal Rules of Criminal Procedure. Each claims that he will suffer spillover prejudice from evidence introduced against co-defendants who had greater roles in the offenses than they did and from the inclusion of conduct constituting offenses outside the scheme to have Smith appear on the Republican mayoral ballot. Tabone also argues that the introduction of co-defendant statements at trial might compromise his Sixth Amendment rights. The defendants' motions are both premature and wholly without merit.

Rule 8 of the Federal Rules of Criminal Procedure provides, in pertinent part, as follows:

> (a) Joinder of Offenses.  Two or more offenses may be charged in the same indictment . . . if the offenses charged . . . are of the same or similar character or are based on the same act or

> transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan.
>
> (b) Joinder of Defendants. The indictment . . . may charge 2 or more defendants if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses. The defendants may be charged in one or more counts together or separately. All defendants need not be charged in each count.

The Second Circuit has interpreted Rule 8 as providing a liberal standard for joinder of offenses. *See United States v. Turoff*, 853 F.2d 1037, 1042 (2d Cir. 1988). In particular, "[j]oinder is proper where the same evidence may be used to prove each count." *United States v. Blakney*, 941 F.2d 114, 116 (2d Cir. 1991); *see also United States v. Amato*, 15 F.3d 230, 236 (2d Cir. 1994) (joinder of counts appropriate under Rule 8(a) where evidence to prove one count was "interconnected and overlapping" with evidence to prove other counts); *United States v. Tubol*, 191 F.3d 88, 95 (2d Cir. 1999) (permitting joinder of being an illegal alien in possession of a firearm and robbery counts and holding that "[j]oinder is proper where the same evidence will support both of the joined counts").

Rule 14 of the Federal Rules of Criminal Procedure, in relevant part, provides:

> If it appears that a defendant or the government is prejudiced by a joinder of offenses or defendants in an indictment . . . or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires.

Fed. R. Crim. P. 14.

A motion to sever under Rule 14 is "committed to the sound discretion of the trial court." *United States v. Casamento*, 887 F.2d 1141, 1149 (2d Cir. 1989). Generally, where "defendants . . . are jointly indicted [they] should be jointly tried." *United States v. Ventura*, 724 F.2d 305, 312 (2d Cir. 1983); *United States v. Feliciano, Jr.*, 2002 WL 575662, No. 01 Cr. 448, at *4

(S.D.N.Y. April 16, 2002); *see also United States v. Lyles*, 593 F.2d 182, 191 (2d Cir. 1979) (presumption in favor of joint trials "conserves judicial resources, alleviates the burden on citizens serving as jurors, and avoids the necessity of having witnesses reiterate testimony in a series of trials") (quoting *United States v. Borelli*, 435 F.2d 500, 502 (2d Cir. 1970)).

A defendant who seeks severance must shoulder an "extremely difficult burden" of showing that he would be so prejudiced by the joinder that he would be denied a constitutionally fair trial. *Casamento*, 887 F.2d at 1149; *see also United States v. Rosa*, 11 F.3d 315, 341 (2d Cir. 1993); *United States v. Torres*, 901 F.2d 205, 230 (2d Cir. 1990), overruled on other grounds as recognized by *United States v. Marcus*, 628 F.3d 36 (2d Cir. 2010). It is insufficient for a defendant seeking severance merely to show that he may suffer some prejudice, or may have a better chance for acquittal at a separate trial. *Torres*, 901 F.2d at 230. Instead, the defendant must show that he may suffer prejudice so substantial that a "miscarriage of justice" will occur. *United States v. Friedman*, 854 F.2d 535, 563 (2d Cir. 1988).

The defendants' severance motions are without merit. A joint trial will not unduly prejudice any of the defendants. All of the allegations in this case center around the bribery of and by public officials in exchange for official actions taken by other politicians and party officers. None of charges is any more inflammatory than the next. Tabone's and Halloran's complaint that there is no connection between the mayoral ballot scheme and the Spring Valley community center scheme misses the mark. As the Indictment makes clear, in exchange for their assistance in bribing Tabone and Savino, Smith agreed to obtain New York State transportation funds for the UC and CW's Spring Valley community center project. Finally, any hypothetical Sixth Amendment issues posed by the admission of the statements of co-defendants can be

addressed through the *Bruton* process that is customarily used in multi-defendant cases where those issues arise.

The defendants' request for a severance on the basis of mutually antagonistic defenses should be denied because they have failed to make the requisite showing. "In order to make a showing of 'mutually antagonistic' or 'irreconcilable defenses,' the defendant must make a factual demonstration that acceptance of one party's defense would tend to preclude the acquittal of [the] other." *Salameh*, 152 F.3d at 116. The defendants have not described in any detail the supposedly antagonistic defense theories, much less explained how any such theories are logically inconsistent with an acquittal of their co-defendants.

The defendants' complaint about varying levels of proof and culpability is not a basis for a severance. It is well settled that "differing levels of culpability and proof are inevitable in any multi-defendant trial and, standing alone, are insufficient grounds for separate trials." *United States v. Chang AnLo*, 851 F.2d 547, 557 (2d Cir. 1988) (quoting *United States v. Carson*, 702 F.2d 351, 366-67 (2d Cir. 1983)); *see also United States v. Zackson*, 6 F.3d 911, 922 (2d Cir. 1993) (same). Here, Tabone and Halloran are equally culpable as their co-defendants. Tabone accepted a cash bribe in exchange for his official action as a Republican County Committee Vice Chairman and Halloran negotiated that payment and arranged the meeting at which it occurred all in exchange for his own personal cash payment. Yet even if they were somehow lower down on the chain of culpability, their motion would still be meritless. *See United States v. Locasio,* 6 F.3d 924, 947 (2d Cir. 1993) (the Second Circuit "has repeatedly recognized that joint trials involving defendants who are only marginally involved alongside those heavily involved are constitutionally permissible.").

