UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------X

UNITED STATES OF AMERICA,

              v.                          13 CR. 297 (KMK)

MALCOLM A. SMITH,

                   Defendant.

----------------------------------------------------------------X


**MEMORANDUM IN AID OF SENTENCING**


Winston & Strawn LLP
Gerald L. Shargel
Evan L. Lipton
200 Park Ave.
New York, NY 10166
(212) 294-2637
gshargel@winston.com


*Attorneys for Malcolm A. Smith*

# TABLE OF CONTENTS

Table of Contents .................................................................................................. i

I.    Preliminary Statement ................................................................................. 1

II.   The Sentencing Guidelines .......................................................................... 2

III.  A Below Guidelines Sentence is Warranted in This Case ........................... 3

   a.   Malcolm Smith's childhood and first forays into public service ................... 3

   b.   Early public service work ............................................................................. 5

   c.   Smith's career in real estate ......................................................................... 6

   d.   Career as a New York State Senator ............................................................ 7

   e.   An advocate for the entire State of New York .............................................. 8

   f.   A leader on public safety issues ................................................................. 10

   g.   Personal involvement with Hurricane Sandy relief efforts ......................... 11

   h.   A special connection with the youth of Queens .......................................... 13

   i.   Personal dedication to his constituents ...................................................... 16

   j.   Election to majority leader and final term .................................................. 19

   k.   Public service work since trial ................................................................... 20

   l.   Smith's family ............................................................................................ 21

III.  The Nature and Circumstances of the Offense Support a Sentence of 366 Days ...... 23

**IV.**   **A Sentence of 366 Days is a Substantial Prison Term That Satisfies the Need for Punishment, General Deterrence, and Specific Deterrence**.................................... 24

**V.   A Sentence of 366 Days Incarceration Will Avoid Unwarranted Sentencing Disparities**.......................................................................................................... 25

**VI.**   **The Court Should Not Order Restitution of Smith's Senate Salary**.......................... 27

**VII.**   **The Court Should Not Order a Fine**............................................................. 29

**VIII.  Conclusion**................................................................................................ 29

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

UNITED STATES OF AMERICA,


      v.         13 CR. 297 (KMK)

MALCOLM A. SMITH,

       Defendant.

-------------------------------------------------------------X


## MEMORANDUM IN AID OF SENTENCING

 **I.**  **Preliminary Statement**

  This memorandum is respectfully submitted in support of Malcolm Smith's request, and counsel's recommendation, that he receive a sentence of 366 days of incarceration. We respectfully submit that this sentence is appropriate under 18 U.S.C. § 3553 for three reasons. First, the history and characteristics of the defendant strongly support this sentence. For more than forty years Malcolm Smith has led a life dedicated to public service, which should be balanced against the offense conduct. Second, the circumstances of the offense weigh in favor of leniency. Smith did not seek to personally enrich himself through his actions, and did not plan or organize the offense conduct. Third, the requested sentence would avoid unwarranted sentence disparities with other elected officials convicted in New York political bribery cases.

1

## II.    The Sentencing Guidelines

The parties agree on the advisory Sentencing Guidelines applicable to the offense

conduct. The Total Offense Level is 30 (PSR ¶ 39), which is calculated as follows:

| | |
|---|---|
| Base Offense Level | **14** (USSG § 2C1.1(a)(1)) (two points added because defendant was a public official) |
| Involved more than one bribe | **+2** (USSG § 2C1.1(b)(1)) |
| Total amount of bribes paid or agreed to be paid | **+10** (USSG § 2C1.1(b)(2); (USSG § 2B1.1(b)(1)(F)) |
| Involved elected public official in high-level decision making position | **+4** (USSG § 2C1.1((b)(3)) |
| Total Offense Level | **30** |

Because Smith has no prior criminal history (he had never been arrested before this case),

he falls in Criminal History Category I. (PSR ¶¶ 40 - 43) The advisory guideline imprisonment

range is thus 97 to 121 months. (PSR ¶ 80)

As the Court is well aware, following United States v. Booker, 543 U.S. 220 (2005) the

Sentencing Guidelines have become truly advisory. The Guidelines may not be presumed to

result in a sentence that complies with the statutory purposes of sentencing.  Nelson v. United

States, 555 U.S. 350, 352 (2009). The Court "must instead conduct its own independent review

of the sentencing factors aided by the arguments of the prosecution and defense." United States

v. Cavera, 550 F.3d 180, 189 (2d Cir. 2008). The justification for a non-Guidelines sentence

need be only "sufficiently compelling" in light of the individualized assessment under § 3553(a).

Gall v. United States, 552 U.S. 38, 50 (2007). A sentence outside the Guidelines range does not

require the Court to find "extraordinary" circumstances, because such a requirement would

"come too close to creating an impermissible presumption of unreasonableness for sentences

2

outside the Guidelines range." <u>Cavera</u>, 550 F.3d at 189. "District judges are, as a result, generally free to impose sentences outside the recommended range." <u>Id.</u>

For the reasons discussed below, we respectfully submit that there is "sufficiently compelling" justification in Smith's case for a sentence far below the advisory Guidelines range. Under an individualized assessment of the § 3553(a) factors, a 366 day sentence of incarceration is "sufficient, but not greater than necessary to comply with the purposes of sentencing."

### III.   A Below Guidelines Sentence is Warranted in This Case

Malcolm Smith is a fundamentally good person who has dedicated his life to serving his community. Attached to this memorandum are more than 100 letters written in support of Malcolm Smith, and a letter to the Court from Smith himself. (Exh. A, Letter of Malcolm A. Smith; Exhibits B through KKKKK, Letters in support.) Each letter writer is aware of Smith's trial and conviction in this matter. Nonetheless, they all write seeking leniency on his behalf. These pleas are not an endorsement of Smith's conduct in this case, nor do they seek to minimize or excuse his actions. Rather, they place this case in context. They describe Smith's early political life and his accomplishments, and the manner in which he conducted himself as a New York State Senator. The picture of the man that emerges weighs *strongly* in favor of leniency.

