

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

June 26, 2015

**BY ECF AND HAND DELIVERY**

Honorable Kenneth M. Karas
United States District Judge
United States Courthouse
300 Quarropas Street
White Plains, New York 10601

>	Re:	United States v. Malcolm A. Smith and Vincent Tabone,
>		S2 13 Cr. 297 (KMK)

Dear Judge Karas:

	The Government respectfully submits this letter in advance of the sentencing of defendants Malcolm Smith and Vincent Tabone, which is scheduled for July 1, 2015.  The defendants were both found guilty of conspiracy, honest services wire fraud, and Travel Act bribery following a month-long jury trial.  Smith was also found guilty of Hobbs Act extortion and Tabone was found guilty of witness tampering.  The United States Probation Office has determined that Smith's sentencing range under the United States Sentencing Guidelines ("Guidelines" or "U.S.S.G.") is 97 to 121 months' imprisonment.  The Probation Office has determined that Tabone's sentencing range is 78 to 97 months' imprisonment.  For the reasons that follow, the Government agrees with those calculations and recommends that the Court sentence the defendants within their applicable Guidelines ranges.

	Smith abused his position of public trust and encouraged others to do so for his own personal benefit.  Tabone violated the trust placed in him by his fellow party members in an effort to enrich himself through quid pro quo bribery, and then brazenly tried to prevent the leader of his own party from testifying against him.  The defendants' offense conduct was truly egregious.  Based on the extent of their misconduct, a Guidelines sentence is necessary to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment, and to afford adequate deterrence generally to those in the political sphere who would consider similar corrupt activity.  *See* 18 U.S.C. § 3553(a)(1), (2)(A), and (B).

## BACKGROUND

A.   **The Offense Conduct**

The defendants' criminal conduct revolved around a scheme to bribe Republican party officials in exchange for their authority for Smith to run as a Republican in the 2013 New York City mayoral race.

1.   **The Scheme to Bribe New York City Republican Party Leaders**

Between the fall of 2012 and the spring of 2013, Smith, then a Democratic member of the New York State Senate, former acting Lieutenant Governor, and former Majority Leader of the New York State Senate, was considering whether to run for mayor of New York City as a Republican.  From in or about November 2012 through in or about April 2013, Smith agreed with New York City Councilman Daniel J. Halloran, an undercover FBI agent posing as a wealthy real estate developer (the "UC"), and a cooperating witness ("CW") to bribe New York City Republican Party county leaders.  The bribe payments were in exchange for the Republican leaders' authorization for Smith to appear on the 2013 New York City mayoral ballot as a Republican candidate, even though Smith was a registered Democrat. Because Smith was not a registered Republican, under New York state law, he needed the approval of three of the five New York City Republican county executive committees in a form known as a "Wilson Pakula certificate" in order to appear on the ballot's Republican Party line.

In furtherance of the scheme, Halloran negotiated cash bribes to be paid by the UC and the CW to Tabone, then the Vice Chairman of the Queens County Republican Party, Joseph J. Savino, then the Chairman of the Bronx County Republican Party, and the chairman of a third Republican county committee. Halloran also arranged for the UC and the CW to meet Tabone, Savino, and two other Republican county committee chairmen to discuss the possibility of obtaining a Wilson Pakula certificate for Smith and what the chairmen would want in exchange for their approval of Smith to run for mayor as a Republican.

On February 8, 2013, Halloran met at a Manhattan hotel with the UC and CW. During that meeting, Halloran gave the following instructions to the CW and the UC: "So, look, you gotta, you gotta get [Savino] business but put twenty-five in an envelope. . . . [Tabone] is twenty-five up front, twenty-five when the Wilson Pakula is delivered. So, he wants, and he doesn't care about [the Queens County Republican Party] getting anything at this point."