Similarly, Halloran's contention that a severance would enable one defendant to testify for another is insufficient to justify a severance.  Halloran fails to identify anyone who would testify on his behalf and his bald speculation is not enough for this Court to vary from the long established rule that joint trials are preferred.  *See Casamento*, 887 F.2d at 1149.  To hold otherwise would turn the rule on its head, as every defendant could so speculate and thereby gain a severance.  Halloran's claim that joinder of the counts against him would preclude him from testifying in his own defense founders on the same rocks.  "'[A] mere unexplicated assertion' of the desire to testify on only one count is not enough to require severance." *United States v. Sampson*, 385 F.3d 183, 191 (2d Cir. 2004) (quoting *United States v. Werner*, 620 F.2d 922, 928 (2d Cir. 1980)).

Halloran's motion under Rule 8(a) to sever the counts against him from each other fails as well.  (Halloran Br. at 21-22).  All three schemes are of the same and similar character as each involves bribing political figures in exchange for their undertaking official action.  Each of the counts is thus properly joined under Rule 8(a).  *See Werner*, 620 F.2d at 926-27 (holding that joinder of counts charging two separate thefts from airport cargo area was proper where both involved abuse of defendant's position at the airport); *see also United States v. Rabbitt,* 583 F.2d 1014, 1021 (8th Cir. 1978) (affirming denial of severance of counts relating to three bribery and kickback schemes where all of the offenses "originate from Rabbitt's scheme to obtain money because of his power, authority, and influence as a legislator.").  In any event, Halloran's involvement in the discretionary fund scheme is directly relevant to his involvement in the mayoral ballot scheme.  Evidence of the former scheme is necessary to provide the background to Halloran's relationship with the UC and CW, and, therefore, his actions in the latter scheme.  In fact, Halloran's first act in connection with the mayoral ballot scheme took place during a

meeting at which Halloran accepted an envelope containing $10,000 cash as partial payment for his grant of City Council discretionary funds to the UC and CW. *See United States v. Rivera*, 546 F.3d 245, 253 (2d Cir. 2008).

Halloran's reliance on Rule 8(b) is similarly misplaced. Rule 8(b) allows joinder of two or more defendants "if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions, constituting an offense or offenses." Fed. R. Crim. P. 8(b). The Second Circuit has "interpreted the 'same series of acts or transactions' language of Rule 8(b) to mean that 'joinder is proper where two or more persons' criminal acts are unified by some substantial identity of facts or participants, or arise out of a common plan or scheme.'" *United States v. Rittweger*, 524 F.3d 171, 177 (2d Cir. 2008) (quoting *United States v. Cervone*, 907 F.2d 332, 341 (2d Cir. 1990) (internal quotation marks omitted)). The Second Circuit "appl[ies] a 'commonsense rule' to decide whether, in light of the factual overlap among charges, joint proceedings would produce sufficient efficiencies such that joinder is proper notwithstanding the possibility of prejudice to either or both of the defendants resulting from the joinder." *United States v. Shellef*, 507 F.3d 82, 98 (2d Cir. 2007) (citing *Turoff*, 853 F.2d at 1044).

Here, all three schemes are unified by an identity of both facts and participants. Halloran's involvement in the mayoral bribery scheme springs from his involvement in the City Council discretionary fund scheme and proof of the latter is entwined with proof of the former. The same is true of the Spring Valley community center scheme. Smith brought that scheme together with the mayoral bribery scheme when he agreed to compensate the UC and CW by directing New York state transportation money to the Spring Valley community center project. Jasmin and Desmaret then each accepted bribes in exchange for their assistance in ensuring that

45

the money Smith provided flowed directly to the UC and CW.  Accordingly, the counts are all properly joined under Rule 8(b).

To the extent that Halloran seeks a severance of Jasmin and Desmaret under Rule 8(b) on the basis that *they* would be prejudiced if tried with him, (Halloran Sev. Br. at 7-15), he lacks the standing to do so.

Finally, Tabone and Halloran's motions are premature.  Currently all six defendants are awaiting trial, but plea negotiations are ongoing.  The exact configuration of defendants with whom any given defendant will proceed to trial has yet to be determined.  Accordingly, the Government respectfully requests that the individual defendants indicate at the appropriate time whether they wish to renew their motions to sever, and the Government will address the arguments specific to those particular defendants at that time.

## **CONCLUSION**

For the reasons discussed above, the defendants' motions should be denied.

Dated:          White Plains, New York
                October 7, 2013


                                Respectfully Submitted,

                                PREET BHARARA
                                United States Attorney


                    By:     _____
                                Douglas B. Bloom
                                Justin Anderson
                                Assistant United States Attorneys
                                (914) 993-1934/(212) 637-1035

**CERTIFICATE OF SERVICE**

DOUGLAS B. BLOOM, pursuant to Title 28, United States Code, Section 1746, hereby declares under the penalty of perjury:

That I am an Assistant United States Attorney in the Office of the United States Attorney for the Southern District of New York.

That on October 7, 2013, I caused one copy of the within Memorandum of Law In Opposition to Defendants' Pretrial Motions to be filed electronically and served on all parties by operation of the ECF system.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated:  White Plains, New York
        October 7, 2013

                                                /s/ Douglas B. Bloom
                                                Douglas B. Bloom