### a.   Malcolm Smith's childhood and first forays into public service

Malcolm Smith, 58 years old, was born into a working-class family in the same Queens, New York district that he later represented in the State Senate. His father, Cliffert Smith, was a welder who commuted daily to work for the General Dynamics Corporation in New London, Connecticut. His mother, Dorothy Thomas, was a part-time teacher's aide. Cliffert and Dorothy

had three children of their own, and cared for four additional foster children. Regardless of parentage, everyone was treated as members of one family. Smith and his siblings attended Catholic grammar school and high school. Smith recalls a good childhood in a close-knit neighborhood where neighbors visited daily. Smith attended Boy Scout summer camp, and his mother led the block organization, which held events like an annual boat trip to Bear Mountain.

Both Dorothy and Cliffert were community leaders who worked for social justice in their neighborhood. Malcolm's sister, Deborah Gaston, writes that "[o]ur parents were adamant that in order to help and protect your community, you must be involved in your community's affairs." As a result of this influence, "from the very beginning, Malcolm was drawn into the world of public service."[1]

Dorothy served as the first recording secretary for the Guy R. Brewer Democratic Club in St. Albans, Queens. Malcolm often accompanied her to meetings, performing helpful tasks and absorbing the strategic debates occurring around him. "Malcolm found his niche" at these meetings.[2] In his letter to the Court, Smith writes that "my earliest role models (other than my parents) were local elected officials."[3] Smith took what he observed to heart.  Before he was even old enough to vote, Smith founded the "Young United Democrats," a sub-committee of the local Guy R. Brewer Democratic Club. Membership was restricted to those between 13 and 17 years of age in order to encourage young people to become involved in local politics.[4] Smith also served as a teen advisor to the NAACP's Jamaica Branch.[5]

---

[1] Letter of Deborah Smith Gaston, dated April 8, 2015, Exh. B
[2] Id.
[3] Letter of Malcolm A. Smith, dated June 16, 2015, Exh. A
[4] Letter of Deborah Smith Gaston, dated April 8, 2015, Exh. B
[5] Letter of Pamela A. Bluford, dated April 9, 2015, Exh. C

After completing Christ the King High School, Smith attended Fordham University in the Bronx. He struggled during his first two years, but committed himself to his studies; by his last year he had improved to such a degree that he was permitted to enroll in post-graduate level courses. Smith graduated in 1978 with a degree in Business Administration, the first member of his immediate family to attend and complete college. He moved back into his childhood home, which he eventually purchased from his parents upon their retirement.

b.   **Early public service work**

Smith's first post-college job was managing a summer youth employment initiative for the City of New York, for which he received a commendation.[6] Smith then went to work for City Councilman Archie Spigner. Spigner, sometimes referred to as the "Dean of Southeast Queens," was the first African American elected to the City Council, and served as a mentor to Smith. Smith worked for Councilman Spigner for four years, rising to the position of chief aide. In a letter to the Court, Spigner describes Smith as "very intelligent, creative and hardworking" and notes that Smith was "known throughout Southeast Queens for his work with the youth of the Jamaica NAACP, the Area Policy Board" and as "chairman of the Neighborhood Housing Services Program."[7] Based on his successful work for the councilman, Smith was hired as an assistant to Mayor Edward Koch, who assigned him to work in the Office of Economic Development and in the Community Relations Unit.

Smith's talent for communicating with constituents was immediately recognized by Mayor Koch's senior staff, and he was called upon to represent the administration in community meetings. Angelo Aponte, who was then the Commissioner of Consumer Affairs, writes that

---

[6] Letter of Deborah Smith Gaston, dated April 8, 2015, Exh. B
[7] Letter of Archie Spigner, dated April 10, 2015, Exh. D

"Smith's care and compassion for the Mayor's constituents was nothing short of amazing."[8] Aponte recalls "a particularly highly charged town hall meeting in Brooklyn" where Smith managed to "diffuse an extremely volatile group of people in a manner that prevented injury to all involved" while clearly communicating that the community's grievances were being heard. Aponte writes, "His dealings with people were extraordinary."[9]

In 1986, Smith launched his first political campaign, running for state assembly. He lost the election but was hired as a district manager by Reverend Floyd Flake, who had just been elected to his first term as a congressman. While working for Congressman Flake, Smith focused on housing and education issues, and particularly on housing development in the Rockaways section of Queens. In 1990, Smith ran for state senate and was again defeated. The next year, he ran for city council and lost by fifteen votes. Following these defeats, Smith decided to enter the private sector.

### c.     Smith's career in real estate

In 1991, building on real estate development experience he had gained while working with Councilman Spigner and Congressman Flake, Smith founded a real estate business, Smith Development Corporation. Over the next nine years, Smith built over 100 housing units in Southeast Queens, as well as several commercial projects. Smith approached the real estate business with the same values he brought to his early political work, demonstrating compassion, concern and pride for the contributions his projects made to the larger community. Joan Flowers, an attorney who represented him during this period, recalls a time when a woman who had closed on a house that Smith had sold her called Smith to tell him that she did not have keys to

---

[8] Letter of Angelo Aponte, dated April 16, 2015, Exh. E
[9] Id.

the back door. Despite the fact that ownership had been transferred a week prior, and that all the keys had indeed been turned over to the homeowner, Smith hired a locksmith, met him at the house, and resolved the issue at his own expense.[10] On another occasion, Smith invited a group of neighborhood children to watch the construction of a prefabricated home in Cambria Heights during summer vacation. He provided breakfast and lunch for the children who "were filled with wonder at the sight of the lot of land going from only a foundation in the ground to a four bedroom home in a matter of hours."[11]

### d.      Career as a New York State Senator

While working as a real estate developer, Smith remained involved in local politics and community organizations, most notably with the Greater Allen African Methodist Episcopal Cathedral of New York, led by his mentor Congressman (and Reverend) Flake. In 2000, Smith decided to again seek elected office and this time won a seat representing Southeast Queens in the New York State Senate, beginning a fourteen year career as a New York State Senator. After his first term, he received endorsements from all the major political parties - Democrats, Republicans, Conservative, and Working Families.[12] He either ran unopposed, or faced only token opposition in each of his subsequent elections. He did not face a serious challenger until the election following his arrest in this case, when he was defeated.