On February 10, 2013, the UC and CW met Smith at a hotel in Manhattan. During that meeting, the UC and CW told Smith about their conversation with Halloran and the three discussed how to ensure that Tabone and Savino would follow through on their promise to obtain a Wilson Pakula certificate for Smith after they had been paid. During that conversation, Smith discussed structuring the payments so that only a portion of the bribe would be paid initially, with the remainder to be paid after Smith received the Wilson Pakula certificate. Smith cautioned: "I wouldn't give them more than like ten, just to, just to start out. . . ." Toward the end of the meeting, Halloran joined Smith, the UC and the CW. During that portion of the meeting, Smith said to Halloran, "You've been busy," and Halloran responded that it had been "a heavy lift."

Honorable Kenneth M. Karas
June 26, 2015
Page 3 of 12

      Halloran arranged for the UC and CW to meet with Tabone and Savino at a restaurant in Manhattan on February 14, 2013. In exchange, Halloran solicited and received from the UC and the CW approximately $20,500 in cash for himself. At the restaurant, Tabone and the UC discussed how much it would cost for Tabone to support obtaining a Wilson Pakula certificate for Smith. During that conversation, Tabone gave a "commitment" to "work to get . . . three or four" Republican county chairmen to sign a Wilson Pakula certificate for Smith. In exchange, the UC suggested a payment to Tabone of "twenty now, twenty later" and Tabone responded, "I was thinking twenty-five now, twenty-five later." Tabone also told the UC that he would send the UC a retainer agreement for the money. Following this conversation, Tabone and the UC retired to the UC's car where the UC handed Tabone an envelope containing $25,000 in cash. While Tabone was in the car, Halloran and the CW remained in the restaurant and discussed the evening's events. During that conversation, the CW said "We just, we just bought a republican candidate. If you think about it." And Halloran replied "It's scary."

      The UC and CW also met with Savino at the Manhattan restaurant. During that meeting, Savino agreed to obtain a Wilson Pakula certificate for Smith in exchange for a total payment of $30,000. Like Tabone, Savino got into the UC's car, where he accepted $15,000 in cash and agreed to accept another $15,000 after he formally approved Smith's appearance on the 2013 Republican ballot for New York City Mayor.

      On March 21, 2013, Smith met with the UC and CW in his New York State Senate offices. During the meeting, Smith complained that the party leaders had not followed through on their promises to get him a Wilson Pakula certificate, and warned that "when you screw somebody over money like that, . . . you know, that's the worst . . . you're looking over your shoulder all the rest of your life. . . . You're looking over your shoulder, because, because, not only that, this world is too small. . . . Yeah, the world is too small." Smith then suggested that judgeship requests made by the leaders may be rejected if the leaders did not follow through. When the UC informed Smith that one of the leaders needed money because he had a child in college, Smith replied, "You know what you do? Tell him, tell him I got a kid in Albany that needs to be born. So, when you birth him, when you birth my child up in Albany, I'll help you with your kid." And at the suggestion that the leaders might want more money before granting Smith a Wilson Pakula certificate, Smith replied:

> You know what? I'd say I wouldn't even touch that. . . . I'd say absolutely not.
> I'd say I'm not giving you a freaking dime. I'd say, if I even give you a nickel
> more, you'd have to stand on the Empire State Building, and drop every person
> you endorsed, and hold Malcolm up and say he's the best thing since sliced bread.
> Matter of fact, he's better than sliced bread.

      In exchange for the bribe payments to Tabone and Savino by the UC and CW, Smith, in his capacity as a New York State Senator, agreed to help obtain $500,000 in New York State funds for road work that would benefit a real estate project in Spring Valley that Smith understood was being developed by the UC's company.

In total, Halloran negotiated and Smith approved $110,000 in bribes to be paid to three New York City Republican party leaders in exchange for a Wilson Pakula certificate for Smith and a $75,000 payment to Halloran for his services in negotiating those bribes.