In 2007, Smith was elected as the Senate Minority Leader. In a proclamation issued to celebrate his inauguration, Mayor Michael Bloomberg wrote:

Malcolm will be an invaluable partner to this administration as we work together on the issues and priorities that are important to us, and to all

---

[10] Letter of Joan E. Flowers, dated March 15, 2015, Exh. F
[11] Id.
[12] Letter of Celeste Morris, dated February 23, 2015, Exh. G

> New Yorkers, through both happy and difficult moments. I have come to
> rely on and benefit from Malcolm's counsel – and his leadership in the
> Senate will surely mean great things for both our city and our state.[13]

Throughout his Senate career, Smith maintained a single-minded commitment to improving the lives of his constituents, not only through his government work, but through personal displays of empathy and compassion. Reflecting on Smith's accomplishments on behalf of his community, a longtime resident writes, "Many seniors would not have food on the table; kids would have gone to bed hungry without his help.  He volunteered his own time asking no questions just to help others."[14] Smith fought to bring economic development to his district, to create and fund social service programs for those in need, and to address crime and environmental issues. He was instrumental in bringing millions of dollars to his district for community development, education, affordable housing, and job creation programs.

Smith's approach was hands on. He attended meetings with potential funders and spoke knowledgeably and passionately about specific project goals. Once a project was funded, Smith conducted site visits and remained personally involved to ensure that the projects ran efficiently. He was a mentor to his district's youth, and comforted  his fellow community members in times of tragedy.

e. **An advocate for the entire State of New York**

Ahmed Diomande, former finance secretary for the New York State Finance Committee, writes that "Smith believed in 'One New York'"[15] Although he was elected to represent Southeast Queens, he thought of himself as working for all citizens of the state. Integral to

---

[13] Proclamation of Mayor Michael Bloomberg, dated January 12, 2007, Exh. H
[14] Letter of Rosie Edwards, dated April 15, 2015, Exh. I
[15] Letter of Ahmed Diomande, dated April 10, 2015, Exh. J

Smith's vision as a political leader was his belief that the needs of the five boroughs of New York City and those of New York State as a whole intertwined. He launched state-wide economic programs, including "Operation Protect Your Home" a program created to educate citizens about avoiding foreclosures. He worked on legislation to protect child victims of sexual abuse, and directed grants to upstate towns and cities. For example, Smith allocated $150,000 to Binghamton to establish a new grocery store easily accessible to local senior citizens.[16]

Smith was also a strong advocate for high speed rail, and was appointed the Chairman of the High Speed Rail Subcommittee of the National Conference of State Legislators.[17] Stuart Brody, who served as an advisor to the Senate on transportation matters, writes: "He advocated nationally for that initiative" and "impressed every crowd with his eloquence, devotion and expertise." Brody notes, "It was a source of continuing surprise to me that a senator from Queens would spearhead an effort with no direct benefit to his constituents, but he believed it was essential to the development of the state generally. I believe Malcolm was motivated by considerations far beyond his own self-interest."[18]

Providing another example of Smith's efforts outside his district, a Long Island resident writes about enlisting Smith in his efforts to repair damaged roads in Freeport. Smith "took the lead and got money allocated from the multi-modal discretionary fund to help Freeport repair the damaged roads. There was very little publicity and most of Freeport's residents don't know that Malcolm Smith was responsible… for improving the quality of their lives."[19]

---

[16] Id.
[17] Letter of Stuart Brody, dated March 31, 2015, Exh. K
[18] Id.
[19] Letter of Donovan Gordon, dated April 6, 2015, Exh. L

f.   **A leader on public safety issues**

Smith used his much of his time in the Senate to design and implement programs to prevent crime and violence. At times, Smith even took unpopular positions to ensure the safety of New York's citizens, such as supporting the NYPD's "stop and frisk" policy.

Eric Adams, currently the Brooklyn Borough President, a former New York State Senator and a former New York City police officer, writes that Smith "contributed greatly to public safety policies that impacted our state."[20] Adams describes his experiences working with Smith on a gun control initiative: "My goal was to have success with him that I was unable to find with other elected officials while I was with the NYPD. To my surprise, State Senator Smith fully understood the importance of addressing the violence that our inner city youth face were facing. Many victims were innocent bystanders that were losing their lives to violence. Malcolm saw the need and responded immediately."[21] Smith created a state-wide program called "Operation SNUG" ('guns' spelled backwards). "SNUG" funds were used to fund organizations that trained and provided "violence interrupters" in neighborhoods throughout the state. The "interrupters" were trained to gain the confidence of key players in at-risk neighborhoods, and to facilitate negotiated solutions to street-level disputes.

Smith also worked to bring attention to the disparity between New York City's gun laws and the laws in surrounding counties. When Smith learned that possession and sale of large capacity assault rifle magazines were permitted outside of the City, he joined Adams for a press conference at the border of the Bronx and White Plains to demonstrate how easy it was to walk a fully loaded assault rifle into the City. Smith's actions led to legislation outlawing possession of large capacity clips in New York State. Adams writes: "While serving in the police department, I

---

[20] Letter of Eric L. Adams, dated April 27, 2015, Exh. M
[21] Id.

10

spent many years attempting to get legislators to actively move towards real solutions to stop senseless violence. I found compassion and caring in Malcolm. The lives of hundreds of young people were saved due to his commitment to public safety."[22]

Peter Florey, who has known Smith throughout his tenure in the state senate, writes to describe Smith's role as a leader on issues of police / community relations: "When tragedy struck in 2006 and Sean Bell was killed by a group of police officers, Malcolm interceded as a voice of reason, harmony and leadership"[23] Smith fostered dialog with community leaders to address the pain and frustration of many New York City residents. He created a task force of elected officials, community leaders, and law enforcement that held hearings about the shooting in all five boroughs and drafted recommendations for change.[24] These hearings gave "everyday New Yorkers" an opportunity to be heard and "prevented civil disturbances and violence."[25] Lance Feurtado, the executive director of an anti-violence non-profit group, writes that Smith's actions following the Bell shooting helped to "improve public confidence in law enforcement."[26] This was one of the defining moments of Smith's political career.