### 2. The Witness Tampering

On April 2, 2013, Tabone was arrested. On May 23, 2014, the parties assembled at the house of Philip Ragusa, then the Chairman of the Queens County Republican Party, to take his court-ordered deposition pursuant to Rule 15 of the Federal Rules of Criminal Procedure. The Court ordered the deposition in light of Ragusa's failing health and the resulting possibility that he would not be available at trial. In fact, Mr. Ragusa died a few weeks later. An hour prior to the start of the deposition, Tabone showed up at Ragusa's house. He was met at the front door by Ragusa's wife, Nelly. Tabone asked Nelly if he could see Ragusa, who was resting in his bed, because Ragusa "shouldn't testify because [Tabone] didn't do anything wrong. Everything was legal what he did." (Tr. 1072). Tabone then went into Ragusa's bedroom. While he was there, Tabone, in front of Ragusa's close friend, Joe Levy, attempted to convince Ragusa not to testify during the deposition in defiance of this Court's order directing him to do so. Ragusa demurred and provided damning testimony. During the deposition, Tabone's then-lawyers, in consultation with Tabone, pursued a line of cross-examination designed to suggest that the Government had infiltrated the Republican party and planted "spies" for political purposes. During the cross-examination, Ragusa lost energy and the deposition was ended before the cross-examination was completed. Ragusa died before the deposition was completed. As a result, the jury did not see the video of Ragusa's testimony.

### B. The Indictment, Trial, and Guilty Verdict

On October 30, 2014, a grand jury returned Indictment S2 13 Cr. 297 (KMK), charging Smith and Tabone in four counts each. Count One charged Smith and Tabone with conspiracy, in violation of Title 18, United States Code, Section 371, to commit honest services wire fraud and to violate the Travel Act in connection with the scheme to bribe leaders of the New York City Republican Party county committees. Count Two charged Smith and Tabone with substantive honest services wire fraud and attempting to commit honest services wire fraud in connection with that bribery scheme, in violation of Title 18, United States Code, Sections 1343, 1346, 1349, and 2. Count Three charged Smith and Tabone with a substantive violation of the Travel Act in connection with that bribery scheme, in violation of Title 18, United States Code, Sections 1952 and 2 and New York Penal Law Sections 200.45 and 200.50. Count Four charged Smith with Hobbs Act extortion in connection with his agreement to obtain $500,000 in state transportation money in exchange for the UC and CW's assistance in bribing, among others, Tabone, in violation of Title 18, United States Code, Section 1951. Count Five charged Tabone with witness tampering in connection with his efforts to prevent Ragusa from testifying against him, in violation of Title 18, United States Code, Sections 1512(b) and (c), and 2.

On February 5, 2015, following a one-month jury trial, Smith and Tabone were both found guilty of all counts charged against them in the Indictment.

Honorable Kenneth M. Karas
June 26, 2015
Page 5 of 12

### C. The Presence Report

#### 1. Malcolm Smith

The Probation Office calculates the Guidelines range for Smith as follows: Counts One through Four are grouped to form a single group. (PSR ¶ 28). The base offense level is 14, which is increased by 2 levels as a result of more than one bribe being paid, 10 levels based on a loss amount of $185,000 representing the total amount of bribes to be paid on his behalf, and by another 4 levels based on Smith's status as an elected official, resulting in an adjusted offense level of 30. (PSR ¶¶ 29-39). Because Smith is in Criminal History Category I, the resulting Guidelines range is 97 to 121 months' imprisonment. (PSR ¶ 80).

#### 2. Vincent Tabone

The Probation Office calculates the Guidelines range for Tabone as follows: Counts One through Three are grouped to form a single group (PSR ¶ 28). The base offense level is 14, which is increased by 2 levels as a result of more than one bribe being paid, 6 levels based on a loss amount of $50,000 representing the total amount of the bribe to be paid to Tabone, and by another 4 levels based on Smith's status as an elected official. An additional 2-level enhancement applies as a result of Tabone's conviction, in Count Five, of obstruction of justice, resulting in an adjusted offense level of 28. (PSR ¶¶ 29-39). Because Tabone is in Criminal History Category I, the resulting Guidelines range is 78 to 97 months' imprisonment. (PSR ¶ 86).