### g.    Personal involvement with Hurricane Sandy relief efforts

Smith's district was hit hard by Hurricane Sandy. The worst devastation was in the poorest areas of Far Rockaway. Hector Tello, a former police officer who served as Smith's driver for seven years, describes Smith's efforts before the storm: "We spent several days driving through at-risk communities meeting with community leaders and individual residents…

---

[22] Id.
[23] Letter of Peter G. Florey, dated April 9, 2015, Exh. N
[24] Letter of  Patricia A. Rubens, dated March 30, 2015, Exh. O
[25] Letter of Eric L. Adams, dated April 27, 2015, Exh. M
[26] Letter of Lance Feurtado, dated April 1, 2015, Exh. P

Malcolm got out of the car, sometimes with a bull horn, warning people to heed the warnings and leave or at least seek shelter… He helped coordinate evacuation busses and stayed while people boarded them. Before we left, he visited the shelters and took a personal interest in making sure there were sufficient provisions."[27]

For more than a week following the storm, "residents remained cut off from the outside world, without electricity, food, transportation, or fuel."[28] The government and the Red Cross could not meet the community's demands. Leroy Gadsden, President of the Jamaica NAACP, writes, "Senator Smith went in and went beyond what was expected." Smith gathered "hundreds of volunteers to distribute thousands and thousands of pounds" of supplies. "Senator Smith not only arranged the purchase and distribution of goods, but he rolled up his sleeves and worked alongside the volunteers and interacted with residents assuring them they would not be forgotten… Senator Smith was there to meet their needs and to restore hope."[29]

A member of Smith's Senate staff in Albany recalls sending a text message to Smith asking what she could do to help. Smith immediately replied, telling her that the community needed gloves, flashlights and batteries. After gathering donations upstate, she drove to meet Smith on a street corner in Queens where hundreds of residents were gathered to wait for help. She recalls her reaction upon arrival: "I was moved to tears when I saw him standing there with members of his community. I pulled over, we hugged, and then we distributed the supplies. It reaffirmed for me a number of things about the senator. He had a natural ability to connect and

---

[27] Letter of Hector Tello, dated April 8, 2015, Exh. Q
[28] Letter of Leroy Gadsden, undated, Exh. R
[29] Id.

lead… He kept cold and desperate people calm and orderly, and his presence reassured them that it would somehow be all right."[30]

After the storm, Smith was appointed to head the Hurricane Sandy Task force. In this role he held hearings throughout the areas impacted by the storm and drafted a report to advise the federal government on the allocation of relief funds. He also worked closely with the governor's office to formulate the state's funding proposal.

Smith played a key role in obtaining a $250,000 grant that allowed the Breezy Point Volunteer Fire Department to purchase a new truck, which became one of the few local emergency vehicles to survive Hurricane Sandy. The chief of that department credits the truck with saving "many lives" in the aftermath of the storm.[31]

### h.     A special connection with the youth of Queens

Smith has demonstrated a lifelong commitment to mentoring young people. Smith grew up in a stable, working class home that was nonetheless within a community that was "a symbol of urban blight and decay."[32] Smith had a "drive to push past the 'script' that had been pre-ordained for young black men from those communities" to become "part of the solution, not part of the problem."[33] Jack P. Jackson, an attorney who met Smith when they were students together at Fordham, recalls Smith's response to a "seminal" 2006 New York Times article publicizing a study on rising incarceration rates for young black men as "illustrative of Malcolm's value to his community." When the article was published, "there was the usual hue and cry for about a week, and then the news and the nation went back to business as usual." But Smith took a different

---

[30] Letter of Mary Wilmot, dated March 16, 2015, Exh. S
[31] Letter of Martin J. Ingram, dated April 12, 2015, Exh. T
[32] Letter of Jack P. Jackson, dated April 30, 2015, Exh. U
[33] Id.

approach: "Without any fanfare, he individually went around to various persons of influence in New York City to put together a task force to address some of the root causes of this systemic problem. Since Malcolm lived this problem, he was very energized and his efforts led to our task force making real proposals that change the lives of young black men in our communities."[34]

One of the hallmarks of Smith's political career, and one of his primary methods of remaining in touch with his constituents, was his regularly-held community forums. During one of these forums, billed as a "youth town hall meeting," Smith heard young people voice their concerns over the lack of summer employment in the area and the shortcomings of the city's youth employment program. In response, Smith created "Biz Kids," a program that paired youth with local businesses and government agencies.[35] Participants in the program obtained jobs at law offices, day care centers, and major corporations with offices in the district. The mother of one participant recalls the opportunity her daughter had to work at the Queens County District Attorney's Office and at Jet Blue: "My daughter is still friends with the core group of kids she met in his group and it excites me to say they have all gone on to become fruitful members of their community. For some that was not the trajectory they were on prior to the guidance given in that group. One young man attended Harvard and is considering public service. My daughter developed a greater sense of self because of Mr. Smith's belief in her abilities to lead, speak publicly, and have an impact."[36]

Through personal interactions, Smith mentored and encouraged individual young people to believe in themselves and their prospects for the future. He regularly addressed graduating classes at local public schools, "exhorting the graduates to meet and beat their challenges" to

---

[34] <u>Id.</u>
[35] Letter of Patricia A. Rubens, dated March 30, 2015, Exh. O
[36] Letter of Sharmayne Jenkins, undated, Exh. V

14

become "men and women of honor."[37] Recalling a visit to Smith's Senate chambers, a young man writes "he always asked me about my school and my future even though I was on summer vacation. Now I know he was truly interested in my future."[38] Another letter writer comments that "Malcolm focused on the youth in Southeast Queens in ways that no other elected official has done." [39]