## DISCUSSION

### A. Applicable Law

Although no longer mandatory, the Sentencing Guidelines continue to provide strong guidance to sentencing courts following *United States v. Booker*, 543 U.S. 220 (2005). Under Supreme Court precedent, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," and that range "should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007). As the Second Circuit has remarked en banc, although the Guidelines do not dictate a presumptively reasonable sentence, they are not merely a "body of casual advice." *United States v. Cavera*, 550 F.3d 180, 188 (2d Cir. 2008) (internal quotation marks omitted). The Guidelines' relevance throughout the sentencing process stems in part from the fact that, while they are advisory, "the sentencing statutes envision both the sentencing judge and the Commission as carrying out the same basic § 3553(a) objectives," *Rita v. United States*, 551 U.S. 338, 348 (2007), and the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall*, 552 U.S. at 46; *see also Rita*, 551 U.S. at 349.

After making the initial Guidelines calculation, a sentencing judge must then consider seven factors outlined in Title 18, United States Code, Section 3553(a), and "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing outlined in Section 3553(a)(2). To the extent a District Court imposes a sentence outside the range

recommended by the Guidelines, the Court must "'consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance.'" *Cavera*, 550 F.3d at 188 (quoting *Gall*, 552 U.S. at 50).

**B.     The Probation Office Has Properly Calculated the Applicable Guidelines Range**

The Government and Smith agree that the Probation Office's calculation of Smith's Guidelines range is correct. Tabone disputes the calculation of his Guidelines range on the grounds that: (a) because he is not a public official, the base offense level should be 12; (b) because Tabone was not a high-level official, the four-level enhancement, pursuant to U.S.S.G. § 2C1.1(b)(3), does not apply; and (c) because the loss amount was limited to the bribe paid to Tabone, the 2-level multiple bribe enhancement, pursuant to U.S.S.G. § 2C1.1(b)(1), does not apply. Tabone is mistaken on all counts.

First, Tabone is a public official as that term is defined for purposes of U.S.S.G. § 2C1.1. Application Note 1 to Section 2C1.1 defines the term public official as encompassing "An individual who . . . (i) is in a position of public trust with official responsibility for carrying out a government program or policy; (ii) acts under color of law or official right; or (iii) participates so substantially in government operations as to possess de facto authority to make governmental decisions." The Note provides as an example of such an individual, "a leader of a state or local political party who acts in the manner described in this subdivision." U.S.S.G. § 2C1.1, Application Note 1(E). Plainly, Tabone falls within the scope of this definition. As the testimony at trial established, Tabone, as a leader of the Queens County Republican Party, wielded tremendous power over governmental decisions—from the appointment of people to the Board of Elections and the granting of patronage jobs, to the authority to permit a non-party member to appear on the party's ballot line. In fact, it was the exercise of that state-granted power that was at the core of the bribery scheme in which Tabone was convicted of participating. Accordingly, the PSR correctly concluded that, pursuant to U.S.S.G. § 2C1.1(a)(1), a 14-level base offense level applies.[1]

Second, because "the offense involved an elected public official," a four-level enhancement pursuant to U.S.S.G. § 2C1.1(b)(3) applies. Tabone, citing no authority, concludes that this enhancement only applies where the defendant at issue is an elected public official. Tabone Mem. at 2. The plain text of the enhancement, however, dictates otherwise. As a jury found and Smith concedes, the offense involved Smith and Halloran, both elected public officials. Crimes involving the corruption of elected public officials create a special harm to our democratic system of government, whether the defendant is the elected official or not. Accordingly, the enhancement applies in situations such as this where the offense involves such an elected official. *See*, *e.g.*, *United States v. Dodd*, 770 F.3d 306, 311-12 (4th Cir. 2014)

---

[1] Tabone's assertion that "the PSI agrees" with his position that he is not a public official is inaccurate. (Tabone Mem. 2). In response to Tabone's objection that ¶ 26 of the PSR incorrectly stated that he was no longer a "public official," the Probation Office revised that paragraph to read "party official." The Probation Office did not agree, however, that Tabone was not a public official as that term is defined in U.S.S.G. § 2C1.1. Rather, as the PSR clearly indicates, the Probation Office applied a base offense level of 14 to his offense, indicating that Tabone did fall within that definition.