Smith collaborated with the music icon LL Cool J and the Greater Allen Cathedral of New York to create "Jump and Ball," a month-long free basketball program during the summer school break. The program provides a positive activity to take young people away from the "drugs and crime prevalent in the community."[40] The basketball league is "unique in that it did more than teach athletic skills, but it developed the character of participants" by teaching them that "they were an important part of the system."[41] The basketball tournaments had such a positive impression that many participants returned years later as volunteer coaches. Ten years later, the program continues to run successfully and has grown from 100 to over 300 participants.[42]

Smith showed a special, personal commitment to his district's schools and students. A teacher in his district writes that "Each and every time my school needed something, he would lend his support."[43] Smith obtained a grant for PS 48 to purchase laptop computers for students. As a result of his efforts, the school was able to implement "several online technology programs"

---

[37] Letter of Claudette Gumbs, undated, Exh. W
[38] Letter of Marquis Henderson,  dated April 2015, Exh. X
[39] Letter of Patricia A. Rubens, dated March 30, 2015, Exh. O
[40] Letter of Brother Erv Francis, dated March 19, 2015, Exh. Y
[41] Letter of Leroy Gadsden, undated, Exh. R
[42] Letter of James Todd Smith (LL Cool J), dated March 16, 2015, Exh. Z
[43] Letter of Pamela A. Bluford, dated April 9, 2015, Exh. C

which allowed the school to provide "additional one to one support for at-risk students."[44] The principal of PS 48 writes that "Malcolm Smith is one of our greatest supporters."[45] Smith has been a supporter of the charter school movement, and is the founder of Peninsula Preparatory Academy, a charter school in Far Rockaway.

For the past three years, every Christmas Smith has visited the Gwendolyn B. Bland Early Learning Center in the South Bronx to deliver gifts and to read "The Night Before Christmas" to children. The coordinator of that program writes: "No one else ever did that for my children. The 79th district is the poorest in the country. Without Mr. Smith, the children would not have had a Christmas." She notes, "It wasn't just about the children in Queens, but all of the children in the State of New York that he cared about."[46]

### i.   <u>Personal dedication to his constituents</u>

Smith "cared for the people he represented" and worked "to address [their] needs."  He "listened" to his constituents' "concerns and acted upon them."[47] A district resident comments, that it wasn't unusual to see Smith "rolling up his sleeves and helping to set up or clean up after a community program."[48] During Senate budget sessions, when members were required to be in Albany all five business days, Smith was "the only official in Southeast Queens" who made himself and his staff available to constituents on the weekends.[49] Despite physical exhaustion, Smith would attend town hall meetings after full-day sessions in Albany.[50]  Smith's wife,

---

[44] Letter of Dorothy Cush, dated March 14, 2015, Exh. AA
[45] Letter of Patricia Mitchell, dated March 3, 2015, Exh. BB
[46] Letter of Phyllis Forde, undated, Exh. CC
[47] Letter of Wilhelmina Carter, undated, Exh. DD
[48] Letter of Andre and Cecelia Cox, dated March 15, 2015, Exh. EE
[49] Letter of  Lawrence J. Cormier, dated April 10, 2015, Exh. FF
[50] Letter of Philip Halliburton, dated April 3, 2015, Exh. GG

Michele, writes that their home phone number was listed in the phone book, and that her husband would often see constituents at home after hours or on the weekends. His home has "literally been open to the Southeast Queens community."[51]

Specific examples of Smith's efforts to protect his constituents are noted in many of the letters submitted on his behalf. For example, Smith's former director of constituent affairs recalls a time when a local woman came into the office in her pajamas, having just endured the flooding of her basement apartment and the loss of all her belongings. "The Senator made sure we spoke to every contact we had to get her emergency resources, including shelter."[52] Another staff member recalls that during an overnight blizzard that brought the city to standstill, and all services to a halt, Smith called his staff members, waking them from sleep, and enlisted them to help him drive through the district assessing needs and offering assistance. He drove through the night with his staff, stopping to personally telephone high ranking officials in government agencies to request assistance.

When a police officer was shot on the Cross Bronx Expressway, Smith dispatched his staff to call residents to advise them to remain inside while the police searched for the perpetrator.[53]

Throughout Smith's tenure in the Senate, gun violence has plagued his district. Smith worked to address this issue through programs like "SNUG" and legislative efforts. But he was also called upon to deal with the issue on more personal level, through his interactions with the families of murder victims. Smith, sometimes accompanied by his wife Michele, went to the

---

[51] Letter of Michele Lisby-Smith, dated April 1, 2015, Exh. HH
[52] Letter of Philip Halliburton, dated April 3, 2015, Exh. GG
[53] Letter of Marilyn Jackson, dated March 13, 2015, Exh. II

homes of grieving families to provide whatever emotional or practical support he could.[54] A letter writer recalls, "Our family was going through a major crisis; our son was killed. Malcolm was very supportive and maintained constant contact."[55] When two of Smith's constituents felt that the District Attorney was not paying sufficient attention to the investigation of their son's murder, they reached out to Smith. "The next day a person from the DA's office called me personally to assure me they would put every effort into the case. He made the call, never asked us to endorse him, campaign for him, or give him funds."[56] Donna Hood, whose son was killed by a stray bullet in 2009 while walking home from school writes, "Unlike most elected officials, after all the press / media were gone, Malcolm Smith would contact me personally on a [periodic] basis to check on the well-being of my family and me."[57]

Smith demonstrated particular commitment to his district's senior citizens. His staff gave seniors rides to doctor's appointments, and Smith often visited seniors in their homes, paying for meals out of his own pocket. Smith also held annual "senior appreciation" events.[58] His yearly senior luncheon was popular and well attended. Smith would attend from start to finish, "joining in all the fun."[59]

Edna Crater, a 73 year old district resident with cerebral palsy, recalls a surprise meeting with Smith in her apartment building when Smith came to facilitate the installation of a ramp to provide her with easier access. After assessing her needs, Smith made sure that the ramp was installed. Crater writes, "He felt compassion and concern for my need… he made me feel