Honorable Kenneth M. Karas
June 26, 2015
Page 7 of 12

(affirming application of Section 3C1.1(b)(3) where defendant, who was incarcerated, bribed corrections officers).

Finally, because "the offense involved more than one bribe or extortion," a 2-level enhancement applies, pursuant to U.S.S.G. § 2C1.1(b)(1). Again without any authority, Tabone asserts that, because the loss amount attributed to him is limited to his own bribe, the multiple bribe enhancement does not apply. Tabone Mem. at 2. Tabone misunderstands the basis for the two distinct enhancements. As even Tabone does not dispute, he agreed to take a $50,000 bribe for his agreement to secure a Wilson Pakula certificate for Smith. What Tabone fails to acknowledge, however, is that, as the Government set forth in detail in response to Tabone's motion for a new trial, the evidence at trial overwhelmingly demonstrated that Tabone was aware that both Jay Savino and Daniel Isaacs had been offered bribes as well. Accordingly, the evidence at trial was more than sufficient to trigger both the 6-level loss amount enhancement pursuant to U.S.S.G. § 2C1.1(b)(2) and the 2-level multiple bribe enhancement pursuant to U.S.S.G. § 2C1.1(b)(1). The two enhancements are entirely distinct and, given that, as Smith acknowledges, the total amount of all bribes was $185,000, that distinction inures to Tabone's benefit. Tabone should not now be heard to complain that, because the Government is not holding him to the higher loss amount, he should not be held to account for his knowledge of the bribery of others.

Accordingly, the Court should adopt the Probation Office's Guidelines calculation.

C.   **A Sentence within the Guidelines Range Is Appropriate**

A sentence within the advisory Guidelines range of 78 to 97 months' imprisonment for Tabone and 97 to 121 months' imprisonment for Smith is reasonable and appropriate in this case principally due to the nature and circumstances of the offense, the need to promote respect for the law, and the need for adequate deterrence to criminal conduct.

Starting with "the nature and circumstances of the offense," 18 U.S.C. § 3553(a)(1), Smith and Tabone each played central roles in an elaborate scheme to make bribe payments to several New York City Republican leaders in order to obtain a benefit for a sitting New York State Senator. As set forth above, Smith helped plan the offense, authorized the bribes, and plotted retaliation against the party leaders when then failed to provide him the sought-after authorization on his timetable. Smith was not a passive participant in the scheme, but took an active role in counseling the UC and CW on their payment of the bribes, from how much to pay to how to structure the payments. And Smith willingly agreed to grant the UC and CW a half-million dollars in taxpayer money for their efforts.

Tabone, for his part, was more than willing to accept tens of thousands of dollars in cash in exchange for his exercise of a state-granted function. Tabone not only took a bribe, but actively negotiated a higher sum than his co-conspirators and demanded a six-figure salaried job to replace his when he realized that his boss would likely fire him for his conduct.

Together, Smith and Tabone readily and willingly undermined the integrity of an election and abused their positions of trust with the City, State, and the taxpayers—all for their own personal benefit. And they carried out their crimes with tremendous arrogance. Smith spoke of

denying judgeships, leaving party leaders looking over their backs for the rest of their lives, and demanding that those same leaders hold him up as "better than sliced bread" if they wanted a bigger bribe. Tabone repeatedly intoned about how he controlled the Queens County Republican Party and how its Chairman served at Tabone's pleasure, not the other way around. Neither man showed an ounce of self-doubt or concern for their behavior. Rather, they both took leading roles in securing benefits for themselves at the expense of the people they were supposed to serve. Such offenses strike at the core of our system of government. And that damage was only compounded by Tabone's attempt to cajole the terminally ill leader of his party from bearing witness against him. Tabone, in particular, made not only a mockery of the electoral system but of the system of justice that is holding him accountable for his crimes.