---

[54] Letter of Constance Higdon, dated March 27, 2015, Exh. JJ
[55] Letter of Shelton and Cheryl Daniels, dated April 11, 2015, Exh. KK
[56] Letter of Lawrence and Shelley Ennett, dated April 12, 2015, Exh. LL
[57] Letter of Donna Hood, dated February 23, 2015, Exh. MM
[58] Letter of Shirley Brooks, dated April 15, 2015, Exh. NN
[59] Letter of Wilhelmina Carter, undated, Exh. DD

special. That my need was real."[60] Another district senior describes the result of Smith's efforts to have a traffic control device placed at a problem curve in the roadway. As a result of Smith's efforts, she writes, "We can walk on the sidewalk, stand on the bus stop and drive around the corner with less fear."[61]

Smith also supported the veterans in this district. He held an annual "Valentine's Day for Veterans" event to express the community's gratitude for their military service.[62] Blossom Ferguson writes about her pride having been nominated to the New York Senate Veterans Hall of Fame by Smith and about the impact the ceremony and subsequent visit to Smith's Senate chambers had on her family: "The kindness and patience Senator Smith extended towards me and my family during our visit to the State's capital has left indelible footprints on our hearts."[63]

### j.    Election to majority leader and final term

Smith's efforts on behalf of his constituents, and his talents as a political leader, did not go unnoticed by his Senate colleagues. When the Democrats won the Senate majority in 2008 (for the first time in four decades), Smith was chosen as Majority Leader and President *pro tempore*, becoming the first African-American to ever hold this position. However, despite Smith's contributions, in 2009, six months into his tenure as Majority Leader, political events compelled him to step down from his position.  In what was later described as a Senate "coup," two Democratic members joined a Republican coalition, bringing the work of the Senate to standstill. In a compromise intended to get the Senate back to work, Smith agreed to resign as the Majority Leader, retaining his position as President *pro tempore*. Reflecting on these events,

---

[60] Letter of Edna M. Crater, February 24, 2015, Exh. OO
[61] Letter of Sylvia Hazell, undated, Exh. PP
[62] <u>Id.</u>
[63] Letter of Blossom Ferguson, undated, Exh. QQ

Smith writes, "I believed that the only way to resolve this situation, and to get the Senate back to work for the people of this state, was to step down as majority leader, and I did so. While I don't regret taking this action, it was personally devastating. In the span of a few weeks, I felt like I watched my life's work come crashing down around me. I felt like I had failed my constituents. The sense of disappointment was immense."[64]

Nonetheless, Smith retained immense support both in his district and statewide. He ran for what would be his final term in 2012 and won in a landslide. Following his election, he aligned himself with the Independent Democratic Conference to form a bipartisan governing coalition with Senate Republicans. In September of 2014, sixteen months after his arrest in this case, Smith was defeated in a primary election. Smith completed his term in office, taking time off only when he was required to be in court for these proceedings.

### k. Public service work since trial

Despite Smith's conviction and fall from public office, he has continued his public service work. A community resident writes, "He has demonstrated a work ethic unsurpassed by anyone I know. Even now in the midst of this unfortunate circumstance, Malcolm isn't somewhere thinking about his challenges, but he is currently providing input and support to community leaders on a variety of initiatives."[65]

In March of this year, Smith created a program to assist senior citizens who reside in the Greater Allen Cathedral's Senior Residence to obtain services, including health care, nutritional services and transportation. The program, which is called the "Center for Advocacy and Resource Development" is designed to identify and obtain the services necessary to allow the

[64] Letter of Malcolm Smith, dated June 16, 2015, Exh. A
[65] Letter of Patricia A. Rubens, dated March 30, 2015, Exh. O

population of the Senior Residence to "age in place" rather than moving to a nursing home. Within the Center, Smith set up a library and computer room, where residents receive computer training, and started a "desk day" program where outside service providers come to the Residence to proactively assist the residents. Smith has also established a weekly shopping trip, and delivery of donated groceries for homebound residents. Smith spends approximately 9 to 10 hours at the Residence on Mondays, Tuesdays, Wednesdays and Fridays. On Thursdays, he volunteers at a soup kitchen, also run by the Cathedral.

l.     **Smith's family**

Malcolm has been married to Michele Lisby-Smith for 29 years. Lisby-Smith is a supervising court reporter for New York State Unified Court System, where she has worked for the past 30 years. Together they have raised three children: Julian Malcolm Smith, 31 years old, Tracey Harris, 34 years old, and Amanda Smith, 22 years old. Julian is Smith's son from his first marriage. Tracey, who is Michele's great-niece, was adopted when she was twelve years old. Amanda was adopted as an infant.

In her letter to the Court, Michele describes the decision to adopt Tracey: "Tracey who was twelve at the time was living in a deplorable situation due to the fact that her mother was addicted to heroin. Malcolm didn't think twice when I asked him if Tracey could live with us in Queens… She was not used to rules and lacked discipline because she basically cared for herself… Malcolm took care of Tracey as if she were his daughter."[66] Michele recounts with

---

[66] Letter of Michele Lisby-Smith, dated April 1, 2015, Exh. HH

pride that Tracey is now married, a mother of two, and has a master's degree.[67] Tracey writes, "Malcolm Smith, by becoming my dad, saved my life."[68]

Julian and Amanda Smith write about their father's influence on their upbringing. Julian credits Smith with teaching him "not just how to be a man, but to be a father."[69] Amanda writes, "Each chance he got, he would stress to me and my siblings how important it was to work during the summer and always wanted us to be productive. Education is key… I have personally went on numerous trips with my father whether it was to one of the charter schools he helped build, or helping serve dinners to less fortunate every Thanksgiving holiday."[70]

Smith's siblings, sister-in-law, nieces, and siblings have also submitted letters to the Court, describing him as a role model, and a source of advice and support in times of need, and asking the Court to issue a lenient sentence. [71]

We respectfully submit that the remarkable outpouring of support on behalf of Malcolm Smith contained in the letters submitted to the Court demonstrate that the history and characteristics of this particular defendant weigh strongly in favor of leniency.