The need for the sentence to "reflect the seriousness of the offense, to promote respect for the law," and "to afford adequate deterrence to criminal conduct" also all weigh in favor of a Guidelines sentence. 18 U.S.C. § 3553(a)(2). As has become commonplace in the sentencing memoranda of disgraced political figures, both Smith and Tabone assert, without any sense of irony, that their dedication to their constituents and communities merits leniency in this case. Indeed, Tabone goes so far as to suggest that, in the heartland of cases, those before the Court for sentencing fail to perform *any* good acts, much less acts as noble as he. (Tabone Mem. 3, 5). While they cite to the good acts that they performed in their public and private lives, as politicians and a member of the bar, they fail to acknowledge in any fashion the special position of trust they held. Rather, they pay lip service to the damage done their communities by their actions while simultaneously blaming the Government for their downfall. (Smith Mem. at 23-24 (claiming "it was Stern who introduced the idea of attempting to influence the Republican county leaders" and asserting the "government encourag[ed his] wrongdoing"); Tabone Mem. at 3 ("the undercover agent and the CI created the illegal schemes.")) Yes, they did good deeds in their political lives, but they were supposed to do that. What they were not supposed to do was use the privilege of their office, and the cloak of those good deeds, to secretly enrich themselves at the expense of the communities they purported to serve. A significant sentence, in line with the Guidelines in this case, is necessary to impress upon the defendants and those who would follow in their lead that theirs was a serious offense that caused meaningful harm to the public.

Such a sentence is particularly important here where it is apparent from the sentencing submissions that the defendants do not fully comprehend the gravity of their actions. Despite his claims to the contrary, Smith's criminal activity was not born of the best intentions. He committed his crimes, he claims, not for pecuniary gain, but "because he believed he had a calling to serve." Smith Mem. at 23. In doing so, Smith persists in the apparent self-denial of his true motives. While Smith certainly spoke repeatedly of how great a mayor and Senate leader he would make, he also spoke repeatedly of his desire to parlay his public office into a high-paying job. In fact, he continually raised the subject of future employment with the UC. So, while he may not have sought the short-term, relatively small dollar gain of his compatriots, money was not far from his mind and his ability to plan long-range is not mitigating factor. Nor is it the case that the Government constructed his offense. Smith apparently has yet to accept the fact that it was he, on November 16, 2012, that first raised the idea of paying any public officials for an official act. It was on that day, in the midst of conversation about Smith giving the CW a job in exchange for campaign contributions, that Smith explained in plain, unvarnished terms, what he meant by putting state senators "on payroll." On that day, he asked the UC, who he had just recently met, to give jobs to his fellow state senators in exchange for a leadership position

for Smith.  It was Smith who brought bribery to the table—not the CW, not the UC, not any other Government agent.  Smith's continued failure to not only recognize his own personal culpability, but to attempt to foist that culpability on others, further reinforces the need for a Guidelines sentence.

Tabone similarly fails to comprehend the seriousness of his conduct.  Rather, he terms it aberrant.  Tabone Mem. at 6.  Yet, as the Government made clear in its pre-trial motions, Tabone's behavior was anything but aberrant.  To the contrary, in the context of another election—Rick Lazio's campaign for Governor of New York—Tabone demanded financial support for his own campaign in exchange for the support of the Queens County Republican Party.  Indeed, even obstruction of justice is nothing new to Tabone.  Although not raised at trial, Tabone previously made statements that, at best, strained credulity to a federal grand jury investigating yet another act of official corruption involving consultants and the Queens County Republican Party.  It was that grand jury investigation that Halloran said had made Tabone behave cautiously around the UC and CW.  Thus, while Tabone would have the Court believe that he is just a generous man who was caught up in a Government-constructed offense, that simply is not the case.  Rather, Tabone brought himself to the defendant's table and, like Smith, his failure to understand that fact warrants a Guidelines sentence.