---

[67] Id.
[68] Letter of Tracey Harris, dated April 1, 2015, Exh. RR
[69] Letter of Julian M. Smith, undated, Exh. SS
[70] Letter of Amanda Smith, April 13, 2015, Exh. TT
[71] Letter of Deborah S. Gaston (sister), dated April 8, 2015, Exh. B; Letter of Raymond Maisonet (brother), dated April 4, 2015, Exh. UU; Letter of Deborah Maisonet (niece), dated April 2, 2015, Exh. VV;  Letter of Diane Maisonet (niece), dated April 26, 2015, Exh. WW; Letter of Muriel Ward-Harper (sister-in-law), dated April 8, 2015, Exh. XX.

III.   **The Nature and Circumstances of the Offense Support a Sentence of 366 Days**

We respectfully submit that there are two offense-specific mitigating factors that the Court should consider in fashioning a fair and just sentence in this case.

First, the Court should consider that Smith did not seek or receive any pecuniary gain as a result of the offense conduct.  In stark contrast to the typical politician in a bribery case – and to his co-defendants - Smith was not motivated by the opportunity for personal financial gain. Throughout the conversations recorded by the cooperating witness and the undercover officer, Smith speaks at length about the reason he wanted to run for mayor: because he felt he would be a good mayor for the people of New York City and because he believed he had a calling to serve.[72] At no time does Smith ask for or receive any money for his personal use. This sets the defendant apart from the vast majority of similarly situated defendants. We submit that this should be taken strongly in consideration under the facts of this case.

Second, Smith did not plan, organize, or initiate the offense conduct. He did not meet Moses Stern with a plan to make payments to the leaders of the New York City Republican party, or to anyone else. Smith's desire to run for mayor on the Republican ballot was no secret in political circles – it had been covered in political "gossip" columns and discussed with the leaders of the party. Smith spoke openly of his aspirations in his early meetings with Stern. And it was Stern who introduced the idea of attempting to influence the Republican county leaders.

Although Smith's entrapment defense was rejected by the jury, we respectfully submit that aspects of the defense remain relevant in a sentencing analysis. Although the jury rejected the entrapment defense, Smith's limited role should weigh in favor of leniency in sentencing

---

[72] The presentence report observes that, "It appears from [letters sent in Smith's support] that Smith had all the right characteristics to be a great mayor of NYC."  (PSR, p. 21)

23

because he is "both less morally blameworthy than an enthusiastic [defendant] and less likely to commit other crimes if not incarcerated." United States v. McClelland, 72 F.3d 717, 726 (9th Cir. 1995); United States v. Bala, 236 F.3d 87 (2d Cir. 2000) (discussing downward departure for "imperfect entrapment" where government encourages wrongdoing, but defendant is not able to establish elements of entrapment defense.)

IV.     **A Sentence of 366 Days is a Substantial Prison Term That Satisfies the Need for Punishment, General Deterrence, and Specific Deterrence**

        Our proposed sentence of 366 days imprisonment first recognizes the need for punishment for the serious offense of conviction. A federal prison sentence of a year and a day is unquestionably a very serious punishment commensurate with the offense. Second, such a sentence would provide specific deterrence. Malcolm Smith has already suffered greatly for his conduct, and he will suffer more in the years to come. He has experienced an extraordinary public downfall, from a popular politician considering opportunities to run for higher office, to a felon awaiting imposition of a sentence in a federal criminal case. He will never again be able to run for public office, and will be otherwise subject to the collateral consequences of a felony conviction. Regardless of the outcome of this sentencing proceeding, he will need to rebuild his life to support himself and his family. There is almost no possibility that Smith will re-offend. His age, lack of arrest history, and the fact that his conviction will serve to remove him from the context in which the offense conduct occurred all suggest an extremely low chance of recidivism. Accordingly, the presentence report notes that Smith's "risk of recidivism is low." (PSR, p. 21)

Third, the imposition of a 366 day prison term will deter other similarly situated individuals.[73] "There is a considerable evidence that even relatively short sentences can have a strong deterrent effect on prospective "white collar" offenders." United States v. Adelson, 441 F. Supp. 2d 506, 514 (S.D.N.Y. 2006) (noting that three-and-a-half-year sentence is not "a short sentence in any practical sense.") (citing Richard Frase, Punishment Purposes, 58 Stanford L. Rev. 67, 80 (2005); Elizabeth Szockyj, Imprisoning White Collar Criminals?, 23 S. Ill. U. L.J. 485, 492 (1998). Cf. United States Sentencing Commission, Fifteen Years of Guidelines Sentencing 56 (2004) (noting that the Sentencing Guidelines were written, in part, to "ensure a short but definite period of confinement for a larger proportion of these 'white collar' cases, both to ensure proportionate punishment and to achieve deterrence"). This reasoning is particularly applicable to politician-defendants, who are in the public eye, and who can never again hold public office following conviction.

## V.     A Sentence of 366 Days Incarceration Will Avoid Unwarranted Sentencing Disparities

Section 3553(a)(7) directs the Court to consider "the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct." A review of sentences from New York State political corruption cases prosecuted in the past five years indicates that a sentence of 366 days is justified and warranted. In each of the cases cited below, the defendant-politician committed the offense of conviction for his own personal, pecuniary benefit, taking money for his own use, either by stealing from a non-profit they controlled, or by taking a cash bribe. As detailed below, sentences issued in these cases range from seven years (Carl Kruger) to one year (Shirley Huntley and Alan Hevesi). For the reasons discussed throughout this memorandum, specifically Smith's history of

public service, the fact that he did not derive financial benefit from the offense conduct, and the

fact that he did not plan or organize this conduct, we respectfully submit that Smith should be

sentenced below these defendants, and below his co-defendants, whose offense conduct was far

more severe than his.