The defendants' appeal to their history and characteristics as a basis for substantially below-Guidelines sentences is unavailing.  That factor, too, calls for a sentence within the range.  Both Smith and Tabone cite to the numerous letters of support they received from family, friends, constituents, and colleagues as evidence of the excessive nature of a Guidelines sentence.  It is, of course, not surprising that the defendants have been able to muster a significant number of letters from friends and family and those whom they have helped in the past.  The Court can, and should, consider these letters.  But, in doing so, the Court must also consider the voices of those whom the defendants betrayed and now ignore—those of the citizens of New York State.  While these voices may not be as loud and while these citizens may have grown too jaded or dispirited to write letters, they no doubt would tell this Court of the shame they experience every time another elected official in this state has betrayed the public trust for his own personal gain.

What the defendants fail to acknowledge is that their careers in public and party service cut two ways, particularly as to Malcolm Smith.  On the one hand, he served in public office—at the highest levels of state government—for many years.  On the other hand, as a lawmaker, he had a special obligation to adhere to the dictates of the law himself, and the record in this case reveals that he more than failed to fulfill that obligation. Smith was a lawmaker trusted and elected by the public to act in its best interest when he committed the crimes in question.  Thus, the defendants' "good deeds," as described in the letters submitted by the defense, provide no basis for leniency. They are, after all, the product of the nature of politics and public life.  The letters submitted to the Court describe exactly the kind of conduct to be expected from a State Senator and a political party leader on behalf of their constituents.  As such, they simply cannot make up for the betrayal practiced by those same public officials whose position enabled and demanded those good deeds and simultaneously motivated the crimes for which the defendants now stand convicted.

      The defendants' family circumstances also cut against leniency. As detailed in the PSR and the defense submissions, the defendants come from a solid and supportive family background. Given the defendants' upbringing, the values they both say were instilled in them by their parents from a young age, and the experiences they had with their constituents and community members who were less fortunate, they should have known better. That they can now muster the support of family that was up to this point insufficient to prevent their criminal actions, should not lead this Court to leniency.

      Finally, "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct" calls for a Guidelines sentence. 18 U.S.C. § 3553(a)(6). While Smith goes into detail about the other sentences received by politicians for bribe-taking, he fails to acknowledge both the sentence handed to his co-conspirator, Daniel Halloran, and the irony of citing to what Smith presumably believes to be lenient sentences for the offense that he committed. Rather, Smith provides the Court with an index of sentences that were given to other politicians that are mostly before he was arrested on the instant indictment and several years longer than the sentence he seeks. None of those sentences, all of which, as Smith points out, were publicly broadcast, was apparently sufficient to deter Smith from his crimes. Tabone, on the other hand, provides no explanation for why, despite going to trial, being convicted of obstructing this prosecution, and continuing to minimize his role in the offense, he deserves a sentence one-third shorter than the 3-year sentence imposed on Joseph Desmaret—who admitted his guilt to the Government and attempted to cooperate *before being indicted*.

      What the sentences referenced by Smith, and sought by both Smith and Tabone, suggest is that general deterrence really is important in public corruption offenses. Other politicians are keenly aware of the sentences handed down to their colleagues—and light sentences beget further requests for light sentences. Serious sentences, however, like those advised by the Guidelines in this case, send a strong and clear message that those who would follow in Smith's and Tabone's footsteps will suffer stringent punishment for doing so. And a Guidelines sentence here would give true voice to the victims of the defendants' offense: the public whose distrust of Government is born of the corrupt actions of their leaders.

**C.**    **The Court should Order Restitution of a Portion of Smith's Senate Salary**

      Restitution should be ordered to the State of New York in the amount of one half of Malcolm Smith's annual salary of $79,500.