- Carl Kruger – New York State Senator convicted of political bribery for accepting more than $1 million in exchange for official action. At sentencing, the Court described his conduct as "extensive, long-lasting, substantial bribery schemes that frankly were like daggers in the heart of honest government." 7 years. (Rashbaum, William K. "After Resigning, Tearful Senator Pleads Guilty to Accepting Bribes." New York Times, Dec. 20, 2011)

- Efrain Gonzalez – New York State Senator convicted of conspiracy and fraud for stealing more than $700,000 from non-profit groups. 7 years. (Weiser, Benjamin. "A Former Bronx Senator Gets 7 Years for Corruption." New York Times, May 25, 2010)

- Larry Seabrook – New York City councilman, and former assemblyman and state senator, convicted of mail and wire fraud for funneling $620,000 in New York City funds to friends and relatives through a group of non-profits under his control. 5 years. (Weiser, Benjamin. " Ex-Lawmaker Gets 5 Years in Corruption Case." New York Times, January 8, 2013)

- Pedro Espada – New York State senator, convicted for stealing $386,000 from a group of non-profit health clinics. 5 years. (Secret, Mosi. "Espada Sentenced to 5 Years for Stealing From Nonprofit." New York Times, June 14, 2013)

- Eric Stevenson – New York State Assemblyman convicted for his involvement in a scheme where he took $20,000 in bribes in return for assisting a businessman to build an adult day care in his district, and also introduced legislation calling for a three-year moratorium on the opening of competing centers. 3 years. (Weiser, Benjamin. "Former Bronx Assemblyman Sentenced for Corruption." New York Times, May 21, 2014)

- Joseph Bruno – New York Senate Majority leader, convicted of honest services fraud for concealing hundreds of thousands of dollars in payments from a businessman seeking assistance from the state legislature. 2 years. (Confessore, Nicholas. "Bruno Gets 2-Year Prison Term, but Stays Free." New York Times, May 6, 2010)

- Shirley Huntley – New York State Senator convicted of stealing $87,000 from a non-profit organization she ran. 366 days. (Secret, Mosi. "One-Year Prison

Sentence for an Ex-State Senator Who Taped Her Colleagues." New York Times, May 9, 2013)

- Alan Hevesi – New York State comptroller, convicted of receiving $1 million in benefits in exchange for approving a $250 million pension fund investment. 1- 4 years. (New York State prosecution) (Elignon, John. "Hevesi Sentenced to One to Four Years." New York Times. April 15, 2011)

A nationwide analysis of United States Sentencing Commission data supports a sentence well below the advisory Guidelines range. Between 2005 and 2014 (the years during which the current version of section 2C1.1 has been in effect), twenty-six defendants have been sentenced pursuant to this guideline with a base offense level of 14 (indicating that the defendant was a public official) and a loss amount of $120,000 to $200,000. Of this group, 88.5% received below Guidelines sentences, with an average departure / variance of 33.7 months. Eleven of these defendants received sentences of 37 months or less.[74]

### VI.   The Court Should Not Order Restitution of Smith's Senate Salary

The Government has indicated its intent to seek restitution of half of Smith's State Senate salary during the time of the offense conduct, pursuant to the authority of United States v. Bajel, 662 F.3d 610, 650 (2d Cir. 2011).[75]

Restitution is intended to restore lost property to the victim of an offense. In Bajel, the Court of Appeals upheld a restitution award of equivalent to ten percent of the defendant's salary during the period of the offense conduct, reasoning that the victim employer lost money

---

[74] See MCM Data Consulting analysis, dated June 5, 2015, Exh. LLLLL. Note that the U.S.S.C. data on which this analysis is based does not include defendant names or docket numbers.

[75] The government expressed its intent to seek restitution pursuant to this authority in an email to the Probation Department, dated April 24, 2015, containing its objections to the draft presentence report. No others facts in support of this application have been offered at this time.

("property") when it paid the defendant for honest services but "receive[d] something else." Bajel, 662 F.3d at 649. The facts of Bajel, however, demonstrate a direct connection between the money lost by the defendant's employer and the offense conduct. This connection does not exist in this case. For this reason, the government's application should be denied.

In Bajel, the defendant, a procurement officer for the United Nations, was convicted of receiving kickbacks in exchange for awarding millions of dollars of contracts. In deciding the appropriate amount of restitution, the district court first noted that "it would be unduly complex to try to delineate which part of $876,000 (the amount Bajel earned in salary between 1999 and 2006, the period covered by the fraud) was paid for honest services and which was paid for dishonest services." Bajel, 662 F.3d at 650. The court then assessed restitution of $86,098.36, representing the amount of salary the defendant received following his suspension pending investigation of the fraud, during which he "performed no services at all." Id.

There is no similar calculation possible under the facts of this case, nor is there any evidence that the people of New York State (Smith's employers) lost any money whatsoever as a result of his actions. Smith did not take time away from work to meet with Stern and Raj, was never suspended from his duties, and did not cause any funds to be expended by the state. To the contrary, Smith continued to fulfill his senate duties during the pendency of this matter, until his Senate term was complete. Further, there is substantial evidence in the attached letters from Smith's former constituents and staff members to establish that he treated his role as a state senator as a "24/7" position, working on weekends and evenings following senate sessions in Albany. To require Smith to repay a portion of his senate salary as restitution is not consistent with Bajel, and is not otherwise supported by any statutory authority.

VII.    <u>The Court Should Not Order a Fine</u>

The Probation Department recommends a fine of $15,000 (the low end of the Guidelines fine range) based, in part, on its analysis of his and his wife's assets. We respectfully submit that in addition to the financial analysis conducted by the Probation Department, the Court should consider the fact the Smith is presently unemployed and does not have any immediate job prospects. For this reason, a fine would create a substantial burden on Smith and his wife.

VIII.   <u>Conclusion</u>

For the reasons stated in this memorandum, we respectfully submit that a sentence of 366 days of incarceration is appropriate in this case.


Dated: New York, NY
       June 17, 2015

                                        Respectfully submitted,

                                        Gerald L. Shargel
                                        Evan L. Lipton
                                        Winston & Strawn LLP
                                        200 Park Ave.
                                        New York, NY 10166
                                        (212) 294-2637
                                        gshargel@winston.com


                                        *Attorneys for Malcolm A. Smith*