    **1.**    **The Applicable Restitution Statute**

      The Mandatory Victim's Restitution Act, 18 U.S.C. § 3663A (the "MVRA"), is the most-applicable restitution statute for the Smith's crimes. *See also United States* v. *Piggie*, 303 F.3d 923, 928 (8th Cir. 2002) (applying the MVRA in a case of honest services fraud); *United States* v. *Paquette*, 201 F.3d 40, 44 (1st Cir. 2000) (same); *United States* v. *Gee*, 432 F.3d 713, 714 (7th Cir. 2005) (applying the MVRA for a violation of 18 U.S.C. § 666). The MVRA makes the

Honorable Kenneth M. Karas
June 26, 2015
Page 11 of 12

award of restitution mandatory.[2]  The MVRA requires that the Court's "order of restitution *shall require that such defendant –* in any case, *reimburse the victim for* lost income and *necessary* child care, transportation, and *other expenses incurred during the participation in the investigation or prosecution of the offense or attendance at proceedings related to the offense*." 18 U.S.C. § 3663A(b)(4) (emphasis added).[3]

The MVRA defines "victim" to mean one "directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered."  18 U.S.C. § 3663A(a)(2).  The State of New York qualifies as a victim in this case because it was "directly and proximately harmed" by Smith's offense conduct.

### 2. The Amount of Restitution Owed to the State of New York

Smith was convicted of engaging in a bribery scheme spanning from 2012 through 2013, thus defrauding the State of New York and Smith's constituents of their right to the honest services of its employee.  As a principal, the State of New York paid a salary to the defendant Smith, an employee and a fiduciary, on the condition that he conducted his work with the primary view of serving the best interests of the State and its citizens.  Instead, the defendant reneged on his end of this employment agreement by engaging in a bribery scheme involving other state politicians and political leaders to benefit himself.

A very large percentage of the harm the State suffered as a result of the defendant's fraudulent scheme is difficult to quantify in pecuniary terms.  For example, there is no way to put a price tag on the reputational harm and the loss of confidence in its governing officials the State has suffered as a result of Smith's corruption being exposed.  It is possible, however, to quantify how much money the State of New York paid Smith when Smith was not fulfilling his end of his employment agreement: Smith's annual salary was $79,500.

While accepting his annual salary from the State of New York, Smith represented to his constituents that he was acting in their best interests.  The proof at trial demonstrated that Smith actually put his own interests and those of people he perceived to be deep-pocketed benefactors ahead of his constituents.  There is no mathematical formula for determining how much "honest service" and how much "dishonest service" Smith's constituents received during the time of this year-long offense.  *See United States* v. *Bahel*, 662 F.3d 610, 650 (2d Cir. 2011). Nevertheless, restitution is warranted under the circumstances. *See* 18 U.S.C. § 3663A(b)(1)(B)(i)(I) (requiring the restitution order to include the value of the property on the date of loss); *Bahel*, 662 F.3d at 649 (salary of corrupt UN official convicted of honest services fraud in bribe case properly subject to order of restitution); *City of New York* v. *Bower*, 1991 WL 19810 (S.D.N.Y. Feb. 1. 1991) (LMM) ("Bower received salary payments from the City in exchange for work which he failed to perform.  His conviction for violations of the Hobbs Act establishes that he was a faithless employee and that his employer, the City, is entitled to recover the salary paid to him."). Accordingly, as in *Bahel*, this Court is authorized to exercise its discretion to award the State of

---

[2]  A second statute, the Victim and Witness Protection Act (the "VWPA"), makes restitution discretionary.  *See* 18 U.S.C. § 3663(b)(4).

[3]  The same language is found in the discretionary restitution statute, the VWPA.  *See* 18 U.S.C. § 3663(b)(4).

Honorable Kenneth M. Karas
June 26, 2015
Page 12 of 12

New York restitution of a percentage of Smith's salary that reflects the extent of dishonest services provided. The Government respectfully submits that restitution be set at 50% of his annual salary: $39,750.

## CONCLUSION

For the foregoing reasons, the Government respectfully submits that the Court should sentence Smith within the Guidelines range of 97 to 121 months' imprisonment and Tabone within the Guidelines range of 78 to 97 months' imprisonment.

        Respectfully submitted,

        PREET BHARARA
        United States Attorney

By: _____
        Douglas B. Bloom
        Justin Anderson
        Perry A. Carbone
        Assistant United States Attorneys

cc:    All counsel (by ECF)